No. 22-10145

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

BRAIDWOOD MANAGEMENT, INCORPORATED, on behalf of themselves and others similarly situated; BEAR CREEK BIBLE CHURCH,

Plaintiffs-Appellants/Cross-Appellees,

v.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; CHARLOTTE A. BURROWS; UNITED STATES OF AMERICA; JANET DHILLON; JOCELYN SAMUELS; ANDREA R. LUCAS; KEITH E. SONDERLING, in their official capacities as chair, vice chair, and commissioners of the Equal Employment Opportunity Commission; MERRICK GARLAND, U.S. Attorney General,

Defendants-Appellees/Cross-Appellants

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division,
No. 4:18-cv-0824 (Hon. Reed O'Connor)

## BRIEF FOR APPELLEES/CROSS-APPELLANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

CHAD E. MEACHAM
  *Acting United States Attorney*

MARLEIGH D. DOVER
CHARLES SCARBOROUGH
JACK STARCHER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7515*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

# CERTIFICATE OF INTERESTED PERSONS

*Braidwood Management v. EEOC*, No. 22-10145 (5th Cir.)

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Plaintiffs-Appellants/Cross-Appellees

- o Braidwood Management, Incorporated
- o Bear Creek Bible Church
- o A class of unnamed persons consisting of "all for-profit businesses that "oppose[] homosexual or transgender behavior for sincere religious reasons," ROA.1727, and for whom religion "plays an important role, but is not the sole mission" of their business, ROA.1871.
- o A class of unnamed persons consisting of "every employer in the United States that opposes homosexual or transgender behavior for religious or nonreligious reasons." ROA.1727.

Defendants-Appellees/Cross-Appellants

- o The United States of America
- o Equal Employment Opportunity Commission
- o Charlotte A. Burrows, Janet Dhillon, Jocelyn Samuels, Andrea R. Lucas, and Keith E. Sonderling in their official capacities as chair, vice chair, and commissioners of the Equal Employment Opportunity Commission
- o Merrick Garland in his official capacity as US Attorney General

Amicus in Support of Plaintiffs in District Court

- o   Becket Fund for Religious Liberty

Counsel

For Plaintiffs-Appellants/Cross-Appellees

- o   Jonathan F. Mitchell
- o   Charles W. Fillmore
- o   H. Dustin Fillmore, III
- o   *The Fillmore Law Firm LLP*
- o   Gene Patrick Hamilton
- o   *America First Legal Foundation*

For Defendants-Appellees/Cross-Appellants

- o   Marleigh D. Dover
- o   Charles Scarborough
- o   Jack Starcher
- o   Benjamin Thomas Takemoto
- o   Brian Walters Stoltz
- o   Eric J. Soskin
- o   Michael Fraser Knapp
- o   *United States Department of Justice*

For Amici Becket Fund for Religious Liberty

- o   Luke Goodrich
- o   Joseph C. Davis

/s/ *Jack Starcher*
Jack Starcher
*Counsel for Defendants-*
*Appellees/Cross-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

The district court held that plaintiffs' pre-enforcement challenges to hypothetical government enforcement actions were ripe for judicial review, and that plaintiffs had established cognizable Article III injuries despite no history of enforcement against plaintiffs and only a single enforcement action against a similarly situated employer. After certifying two nationwide classes, the district court also ruled in plaintiffs' favor on various fact-intensive religious liberty claims, despite the absence of any specific factual development. Finally, the district court purported to resolve—categorically and in the abstract—whether certain broadly defined categories of employer conduct violate Title VII's prohibition against sex discrimination, as interpreted by the Supreme Court in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). Combined, those rulings fundamentally disregard bedrock Article III requirements. The resulting decision amounts to a nationwide advisory opinion on the scope of Title VII and its interaction with RFRA and the First Amendment. The government therefore believes that oral argument would aid in the consideration of this appeal.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION ........................................................ 2

STATEMENT OF THE ISSUES .............................................................. 3

STATEMENT OF THE CASE ................................................................. 3

STATEMENT OF THE CASE ................................................................. 3

    A.   Statutory Background .............................................................. 3

    B.   Plaintiffs' Complaint ................................................................ 6

    C.   Proceedings Below .................................................................. 8

SUMMARY OF ARGUMENT ............................................................... 14

STANDARD OF REVIEW ..................................................................... 19

ARGUMENT ........................................................................................ 19

I.   The District Court Lacked Jurisdiction To Adjudicate
    Plaintiffs' Claims. ............................................................................ 19

    A.   Plaintiffs' claims are not ripe. .............................................. 19

    B.   Plaintiffs lack standing. ......................................................... 34

II.  The District Court Erred in Granting Summary Judgment on
    Plaintiffs' RFRA and First Amendment Claims. ........................... 37

    A.   Plaintiffs are not entitled to summary judgment on their
        class-wide RFRA and Free Exercise claims. ........................ 37

1.     *Substantial Burden.* ..................................................... 40

2.     *Compelling Interest and Least Restrictive Means.* ...... 43

B.     Plaintiffs are not entitled to summary judgment on their
Free Association claim. .......................................................... 46

III.     The District Court Erred in Granting Summary Judgment on
Plaintiffs' Title VII Claims ................................................. 50

A.     Plaintiffs failed to identify any cause of action that
would entitle them to declaratory relief on the meaning
of Title VII. ........................................................................... 50

B.     Plaintiffs' scope-of-Title-VII claims fail on the merits. ........ 52

IV.     The District Court Separately Erred in Certifying Two
Nationwide Classes. ......................................................... 60

1.     *Commonality.* ................................................................. 62

2.     *Rule 23(b)(2).* ................................................................. 65

CONCLUSION ....................................................................... 67

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) .............................................................. 20

*Allison v. Citgo Petroleum Corp.,*
151 F.3d 402 (5th Cir. 1998) ................................................ 19

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020) ........................... 1, 5, 6, 25, 26, 53, 54, 56, 57, 59

*Boy Scouts of Am. v. Dale,*
530 U.S. 640 (2000) ................................................ 13, 25, 26, 47, 49, 50

*Brown v. Collier,*
929 F.3d 218 (5th Cir. 2019) .................................................... 22, 39, 41

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ................................................ 2, 12, 25-26, 44

*Calderon v. Ashmus,*
523 U.S. 740 (1998) .............................................................. 34

*California v. Texas,*
141 S. Ct. 2104 (2021) ................................................ 34, 52

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) .............................................................. 61

*City of Boerne v. Flores,*
521 U.S. 507 (1997) .............................................................. 23

*Dodds v. U.S. Dep't of Educ.,*
845 F.3d 217 (6th Cir. 2016) ................................................ 55

*Doe v. Tangipahoa Parish Sch. Bd.*,
494 F.3d 494 (5th Cir. 2007) ............................................................34-35

*East Tex. Baptist Univ. v. Burwell*,
793 F.3d 449 (5th Cir. *2015), vacated and remanded sub nom.*
*Zubik v. Burwell*, 578 U.S. 403 *(2016), cert. granted, judgment*
*vacated sub nom. University of Dall. v. Burwell*,
136 S. Ct. 2008 (2016) ...........................................................................42

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
884 F.3d 560 (6th Cir. 2018), *aff'd sub nom.*
*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) .........9, 23-24, 24, 31

*Flecha v. Medicredit, Inc.*,
946 F.3d 762 (5th Cir. 2020) ................................................................63

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021) ............................................................12, 39, 45

*General Tel. Co. of the Nw., Inc. v. EEOC*,
446 U.S. 318 (1980) ..................................................................................4

*Gibson v. Missouri Pac. R.R.*,
579 F.2d 890 (5th Cir. 1978) ................................................................51

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
546 U.S. 418 (2006) ..................................................................22, 45, 65

*Grimm v. Gloucester County Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020), *cert. denied,*
141 S. Ct. 2878 (2021) ...........................................................................55

*Harris County Texas v. MERSCORP Inc.*,
791 F.3d 545 (5th Cir. 2015) .........................................................51, 52

*Hishon v. King & Spalding*,
467 U.S. 69 (1984) ..................................................................................50

*International Tape Mfrs. Ass'n v. Gerstein,*
   494 F.2d 25 (5th Cir. 1974) .................................................. 29

*Lopez v. City of Houston,*
   617 F.3d 336 (5th Cir. 2010) ............................................... 20

*Louisiana Crawfish Producers, In re,*
   852 F.3d 456 (5th Cir. 2017) ............................................... 19

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ............................................................ 35

*Mach Mining, LLC v. EEOC,*
   575 U.S. 480 (2015) .............................................................. 5

*Maldonado v. Ochsner Clinic Found.,*
   493 F.3d 521 (5th Cir. 2007) ............................................... 67

*M.D. ex rel. Stukenberg v. Perry,*
   675 F.3d 832 (5th Cir. 2012) ............................................... 63

*MedImmune, Inc. v. Genentech, Inc.,*
   549 U.S. 118 (2007) ............................................................ 35

*Merced v. Kasson,*
   577 F.3d 578 (5th Cir. 2009) ............................................... 65

*Monegain v. Virginia Dep't of Motor Vehicles,*
   491 F. Supp. 3d 117 (E.D. Va. 2020) .................................. 55

*Monk v. Huston,*
   340 F.3d 279 (5th Cir. 2003) ............................................... 20

*National Park Hosp. Ass'n v. Department of Interior,*
   538 U.S. 803 (2003) ................................................ 15, 21, 28

*Newsome v. EEOC,*
   301 F.3d 227 (5th Cir. 2002) ............................................... 37

*Occidental Life Ins. Co. of Cal. v. EEOC,*
  432 U.S. 355 (1977) ................................................................ 5

*Ohio Forestry Ass'n v. Sierra Club,*
  523 U.S. 726 (1998) .............................................................. 33

*Okpalobi v. Foster,*
  244 F.3d 405 (5th Cir. 2001) ................................................ 52

*Oncale v. Sundowner Offshore Servs., Inc.,*
  523 U.S. 75 (1998) ................................................................ 58

*Pennzoil Co. v. FERC,*
  645 F.2d 394 (5th Cir. 1981) ................................................ 21

*Price Waterhouse v. Hopkins,*
  490 U.S. 228 (1989) .................................................... 44-45, 57

*Raines v. Byrd,*
  521 U.S. 811 (1997) .............................................................. 35

*Reyes v. North Tex. Tollway Auth.,*
  861 F.3d 558 (5th Cir. 2017) ................................................ 52

*Roberts v. United States Jaycees,*
  468 U.S. 609 (1984) .............................................................. 47

*Sample v. Morrison,*
  406 F.3d 310 (5th Cir. 2005) ................................................ 20

*Severance v. Patterson,*
  566 F.3d 490 (5th Cir. 2009) ................................................ 21

*Skelly Oil Co. v. Phillips Petroleum Co.,*
  339 U.S. 667 (1950) .............................................................. 52

*Smith v. City of Salem,*
  378 F.3d 566 (6th Cir. 2004) ................................................ 57

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ........................................................... 14, 16, 30, 36

*Tagore v. United States,*
  735 F.3d 324 (5th Cir. 2013) ............................................................. 45

*Texas v. United States,*
  497 F.3d 491 (5th Cir. 2007) ............................................................. 14

*Texas v. United States,*
  523 U.S. 296 (1998) ........................................................... 14, 21, 27, 28

*Thomas v. Union Carbide Agric. Prods. Co.,*
  473 U.S. 568 (1985) ............................................................... 20, 21, 32

*Threat v. City of Cleveland,*
  6 F.4th 672 (6th Cir. 2021) ............................................................... 58

*Tucker v. Collier,*
  906 F.3d 295 (5th Cir. 2018) ............................................................. 40

*20/20 Communications, Inc. v. Crawford,*
  930 F.3d 715 (5th Cir. 2019) ............................................................. 68

*United States v. Friday,*
  525 F.3d 938 (10th Cir. 2008) ........................................................... 37

*U.S. Navy Seals 1-26 v. Biden,*
  27 F.4th 336 (5th Cir. 2022), *preliminary injunction partially
  stayed,* 142 S. Ct. 1301 (2022) .................................................... 22, 39

*Venator Grp. Specialty, Inc. v. Matthew/Muniot Family, LLC,*
  322 F.3d 835 (5th Cir. 2003) ............................................................. 19

*Walmart Inc. v. U.S. Dep't of Justice,*
  21 F.4th 300 (5th Cir. 2021) .............................................................. 27

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ........................................................... 61, 63, 66, 67

*Washington v. CSC Credit Servs.,*
    199 F.3d 263 (5th Cir. 2000) ................................................ 19

*Webster v. Reproductive Health Servs.,*
    492 U.S. 490 (1989) .............................................................. 32

*Whitaker ex. rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1*
    *Bd. of Educ.,*
    858 F.3d 1034 (7th Cir. 2017) ............................................. 55

**U.S. Constitution:**

Art. III, § 2 ................................................................................ 19

**Statutes:**
28 U.S.C. § 1291 ........................................................................ 3

28 U.S.C. § 1331 ........................................................................ 2

28 U.S.C. § 1361 ........................................................................ 2

42 U.S.C. § 2000e-2(a) ............................................................. 18, 44

42 U.S.C. § 2000e-2(a)(1) ......................................................... 4, 56

42 U.S.C. § 2000e-2(a)(2) ......................................................... 4

42 U.S.C. § 2000e-5 ................................................................... 4-5

42 U.S.C. § 2000e-5(f)(1) .......................................................... 4, 5, 27

42 U.S.C. § 2000bb-1(a) ........................................................... 40

42 U.S.C. § 2000bb-1(b) ............................................................38

**Rules:**

Fed. R. Civ. P. 23(a) ...............................................................61

Fed. R. Civ. P. 23(b)(2) .....................................................61, 67

**Other Authorities:**

EEOC:
    EEOC Compliance Manual on Religious Discrimination
        § 12-I(C)(3) (Jan. 15, 2021), https://www.eeoc.gov/laws/
        guidance/section-12-religious-discrimination...................................31

    *EEOC Litigation Statistics, FY1997 through FY2020*,
        https://www.eeoc.gov/statistics/eeoc-litigation-statistics-
        fy-1997-through-fy-2020 (last visited May 31, 2022).........................5

    *LGBTQ+-Based Sex Discrimination Charges*,
        https://www.eeoc.gov/statistics/lgbtq-based-sex-
        discrimination-charges ...............................................................36-37

    *Title VII of the Civil Rights Act of 1964 Charges*,
        https://www.eeoc.gov/statistics/title-vii-civil-rights-act-1964-
        charges-charges-filed-eeoc-includes-concurrent-charges.................36

## INTRODUCTION

In *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the Supreme Court held that discrimination on the basis of sexual orientation or gender identity is necessarily discrimination "because of sex" under Title VII.  In so holding, the Court recognized that religious freedoms "might supersede Title VII's commands in appropriate cases" but left those potentially difficult questions about the intersection between Title VII and religious freedoms to be resolved in future cases.  *Id.* at 1754.

Plaintiffs here sought to prevent courts from ever engaging in the case-specific consideration of competing interests contemplated by *Bostock*, and the district court gave them what they wanted.  The district court issued a nationwide advisory opinion on the scope of Title VII and its interaction with the Religious Freedom Restoration Act of 1993 (RFRA) and the First Amendment.  And it purported to definitively resolve those questions in favor of (and, as to some issues, against) nationwide classes of all affected employers in all future cases without any consideration of individualized facts or circumstances.  That is not what the Supreme Court contemplated in *Bostock*, and it is not what Congress contemplated in RFRA, which requires case-by-case analysis of

the "application of the challenged law" to a "particular claimant," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014) (citation omitted). But even more fundamentally, the district court's approach is incompatible with bedrock Article III limitations prohibiting federal courts from rendering advisory opinions based on hypothetical facts. Because the district court's decision violates basic jurisdictional principles of ripeness and standing, and because it cannot be squared with this Court's precedents requiring individualized assessments of religious liberty and Title VII claims, that decision should be reversed.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court pursuant to 28 U.S.C. §§ 1331 and 1361. The district court's subject-matter jurisdiction is contested. *See infra* Part I. The district court entered its order granting in part and denying in part the parties' motions for summary judgment on October 31, 2021. ROA.1619-1688. The district court issued an amended opinion and order on November 22, 2021, correcting an error in its initial decision. ROA.1702-1771. On January 12, 2022, the district court largely denied plaintiffs' motion to alter or amend its final judgment. ROA.1867-1873. Plaintiffs filed a notice of

2

appeal on February 9, 2022.  ROA.1874-1876.  The government filed a notice of appeal on March 11, 2022.  ROA.1885-1886.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in concluding that it had subject-matter jurisdiction over plaintiffs' claims.

2.     Whether the district court erred in granting summary judgment to all "Religious Business-Type Employers" on their RFRA and First Amendment claims.

3.     Whether the district court erred in holding that certain broadly defined employment practices can never violate Title VII as a matter of law.

4.     Whether the district court erred in certifying two nationwide classes, one consisting of all "religious business-type employers" and one consisting of all employers who oppose "homosexual or transgender behavior" for religious or nonreligious reasons.

## STATEMENT OF THE CASE

### A.    Statutory Background

Title VII of the Civil Rights Act of 1964 forbids employers from "discriminat[ing]    against    any    individual    with    respect    to    his

3

compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). Title VII also forbids an employer from "limit[ing], segregat[ing], or classify[ing] ... employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex." *Id.* § 2000e-2(a)(2). With respect to private employers, those prohibitions may be enforced by EEOC (which is authorized to bring civil enforcement actions against employers suspected of violating Title VII) or by aggrieved employees (who may intervene or bring their own private enforcement actions if EEOC declines to do so). *See id.* § 2000e-5(f)(1); *General Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 325-326 (1980).

EEOC administers and enforces Title VII in many ways, including by (1) investigating charges of discrimination filed with EEOC; (2) issuing determination letters indicating whether EEOC has found reasonable cause to believe an employer has violated the statute; (3) attempting voluntary conciliation with the employer, if EEOC found reasonable cause to believe the employer has violated Title VII; and (4) sometimes filing enforcement actions in district court. *See* 42 U.S.C.

4

§ 2000e-5; *id.* § 2000e-5(f)(1) (if the employer declines to resolve the matter informally, EEOC "may" file an enforcement action); *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 483 (2015) (describing "detailed, multi-step procedure through which the Commission enforces the statute's prohibition on employment discrimination"). EEOC has no authority to impose penalties on employers itself. *See Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 363 (1977). And EEOC has limited resources, so in practice the overwhelming majority of Title VII suits are brought by aggrieved individuals. *See EEOC Litigation Statistics, FY1997 through FY2020*, https://www.eeoc.gov/statistics/eeoc-litigation-statistics-fy-1997-through-fy-2020 (last visited May 31, 2022).

In *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the Supreme Court held that discrimination on the basis of "homosexuality or transgender status" is necessarily discrimination "because of sex" under Title VII. The Supreme Court reasoned that "[a]n employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex." *Id.* at 1737. Because "[s]ex plays a necessary and undisguisable role in the decision," the Court held that such discrimination is prohibited

5

by the plain text of Title VII. *Id.* The Court recognized that religious freedoms "might supersede Title VII's commands in appropriate cases," but stated that "while other employers in other cases may raise free exercise arguments that merit careful consideration, none of the employers before" the Court raised those arguments. *Id.* at 1754.

## B.    Plaintiffs' Complaint

Plaintiffs are Bear Creek, a nondenominational church, and Braidwood Management Inc., a for-profit management company controlled and operated by Steven Hotze. ROA.1205 (plaintiffs' Fourth Amended Complaint). Braidwood oversees the operation of several for-profit wellness businesses, which are also operated and controlled by Hotze. While Braidwood operates businesses of a secular, for-profit nature, Hotze is "Christian, and he ... operates his businesses according to Christian and Biblical principles." ROA.1212.

Plaintiffs assert religious objections to hiring anyone who engages in "sexually immoral behavior, including homosexuality" or "gender non-conforming behavior." ROA.1705-1706 (quoting ROA.1385) (amended opinion and order). The operative complaint lists several examples of plaintiffs' workplace policies, such as "[n]o employee, male or female, may

enter a gay bar or gay bathhouse," "use Grindr," or "seek or obtain hormone therapy unless it is prescribed for a medical condition other than gender dysphoria." ROA.1219-1220. Plaintiffs sued EEOC alleging that, after *Bostock*, they cannot comply with Title VII without violating their religious beliefs. *See* ROA.1221-1223. Even though plaintiffs are not aware of any imminent or past employment action of theirs that could violate Title VII, they allege that they are currently exposed to the threat of future penalties and enforcement suits if they maintain their policies. ROA.1221-1223. Plaintiffs also sought certification of two classes under Rule 23(b)(2): (1) all employers opposing "homosexual or transgender behavior" based on sincere religious beliefs and (2) all employers opposing the same for religious or non-religious reasons. ROA.1223.

Plaintiffs asked for declaratory judgments that RFRA, the Free Exercise Clause, and the First Amendment's right of free association each "protects the class members' prerogatives" to refuse to employ individuals who are gay or transgender if they engage in certain gay or gender non-conforming "behavior." ROA.1216, 1217. Plaintiffs also sought declaratory judgments stating that Title VII allows all "employers to discriminate against bisexuals, so long as the employer regards

bisexual behavior or orientation as equally unacceptable in a man or a woman," ROA.1218-1219, and that "Title VII allows employers to refuse to employ individuals who engage in homosexual or transgender behavior, so long as they do so according to rules of conduct that apply equally to both sexes and would lead to the same result if the employee's biological sex were different," ROA.1220-1221.

## C.    Proceedings Below

After the district court largely denied EEOC's initial motion to dismiss for lack of subject-matter jurisdiction based on ripeness, the case proceeded to the summary judgment stage. *See* ROA.756-773. Plaintiffs filed motions for summary judgment and for class certification. EEOC filed its own motion for summary judgment based on standing, ripeness, sovereign immunity, and the merits. The district court certified two classes and granted summary judgment in large part to Braidwood and the classes while denying summary judgment in large part to EEOC. *See* ROA.1702-1703.

1.    The district court first rejected EEOC's threshold jurisdictional arguments. The court held that plaintiffs had established a "credible fear" of enforcement sufficient to establish Article III

standing. *See* ROA.1718-1722. In support of this conclusion, the district court relied on EEOC's enforcement action in *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018), *aff'd sub nom. Bostock*, 140 S. Ct. 1731, EEOC guidance documents indicating that EEOC understands discrimination against LGBTQ people to violate Title VII, and plaintiffs' avowal not to employ LGBTQ individuals. *See* ROA.1719-1720.

Next, the court held that plaintiffs' claims are ripe because it believed that their complaint "presents several issues that are 'purely legal, and will not be clarified by further factual development.'" ROA.1724. In addition, the court concluded that withholding review of plaintiffs' claims would force plaintiffs to choose between violating Title VII or violating their religious beliefs. ROA.1724.

The district court did not address EEOC's final argument for dismissal: that Plaintiffs failed to identify a cause of action for their claims seeking declaratory relief regarding the scope of Title VII's prohibition under *Bostock*. *See* ROA.1450-1451.

2. The district court next turned to plaintiffs' motion for class certification. The court split plaintiffs' proposed religious employers

9

class (all United States employers with religious objections to "homosexual or transgender behavior") into two sub-classes: (1) Religious Business-Type Employers (like Braidwood), which "are for-profit entities producing a secular product," and (2) Church-Type Employers (like Bear Creek), which are employers operating as religious nonprofits with explicitly religious purposes. ROA.1728-1729. The court left intact plaintiffs' proposed All Opposing Employers Class, consisting of every employer in the United States with a religious or non-religious reason for "oppos[ing] homosexual or transgender behavior." ROA.1727.

As to the Church-Type Employers subclass (which included plaintiff Bear Creek), the court refused to certify the class because it concluded that such employers fall within Title VII's exemption for religious organizations and therefore have no need for relief from the court.[1] ROA.1728-1729. The court certified the remaining two classes, holding that all of Rule 23's requirements were satisfied. *See* ROA.1729-1742.

---

[1]     Because the court concluded that Bear Creek was exempt from Title VII under the religious organization exemption, the court granted summary judgment in EEOC's favor as to all of Bear Creek's claims. *See* ROA.1743-1744.

3.    The district court next turned to Braidwood and the Religious Business-Type Employers' RFRA and First Amendment claims.    The court first granted summary judgment to the Religious Business-Type Employers Class on the RFRA claim. ROA.1745-1748.  The court rejected EEOC's argument that the question whether Title VII imposes a "substantial burden" on any particular employer's exercise of religion is too fact-specific to decide class-wide within the context of a declaratory judgment action.   The court instead held that Title VII substantially burdens all class members' ability to conduct their businesses in accordance with their sincerely held religious beliefs because they have to choose between complying with Title VII or violating their religious convictions and facing possible EEOC enforcement.   ROA.1746-1747. The court then concluded, again on a class-wide basis, that EEOC failed to establish a compelling interest in denying a religious exemption to the class members.  In the alternative, the district court held that EEOC had not shown that EEOC had selected the least restrictive means to further any such interest because Title VII includes "exceptions" for "secular purposes," such as by exempting employers who employ fewer than fifteen employees.  ROA.1748.

The court also granted summary judgment on the class's First Amendment claims. As to Free Exercise, the court concluded that Title VII is not a generally applicable statute because of its "individualized exemptions," triggering strict scrutiny. ROA.1749-1751. Title VII, the court said, "places a substantial burden on the Religious Business-Type Employers." ROA.1751. Relying on *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), and *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014), the court ruled that the government's interest in preventing discrimination was not compelling, given Title VII's "system of exceptions." ROA.1751. And as with its RFRA analysis, the court reasoned that even if there were a compelling interest, Title VII is not narrowly tailored because it includes secular exceptions. ROA.1751-1752.

The district court also ruled in favor of the Religious Business-Type Employers class on the Free Association claim. The court held that for-profit businesses could pursue Free Association claims and that members of the Religious Business-Type Employers class could therefore assert a right not to associate with those engaged in "homosexuality and transgender conduct." ROA.1754-1755 (implicitly finding that Title VII

substantially burdens this right). Relying on *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), the court held that EEOC failed to show a compelling interest outweighing the associational rights of the Religious Business-Type Employers. ROA.1755-1756.

4. Finally, the district court considered plaintiffs' request for a declaration that Title VII does not prohibit certain supposedly "sex-neutral" employment practices. The court granted summary judgment in EEOC's favor on several of plaintiffs' claims—holding that Title VII forbids policies that "prohibit[] only bisexual conduct" or that prohibit genital surgery and hormone treatment for gender dysphoria. ROA.1766. Those adverse holdings bind every employer in the certified class because the district court provided no opportunity to opt-out of the class under Rule 23(b)(2).

The court granted summary judgment in plaintiffs' favor on the remainder of the practices identified in plaintiffs' complaint. The court held that policies regulating the sexual conduct of employees that apply equally to both sexes—such as policies against sodomy, premarital sex, and adultery—do not violate Title VII. ROA.1767. The court also ruled that sex-specific dress codes and restrooms are always permissible under

Title VII, even when deployed to prohibit transgender employees from dressing or using the restroom in accordance with their gender identity, because those policies do not treat one sex worse than another. ROA.1770-1771. Again, those abstract holdings apply to the entire class, without regard to class members' particular circumstances or whether and how they might implement policies of the sort contemplated by the court's order.

## SUMMARY OF ARGUMENT

I.    Article III of the Constitution limits the power of the federal courts to the resolution of "Cases" and "Controversies." In order to effectuate that Constitutional mandate, the Supreme Court has developed the doctrines of standing and ripeness. These doctrines "often overlap in practice," *Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007), because they "originate from the same Article III limitation." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014). The district court here disregarded those fundamental limitations on judicial authority.

A.    As to ripeness, plaintiffs' claims all rest "upon contingent future events that may not occur ... at all." *Texas v. United States*, 523

14

U.S. 296, 300 (1998) (quotation omitted). Plaintiffs identify no particular employment action—past or future—that could subject them to Title VII liability. And each of plaintiffs' claims require individualized, fact-intensive analysis that simply cannot occur in the abstract. Even assuming plaintiffs' claims raise some purely legal issues, "further factual development" would "significantly advance [this Court's] ability to deal with the legal issues presented," and "judicial resolution of the question[s] presented here should" therefore "await a concrete dispute about a particular" application of Title VII. *National Park Hosp. Ass'n v. Department of Interior*, 538 U.S. 803, 812 (2003) (quotation omitted).

Nor have plaintiffs demonstrated that they will suffer any meaningful hardship while waiting for this dispute to crystalize into a justiciable controversy. Plaintiffs have "made it clear that they have no intention" to alter or discontinue the relevant employment policies. ROA.1721. And plaintiffs have not established that they are likely to face any EEOC enforcement action in the future, such that they will suffer some ongoing injury due to a reasonable fear of future enforcement.

B. For many of the same reasons, plaintiffs also have failed to demonstrate that they have suffered a cognizable Article III injury for

15

standing purposes. A plaintiff can demonstrate a cognizable injury in a pre-enforcement challenge like this one only if it establishes both (1) that it has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and (2) that there "exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159 (quotation omitted). Plaintiffs have not established that they face any imminent, credible threat of prosecution under Title VII. EEOC has never brought a Title VII action against a religious entity like Bear Creek for LGBTQ discrimination, and has only once brought such an action against a business raising religious objections like Braidwood. That EEOC has not enforced Title VII against entities like plaintiffs is not just happenstance: EEOC counsels its investigators to carefully consider employers' First Amendment and RFRA rights when considering whether to bring enforcement actions.

EEOC's enforcement discretion, the agency's past acknowledgments of RFRA and First Amendment rights, and the dearth of EEOC actions against employers raising religious defenses all indicate that EEOC carefully balances Title VII and religious liberty concerns, making it highly unlikely that plaintiffs will ever face any EEOC

enforcement action related to the employment practices at issue here. And because plaintiffs have not established that they currently face a credible threat of enforcement, they do not have standing to bring a pre-enforcement challenge seeking broad declaratory relief about hypothetical religious defenses and the general scope of Title VII.

II.    Even if judicial review were available at this time, the district court's decision went far beyond any conceivably ripe dispute between plaintiffs and EEOC.  First, as to Braidwood's claims that religious liberties supersede Title VII's commands in some circumstances, the district court did not limit its analysis even to *Braidwood's* broadly defined and inchoate claims.  Instead, the court vastly expanded the case by adjudicating the hypothetical future religious liberty defenses of *all* Religious Business-Type Employers who oppose "homosexual or transgender behavior" for any religious reasons.  At that level of generality, the very contours of the RFRA and First Amendment analyses unravel.  The result is a decision that conclusorily marches through the elements of plaintiffs' religious and associational claims without any real attempt to justify or tether the court's holdings to any concrete facts. This Court should reverse the district court's attempt to categorically

pre-adjudicate the hypothetical, future First Amendment and RFRA defenses of thousands of disparate employers.

III.    The district court's treatment of plaintiffs' Title VII claims is equally deficient. Again, the district court did not evaluate the applicability of Title VII to any particular policy or employer, much less to an "individual" employee, as required by Title VII, 42 U.S.C. § 2000e-2(a). Instead, it certified a class of all employers who oppose "homosexual or transgender behavior" for any reason, and then held that for all such employers several broad categories of employment practices can *never* violate Title VII as to *any* employee. That holding is irreconcilable with the case-specific approach the Supreme Court endorsed in *Bostock*. The district court's attempt to adjudicate complex, fact-intensive questions about the scope of Title VII class-wide and *en masse* should be rejected.

IV.    Finally, for many of the reasons already discussed, the district court independently erred by certifying two broad, nationwide classes. The claims plaintiffs asked the district court to adjudicate are not capable of class-wide resolution and thus the court was wrong to conclude that the classes satisfied Rule 23(a)'s commonality requirement and the additional requirements of Rule 23(b)(2).

## STANDARD OF REVIEW

A court of appeals reviews de novo the question whether plaintiffs have standing and whether a controversy is ripe for adjudication. *See Venator Grp. Specialty, Inc. v. Matthew/Muniot Family, LLC*, 322 F.3d 835, 838 (5th Cir. 2003). The Court reviews grants of summary judgment de novo. *In re Louisiana Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017). A district court's decision to certify a class is reviewed for abuse of discretion. *See Washington v. CSC Credit Servs.*, 199 F.3d 263, 265 (5th Cir. 2000). But "[w]hether the district court applied the correct legal standard in reaching its decision on class certification[] … is a legal question that [the court of appeals] review[s] *de novo*." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998).

## ARGUMENT

## I.    The District Court Lacked Jurisdiction To Adjudicate Plaintiffs' Claims.

### A.    Plaintiffs' claims are not ripe.

Article III of the United States Constitution limits federal courts' jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. Ripeness is an "essential component[]" of "Article III's case-or-controversy requirement" because a court has no power to decide disputes

that are not yet justiciable. *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005) (per curiam). The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-149 (1967).

In order to assess whether a particular claim is ripe for judicial review, this Court considers both "(1) the fitness of the issues for judicial resolution, and (2) the potential hardship to the parties caused by declining court consideration." *Lopez v. City of Houston*, 617 F.3d 336, 341 (5th Cir. 2010). "A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical." *Monk v. Huston,* 340 F.3d 279, 282 (5th Cir. 2003) (quotation omitted). If a claim is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," the claim is not ripe for adjudication. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-581 (1985) (quotation omitted). Even when "the question presented" is "purely legal," it is unfit for adjudication

where a concrete factual context would facilitate a court's "ability to deal with the legal issues presented." *National Park Hosp. Ass'n*, 538 U.S. at 812; *see also Pennzoil Co. v. FERC*, 645 F.2d 394, 398 (5th Cir. 1981) (legal issue not ripe where judicial review "would stand on a much surer footing in the context of an application to a specific factual framework").

The question whether a particular claim "rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all'" is necessarily claim-specific. *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas*, 473 U.S. at 580-581). Thus, this Court separately assesses the ripeness of each claim to determine whether it is justiciable. *See, e.g.*, *Severance v. Patterson*, 566 F.3d 490, 496-501 (5th Cir. 2009) (finding some claims ripe but not others). None of plaintiffs' claims are ripe at this stage and the district court erred by failing to dismiss on that basis.

1.     Each of plaintiffs' claims presents issues that are not presently fit for judicial resolution because they require further factual development and are "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all." *Thomas*, 473 U.S. at 580-581 (quotation omitted).

The need for concrete facts grounded in an actual controversy is particularly pronounced with respect to Braidwood and the Religious Business-Type Employers' RFRA and Free Exercise claims. The Supreme Court and this Court have repeatedly made clear that "RFRA, and the strict scrutiny [standard] it adopted [from First Amendment jurisprudence]," requires "a case-by-case, fact-specific inquiry." *Brown v. Collier*, 929 F.3d 218, 230 (5th Cir. 2019), *as revised* (July 5, 2019) (quotation omitted); *see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430 (2006) (RFRA requires an inquiry "more focused than [a] categorical approach"). That is true at every stage of the RFRA analysis. *See Brown*, 929 F.3d at 230 (substantial burden analysis is fact-specific); *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 350 (5th Cir. 2022) (per curiam), *preliminary injunction partially stayed*, 142 S. Ct. 1301 (2022) (compelling interest must be focused on "particular claimant").

At every turn, plaintiffs' RFRA and Free Exercise claims call for factual development that simply has not yet occurred and may never occur. That is especially clear with regard to plaintiffs' request for class-wide relief on these claims (the only relief the district court addressed in

its decision). *See infra* Part II.  But even as to Braidwood, whether any particular application of Title VII will run afoul of RFRA or the Free Exercise Clause will depend on the precise employment practices applied to particular individual employees at issue in a given case.  Plaintiffs say they oppose employing people who engage in certain gay or gender non-conforming "behavior." *See* ROA.1702; ROA.1216-1218.  But until those policies and preferences crystalize into particular employment decisions that violate Title VII, there is no way of assessing whether enforcing Title VII *as to that decision* will impose a substantial burden on Braidwood, or whether the government has a compelling interest in enforcing Title VII in that particular context. *See City of Boerne v. Flores*, 521 U.S. 507, 544 (1997) (Scalia, J., concurring in part) (observing that "the abstract proposition that government should not, even in its general, nondiscriminatory laws, place unreasonable burdens upon religious practice[] … must ultimately be reduced to concrete cases").

The Sixth Circuit's decision in *Harris Funeral Homes* underscores the point.  There, the court rejected the employer's RFRA defense only after a fact-intensive analysis that turned on the context of a particular application of Title VII to an actual employment decision. *Equal Emp.*

*Opportunity Comm'n v. R.G. & G.R. Harris Funeral Homes, Inc.,* 884 F.3d 560, 585-595 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton County, Georgia,* 140 S. Ct. 1731 (2020). For example, the Sixth Circuit considered whether "the Funeral Home has identified any way in which continuing to employ [the particular employee] would substantially burden" the owners' "ability to serve mourners." *Id.* at 586. And that, in turn, depended on the precise ways that the Funeral Home claimed that employing the particular employee would burden its religious practice. *See id.* (noting that Funeral Home claimed "allowing a funeral director to wear the uniform for members of the opposite sex would often create distractions for the deceased's loved ones and thereby hinder their healing process (and [the Funeral Home's] ministry)" (quotation omitted)). The Sixth Circuit's analysis of compelling interest and least-restrictive means was similarly fact-specific. *Id.* at 592-594. Here, by contrast, plaintiffs' RFRA and First Amendment claims lack any of that factual development and therefore are not fit for judicial resolution at this time.[2]

---

[2] Nor is this a case like *Hobby Lobby*, which involved a statute and implementing regulations that required specified employers' health

The same is true of plaintiffs' freedom of association claim. Like the rights conferred by RFRA, associational rights are context specific: The "forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of *that person* affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648, (2000) (emphasis added). That inquiry will necessarily be fact-intensive, particularly where (as here) plaintiffs have conceded that they do not oppose employing gay or transgender people so long as those individuals do not engage in certain conduct that plaintiffs oppose. *See* ROA.1702. Even assuming plaintiffs could show that they are engaged in expressive associational conduct, determining whether employing a particular

---

insurance plans to do something specific, *i.e.*, to cover "preventive care and screenings," including a variety of contraceptive methods. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 682 (2014) (quotation omitted). That kind of across-the-board mandate required no further factual development for the courts to evaluate Hobby Lobby's RFRA claim. As the Supreme Court made clear in *Bostock*, however, Title VII operates differently: the plain text of Title VII makes clear that its protections focus on the treatment of "individuals, not groups." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1740 (2020). Thus, unlike the RFRA claim at issue in *Hobby Lobby*, plaintiffs' RFRA claim here requires a fact-intensive, individualized inquiry to determine whether an employment action is even prohibited, let alone whether hypothetical enforcement of the statute in a particular way would impose a substantial burden.

individual engaged in "homosexual or transgender behavior" would "significantly burden" that expression, *Boy Scouts*, 530 U.S. at 653, would necessarily depend on the particular facts and circumstances. As the Supreme Court explained in *Boy Scouts*, plaintiffs cannot leverage their associational rights to create a generalized "shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair [their] message." *Id.* at 653. But that is precisely what plaintiffs attempt to do here.

It is similarly impossible to resolve in the abstract plaintiffs' claims seeking a declaration that broad categories of employment practices are permissible under Title VII. Whether the application of a sex-neutral employment policy or practice violates Title VII is invariably a fact-specific question that will turn on the details of how that practice is being applied. As the Supreme Court has emphasized, *e.g.*, *Bostock*, 140 S. Ct. at 1740, Title VII's text makes clear that it is focused on the treatment of individuals, not groups. Plaintiffs' Title VII claims cannot be reconciled with that admonition because they seek to pre-adjudicate the application of Title VII to a broad range of individuals in the abstract, and without the participation of the individual employees or applicants who are the

focus of Title VII's protections.  And the relief that plaintiffs seek—blanket, generalized preclearance of broadly defined employment practices—will have the perverse effect of preventing the investigation and fact-development necessary to determine whether a particular employment action violates Title VII in the first place.

Finally, even assuming that "it would be theoretically possible to declare as a matter of law whether [plaintiffs] had *any* obligation under [Title VII]" or whether their religious liberties might trump those obligations in some circumstance, those questions would "be easier" to answer with further factual development.  *Walmart Inc. v. U.S. Dep't of Justice*, 21 F.4th 300, 312 (5th Cir. 2021).  The mere existence of Title VII does not entitle plaintiffs to litigate about its meaning or potential interaction with other rights.  Title VII's protections are not self-executing—they require either EEOC or an aggrieved individual to bring an enforcement action related to a particular adverse employment decision or policy of a private employer.  *See* 42 U.S.C. § 2000e-5(f)(1).  Plaintiffs asked the district court to preemptively "hold that under no circumstances" can certain conduct violate Title VII.  *Texas*, 523 U.S. at 301.  But that is exactly the same kind of challenge the Supreme Court

rejected as unripe in *Texas*. There, Texas sought a declaration that § 5 of the Voting Rights Act of 1965 categorically did not apply to certain actions authorized under Texas state law. *See id.* at 297-299. But as Justice Scalia noted in holding that challenge was not ripe, "[t]he operation of the statute is better grasped when viewed in light of a particular application." *Id.* Here too, any hypothetical legal issues raised by plaintiffs' claims are not ripe for judicial review.

In short, for each of plaintiffs' claims, "further factual development" would "significantly advance [this Court's] ability to deal with the legal issues presented," and "judicial resolution of the question[s] presented here should" therefore "await a concrete dispute about a particular" application of Title VII. *National Park Hosp. Ass'n v. Department of Interior*, 538 U.S. 803, 812 (2003) (quotation omitted).

2. The second prong of the ripeness inquiry (the potential hardship to the parties caused by declining court consideration) confirms that plaintiffs' claims are not justiciable at this time. Plaintiffs do not face any imminent threat of Title VII enforcement—they have identified no past employment action that could give rise to liability under Title VII, nor have they demonstrated such an employment action is likely to

take place in the foreseeable future. Because plaintiffs may *never* in fact face an EEOC investigation or lawsuit, the district court's decision is an advisory opinion, deciding legal questions in the abstract without any underlying case or controversy. That is exactly the kind of judicial overreach that the ripeness doctrine is designed to prevent. *See International Tape Mfrs. Ass'n v. Gerstein*, 494 F.2d 25, 28 (5th Cir. 1974) (where claim is not ripe, "court's adjudication [of that claim] would be an advisory opinion treating a hypothetical case"). And if plaintiffs were to face EEOC enforcement at some point in the future, they could raise all of these same issues at that time, which would facilitate a proper judicial ruling against the backdrop of a concrete dispute and developed facts.

Contrary to the district court's conclusion, waiting for plaintiffs' generalized complaints to crystalize into justiciable claims will not impose any hardship. The district court asserted that "denying prompt judicial review would impose a substantial hardship on Plaintiffs, forcing them to choose between violating Title VII on one hand, and violating their religious convictions on the other." ROA.1724. But as the district court acknowledged elsewhere, "[p]laintiffs have made it clear that they have no intention" of altering or discontinuing the relevant employment

policies. ROA.1721. In other words, plaintiffs have made clear that they will not violate their religious convictions in the absence of judicial review at this time. *Cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 155, 168 (2014) (claims were ripe where "the complaint alleged [the plaintiff's] speech ... had been chilled").

Nor have plaintiffs established that they are likely to face any EEOC enforcement action in the future, such that they will suffer some ongoing injury due to a reasonable fear of future enforcement. As discussed in more detail below, *infra* Part I.B, EEOC has long understood Title VII to prohibit discrimination against LGBTQ employees, yet plaintiffs have identified no case in which EEOC has ever enforced that prohibition against a religious entity like Bear Creek. And plaintiffs have identified only one LGBTQ discrimination case (*Harris Funeral Homes*) where EEOC enforced Title VII against a business like Braidwood over the employers' religious objection—and in that case the employer raised its RFRA defense months after EEOC filed its complaint.[3] That is unsurprising, as EEOC carefully considers the

---

[3] The EEOC prevailed on the particular facts presented in *Harris Funeral Homes*, as the Sixth Circuit held that the employer's religious

religious defenses claimed by employers and has established practices in its Compliance Manual to ensure that any First Amendment or RFRA related defense is given full weight. *See* EEOC Compliance Manual on Religious Discrimination § 12-I(C)(3) (Jan. 15, 2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (recognizing "nuanced balancing" required and instructing investigators to "take great care").

EEOC's enforcement discretion, the agency's past acknowledgments of RFRA and First Amendment rights, and the dearth of EEOC actions against employers raising religious defenses all create serious doubt that plaintiffs will ever face any EEOC enforcement action related to these employment practices. Waiting to see if plaintiffs' claims ever ripen into concrete disputes will thus not only avoid unnecessarily adjudicating questions that may never arise but also will impose only negligible, if any, hardship on plaintiffs in the meantime. *See Webster v. Reproductive Health Servs.*, 492 U.S. 490, 506 (1989) ("It will be time enough for federal courts to address the meaning of [the challenged

---

practice was not substantially burdened by Title VII, and that in any event Title VII was the least restrictive way to further the government's compelling interest. 884 F.3d at 585-595.

statute] should it be applied to restrict the activities of appellees in some concrete way.").

3.    The district court failed to grapple with any of these fundamental limitations on the scope of its jurisdiction under Article III. Instead, the court summarily held that all of plaintiffs' claims are ripe because this case "presents several issues that are 'purely legal, and will not be clarified by further factual development.'"   ROA.1724 (quoting *Thomas*, 473 U.S. at 581).   But that misses the point.   Even assuming plaintiffs' claims raise some *issues* that could be considered "purely legal," that does not answer the question whether any of plaintiffs' *claims* can be resolved without further factual development or without speculating about "contingent future events that may not occur as anticipated, or indeed may not occur at all."   *Thomas*, 473 U.S. at 580-581 (quotation omitted).   That is the relevant question for assessing ripeness—were it otherwise, even a totally hypothetical and inchoate case could be rendered ripe simply by identifying some purely legal question relevant to the claim.   *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998) (case not ripe where "further factual development would significantly advance [the Court's] ability to deal

with the legal issues presented and would aid [the Court] in their resolution" (quotations marks omitted)).   And as already discussed at length above, all of plaintiffs' claims are contingent on future events and require additional factual development before they can be resolved. *Supra* pp. 21-28.

Relatedly, although the district court stated that plaintiffs' claims present "several" purely legal issues, it never identified what those legal issues are.   ROA.1724.   The only purely legal questions raised by plaintiffs' claims are ones that bear no relation to the relief that the district court ultimately granted.   For example, the question whether RFRA (and the First Amendment) can trump Title VII's commands in some circumstances may be purely legal.   But answering that question in the affirmative, at that level of generality, does not resolve plaintiffs' claims or entitle to them to any of the relief they sought.   It is just the starting point for a fact-intensive, context-specific inquiry as to whether RFRA precludes the government from using Title VII to compel an employer to take, or refrain from taking, any particular action.   At best, plaintiffs have "carved out" particular legal questions that, if resolved favorably, give them "a litigation advantage" in a future hypothetical

enforcement action. *Calderon v. Ashmus*, 523 U.S. 740, 746-747 (1998). But the judicial power may be invoked only to "resolve" an "entire case or controversy," not to have legal issues "determined in anticipation" of further litigation without resolving the actual claims. *Id.*

## B. Plaintiffs lack standing.

To establish standing, plaintiffs have the burden to demonstrate (1) that they suffered an injury (2) "fairly traceable to the defendant's allegedly unlawful conduct" and (3) "likely to be redressed by the requested relief." *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quotation omitted). This Court has recognized that the standing inquiry is especially demanding where, as here, the merits of a plaintiff's claims raise constitutional and separation-of-powers considerations. *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494, 496 (5th Cir. 2007) (en banc); *see also Raines v. Byrd*, 521 U.S. 811, 819-820 (1997).

For many of the same reasons that plaintiffs' claims are not ripe, plaintiffs also have failed to establish a cognizable injury. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007) (noting overlap between standing and ripeness inquiries). An injury must be both "concrete and particularized" and "actual or imminent." *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Here, as already discussed, *supra* pp. 28-31, there is no dispute that plaintiffs do not face any imminent Title VII enforcement action by EEOC linked to any particular employee or employment action.

Plaintiffs do not allege that they are aware of any applicants or current employees engaged in "homosexual or transgender behavior" or that they have taken any adverse employment action in the past that could violate Title VII as interpreted in *Bostock*. Instead, plaintiffs acknowledge that they bring a pre-enforcement challenge based solely on a fear of hypothetical future consequences arising from their employment policies and practices. *See* ROA.1635. But a plaintiff can demonstrate a cognizable injury in a pre-enforcement challenge only if it establishes both that (1) it has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and (2) there "exists a credible threat of prosecution thereunder." *Susan B. Anthony*, 573 U.S. at 159 (quotation omitted).

Plaintiffs have not established that they face any imminent, credible threat of prosecution under Title VII. Before a charge could even get to the EEOC, plaintiffs would have to employ or receive an

employment application from an individual engaged in "homosexual or transgender behavior" and subject that individual to an adverse employment action; that individual would also have to file a charge with the EEOC.  EEOC would then have to exercise its discretion to pursue an enforcement action.  *See supra* pp. 4-5.  But EEOC infrequently finds reasonable cause, much less decides to exercise its discretion to bring an enforcement action.  *See* EEOC, *Title VII of the Civil Rights Act of 1964 Charges*,    https://www.eeoc.gov/statistics/title-vii-civil-rights-act-1964-charges-charges-filed-eeoc-includes-concurrent-charges;    EEOC, *LGBTQ+-Based    Sex    Discrimination    Charges*, https://www.eeoc.gov/statistics/lgbtq-based-sex-discrimination-charges.

And as already discussed, *supra* pp. 30-31, EEOC has virtually no history of enforcing Title VII's prohibition against LGBT discrimination against entities like plaintiffs.  EEOC counsels its investigators to respect employers' religious liberties when considering whether to bring an enforcement action, and that admonition is not just talk: EEOC *does* recognize employers' valid religious defenses and dismisses charges at the administrative stage accordingly.  *See Newsome v. EEOC*, 301 F.3d 227, 229-230 (5th Cir. 2002) (per curiam) (EEOC dismissed charge where

employer offered evidence it fell under religious organization exception). And the fact that EEOC took the position that a particular employer's RFRA defense was not valid—a position with which the Sixth Circuit eventually agreed in *Harris Funeral Homes*—does not suggest that EEOC would not honor a valid religious defense in another case. *See United States v. Friday*, 525 F.3d 938, 955 (10th Cir. 2008) (finding government's refusal to provide a religious exemption once does not support a finding that it would always do so, at least absent some reason to believe the government's initial refusal "was improper").

For all of those reasons, plaintiffs have failed to establish that they face a credible threat of enforcement, and they have therefore also failed to demonstrate that they have standing to challenge hypothetical future applications of Title VII.

## II.    The District Court Erred in Granting Summary Judgment on Plaintiffs' RFRA and First Amendment Claims.

### A.    Plaintiffs are not entitled to summary judgment on their class-wide RFRA and Free Exercise claims.

Under RFRA the government may "substantially burden a person's exercise of religion only if it demonstrates that application of the burden

to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The statute in effect requires government actions that substantially burden religious exercise to survive strict scrutiny.[4]

As both this Court and the Supreme Court have recognized, RFRA challenges are necessarily fact-intensive and require a case-by-case assessment that turns on both the precise religious beliefs of the plaintiff and the particulars of the government action at issue. That is true at every stage of the RFRA analysis. "[W]hether the government action or regulation in question imposes a substantial burden on an adherent's religious exercise" requires "a case-by-case, fact-specific inquiry." *Brown*, 929 F.3d at 230 (quotation omitted). And if government action imposes a substantial burden, the question is not whether the government has a compelling interest in "enforcing its non-discrimination policies generally," but whether it has "such an interest in denying an exception"

---

[4] The district court evaluated plaintiffs' First Amendment Free Exercise claim using the same strict scrutiny rubric. *See* ROA.1751-1752. For this reason, this brief addresses plaintiffs' RFRA and First Amendment Free Exercise claims in tandem.

as to a particular religious claimant in a particular context. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021); *see also U.S. Navy Seals*, 27 F.4th at 351. Indeed, that individualized inquiry is mandated by the statute's text, which prohibits the government from "substantially burden[ing] *a person's* exercise of religion" unless doing so is the least restrictive means to accomplish a compelling interest. 42 U.S.C. § 2000bb-1(a) (emphasis added); *see also Tucker v. Collier,* 906 F.3d 295, 301 (5th Cir. 2018).

Many of the ripeness problems identified above are exacerbated in the district court's analysis of the class-wide RFRA and Free Exercise claims. For the reasons discussed above, the district court lacked jurisdiction even as to Braidwood's RFRA claim. But in granting summary judgment, the district court did not stop at Braidwood's hypothetical future RFRA defenses: It purported to preemptively assess the RFRA defenses of all members of the Religious Business-Type Employers Class, holding those defenses barred all possible future applications of Title VII by EEOC. The district court provided no meaningful analysis or justification for that shockingly broad holding,

and none of the district court's conclusions on this score withstands scrutiny.

*1. Substantial Burden.*

The district court held that Braidwood had established that the general prohibition against discrimination on the basis of sex in Title VII, as construed in *Bostock*, substantially burdens Braidwood's ability to operate its business consistent with its religious beliefs. ROA.1746-1747. But the court did not meaningfully grapple with the fact that it was resolving this question not just for Braidwood, but for all class members nationwide. Instead, the court simply asserted—with no explanation— that all members of the class must either "(1) violate Title VII and obey their [religious] convictions or (2) obey Title VII and violate their convictions." Op. 46. But that conclusory holding ignores what this Court and the Supreme Court have repeatedly held: Assessing substantial burden requires a "a case-by-case, fact-specific inquiry." *Brown*, 929 F.3d 230 (quotation omitted). That inquiry is, by definition, impossible to conduct class-wide and *en masse*. The district court's

failure to recognize that fact is reason enough to reverse its grant of summary judgment on plaintiffs' RFRA claim.

The district court's errors do not stop there. The court conducted no analysis of whether the conduct that Title VII requires of Braidwood— merely employing gay or transgender people, or providing equal benefits to them—imposes a substantial burden on Braidwood's religious exercise. The very case the district court cites—*East Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015), *vacated and remanded sub nom. Zubik v. Burwell*, 578 U.S. 403 (2016), *and cert. granted, judgment vacated sub nom. University of Dall. v. Burwell*, 136 S. Ct. 2008 (2016)— highlights the district court's error. *See* ROA.1663. There, this Court held that the question whether the challenged law pressures an adherent to modify his religious exercise is a fact-intensive question for the court to decide. And in conducting that analysis, this Court held that, "[a]lthough the plaintiffs have identified several acts that offend their religious beliefs, the acts *they* are required to perform" did not run contrary to their religious beliefs. 793 F.3d at 459. The same is true here: It is undisputed that Braidwood believes that certain personal conduct offends the religious beliefs of its owner. But the only action that

Braidwood is required to take under Title VII is to refrain from taking adverse employment actions against individuals who choose to engage in that conduct themselves.

The district court's failure to assess whether Title VII actually imposes a substantial burden is even more pronounced as to the class as a whole. The Religious Business-Type Employers Class is defined to include all business-type employers "that oppose[] homosexual or transgender behavior for sincere religious reasons." ROA.1727-1728. But the mere fact that an employer "opposes homosexual or transgender behavior" does not necessarily mean that their religious beliefs compel them to refuse to employ individuals who engage in that conduct. Indeed, many employers who oppose various conduct for religious reasons will not feel compelled by their faith to take adverse employment action against employees who harbor different beliefs. For those members of the class, Title VII would not impose any burden at all on religious exercise.

Viewed through another lens, the district court's decision assumes that religious views about "transgender and homosexual conduct" are monolithic and uniform, and that any employer who opposes

42

"homosexual or transgender behavior" for religious reasons will feel compelled by their faith to fire gay and transgender employees. But federal courts are not at liberty to generalize about closely held religious beliefs in that way, and this Court should reverse on that basis.

*2. Compelling Interest and Least Restrictive Means.*

The district court similarly provided no meaningful analysis or justification for its conclusory holdings that the government failed to demonstrate both a compelling interest in eradicating employment discrimination because of sex (including as characterized in *Bostock*), and that Title VII is the least restrictive means of achieving that interest. *Cf.* ROA.1747-1748, 1751-1752. Nor could it have. For starters, the Supreme Court suggested just the opposite in *Hobby Lobby*. The Court stated that "[t]he Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014). There is no sound basis to reach a different conclusion with respect to sex, which is included alongside race in a parallel list of terms in Title VII's operative provisions. *See* 42 U.S.C. 2000e-2(a); *Price*

*Waterhouse v. Hopkins*, 490 U.S. 228, 243 n.9 (1989) ("[Title VII] on its face treats each of the enumerated categories exactly the same.").

That the district court separately faulted the government for not demonstrating a marginal compelling interest in denying a religious exemption to Braidwood and each of the unnamed class members, *see* ROA.1751-1752, simply underscores the court's failure to engage in the plaintiff-specific "focused inquiry" that RFRA requires. *O Centro*, 546 U.S. at 432. It is not yet clear whether EEOC will ever initiate an enforcement action against any member of the Religious Business-Type Employers Class. But even if EEOC decided to do so in some future case, it is impossible to assess e*x ante* the particular facts that would be relevant to the government's compelling interest in that case.

The same is true of the least-restrictive-means analysis required by RFRA. In the absence of a particular factual situation in which EEOC is actually enforcing Title VII, it is impossible to weigh the "harm of granting [a] specific exemption[] to [a] *particular* religious claimant[]." *O Centro*, 546 U.S. at 431; *Tagore v. United States*, 735 F.3d 324, 332 (5th Cir. 2013). The district court's contrary conclusion rested on the Supreme Court's decision in *Fulton*, 141 S. Ct. at 1878. The court analogized this

case to *Fulton*, noting that Title VII (1) does not apply to employers with fewer than 15 employees, (2) specifies that it is not an unlawful employment practice to give preferential treatment to certain Indians on or near reservations in some circumstances; and (3) provides that it does not forbid firing an employee because of Communist Party affiliation. *See* ROA.1750. Congress's "willing[ness] to make exceptions to Title VII for secular purposes," the court held, necessarily means that Title VII's prohibition on sex discrimination cannot be the least restrictive means of achieving any compelling interest. ROA.1748.

But the provisions *Fulton* addressed are not like Title VII. The government program at issue in *Fulton* provided for a free-wheeling system of entirely discretionary exemptions, but the exemptions contained in Title VII are clearly defined and leave no discretion for EEOC. And in any event, *Fulton* does not (and cannot) answer the question whether the least restrictive means available in a particular

case involving a particular employee might be an enforcement action. That is a question that cannot be answered in the abstract.

### B.    Plaintiffs are not entitled to summary judgment on their Free Association claim.

The district court also erred in granting summary judgment to the Religious Business-Type Employers Class on their Free Association Claim. "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts*, 530 U.S. at 648. In order to assert a violation of that associational right, a plaintiff must first demonstrate that it "engages in 'expressive association.'" *Id.* That does not require that the plaintiff be an actual advocacy group, "[b]ut to come within its ambit, a group must engage in some form of expression, whether it be public or private." *Id.* Even if a plaintiff establishes that it has protected associational rights, that right can be overridden "by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984).

Neither Braidwood nor the class qualifies as a "group [that] engages in 'expressive association.'" The district court defined the Religious Business-Type Employers Class to include for-profit employers who produce "secular product[s]," but for whom "faith may be a motivating part" of the employers' business or for whom religion "plays an important role" in the "mission of the organization." ROA.1728. Defined at that level of generality, it cannot be said that all members of the class necessarily engage in expressive associational conduct regarding their beliefs. Even as to Braidwood, there is nothing in the record to support a conclusion that it engages in any expressive associational conduct. In the district court, plaintiffs vaguely asserted that "overtly Christian" businesses "run their places of employment as a way of expressing deep and sincere religious commitments." ROA.1374-1375. But those assertions do not establish that Braidwood—which runs a for-profit health business—engages in any constitutionally protected expressive conduct, much less that every single member of the class does so.

In any event, even assuming all the Religious Business-Type Employers are engaged in expressive conduct, the district court erred by concluding that the class has established that employing an individual

47

engaged in "homosexual or transgender behavior," ROA.1727, would "significantly burden" that expression, *Boy Scouts*, 530 U.S. at 653. Particularly given that the nature of the message expressed by members of the class may vary widely from employer to employer, the district court was wrong to hold that the "forced inclusion" of gay or transgender employees "would significantly affect [the employers'] ability to advocate" for their viewpoints. *Id.* at 650. The Court's approach in *Boy Scouts* makes clear that an individualized inquiry into the degree to which a particular action impairs asserted free association rights is necessary. *Id.* at 648 (noting "the ultimate conclusions of law are virtually inseparable from findings of fact" in free association cases). The district court fundamentally erred in taking a categorical approach to these questions and by attempting to resolve these issues for *all* members of the class in the abstract.

But even as to Braidwood, plaintiffs have failed to demonstrate how the mere employment of a person engaged in conduct Braidwood finds objectionable would significantly interfere with Braidwood's ability to express whatever message it wants to communicate about "transgender and homosexual conduct." In holding that Braidwood nevertheless

carried that burden, the district court relied on the Supreme Court's decision in *Boy Scouts*. That reliance was misplaced. For starters, the court overlooked the Supreme Court's warning in that case that "an expressive association can[not] erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Id.* at 653; *see also Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) ("Invidious private discrimination [under Title VII] may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections").

Moreover, *Boy Scouts* involved *membership* in an expressive group, whereas this case involves *employment*. That distinction is relevant not only to the balancing of the government's interest against the associational interest, *see* 530 U.S. at 658-659 (calling for such balancing), but also to the question whether the "forced inclusion of an unwanted [employee] in a group ... affects in a significant way the group's ability to advocate public or private viewpoints," *id.* at 648, as required to establish a constitutional violation. Although a group is entitled to "deference to [its] view of what would impair its expression,"

*id.* at 653, no member of the Religious Business-Type Employers has explained how Title VII's antidiscrimination provisions or the purely private conduct of their employees would impair or undermine the message it wishes to express (especially given Braidwood's concession that it does not oppose the hiring of gay or transgender employees, standing alone, *see* ROA.1702).

## III.    The District Court Erred in Granting Summary Judgment on Plaintiffs' Title VII Claims.

### A.    Plaintiffs failed to identify any cause of action that would entitle them to declaratory relief on the meaning of Title VII.

Plaintiffs' scope-of-Title-VII claims fail at the threshold because plaintiffs failed to identify a cause of action for that claim.  To raise a claim in federal court, plaintiffs have the burden to demonstrate "that they (the plaintiffs) have a right of action to initiate that claim." *Harris County Texas v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015). Plaintiffs have not done so here.

To the extent that plaintiffs attempt to invoke Title VII itself as a basis for those claims, that attempt fails.  As this Court has repeatedly recognized, Title VII "confers no right of action against the [EEOC]." *Gibson v. Missouri Pac. R.R.*, 579 F.2d 890, 891 (5th Cir. 1978) (per

curiam) (affirming dismissal of an individual's claim against EEOC). Nor can plaintiffs locate a cause of action in the Declaratory Judgment Act. This Court has held that the Declaratory Judgment Act does not provide an independent cause of action. *See Harris County*, 791 F.3d at 552; *Okpalobi v. Foster*, 244 F.3d 405, 423 n.31 (5th Cir. 2001); *Reyes v. North Tex. Tollway Auth.*, 861 F.3d 558, 565 n.9 (5th Cir. 2017). "[T]he Act 'enlarged the range of remedies available in the federal courts,' but it did not create a new right to seek those remedies." *Harris County*, 791 F.3d at 552 (quoting *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)); *cf. California*, 141 S. Ct. at 2115 (explaining that the "Act does 'not confer jurisdiction over declaratory actions when the underlying dispute could not *otherwise* be heard in federal court'") (alteration and citation omitted)).

The district court failed even to address this issue in its opinion although the government raised it below. *See* ROA.1450-1451. That was error. This Court should reverse with instructions to dismiss all of plaintiffs' scope-of-Title-VII claims for failure to identify a cause of action.

### B.    Plaintiffs' scope-of-Title-VII claims fail on the merits.

Even assuming plaintiffs could identify a cause of action for their scope-of-Title VII claims, the district court erred in granting summary judgment class-wide on the claims it resolved in plaintiffs' favor.

1.    First, the district court erred in holding that Title VII categorically permits all employers to adopt workplace policies implementing "sex-specific dress codes," ROA.1770, and "policies that promote privacy, such as requiring the use of separate bathrooms on the basis of biological sex," ROA.1771. Although *Bostock* reserved judgment on "sex-segregated bathrooms ... and dress codes," 140 S. Ct. at 1753, the Supreme Court's reasoning forecloses the district court's omnibus holding that sex-specific dress codes and restroom policies can never violate Title VII under any circumstances.

The Supreme Court in *Bostock* endorsed a straightforward rubric for assessing whether an employer violates Title VII's prohibition against sex discrimination when it takes adverse action against a gay or transgender individual: If sex is a "but-for" cause of the employment action, then it falls within the plain text of Title VII. "[P]ut differently, if changing the employee's sex would have yielded a different choice by

the employer[,] a statutory violation has occurred." 140 S. Ct. at 1741. Applying that rubric *Bostock* held, for example, that an employer who "fires a transgender person who was identified as a male at birth but who now identifies as a female" but "retains an otherwise identical employee who was identified as female at birth" has violated Title VII by "intentionally penaliz[ing] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.*

That same reasoning compels the conclusion that dress codes and restroom policies may violate Title VII when they are enforced in a manner that results in adverse employment actions against LGBTQ employees based on their sex. If an employer fires a transgender employee for using the restrooms that correspond with their gender identity, the employer is likely penalizing that employee based at least in part on their sex assigned at birth. And if an employer fires a transgender employee for wearing clothing that is not traditionally associated with that employee's sex assigned at birth, that employer is likely discriminating based on sex. Indeed, plaintiffs all but conceded below that, under *Bostock*'s reasoning, the kinds of policies they wish to

53

impose would violate Title VII in the absence of a religious exemption under RFRA or the First Amendment. *See* ROA.1970-1971; ROA.1365.

Numerous courts both before and after *Bostock* have reached the conclusion that restroom policies and dress codes violate federal prohibitions against sex discrimination when deployed to penalize people who are transgender for behaving in accordance with their gender identity. *See, e.g.*, *Grimm v. Gloucester County Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) (excluding transgender student from restroom corresponding with gender identity constituted sex discrimination within the meaning of Title IX), *cert. denied*, 141 S. Ct. 2878 (2021); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221-222 (6th Cir. 2016) (per curiam) (similar); *Whitaker ex. rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049-1050 (7th Cir. 2017) (similar); *Monegain v. Virginia Dep't of Motor Vehicles*, 491 F. Supp. 3d 117, 143-144 (E.D. Va. 2020) (applying *Bostock* to conclude that dress-code policy that prevented employee from "expressing her gender through feminine dress" violated Equal Protection Clause).

The district court reached a contrary conclusion by assuming that sex discrimination under Title VII occurs only where a gay or

transgender employee can show that they have been treated "worse" than similarly situated individuals of "the opposite biological sex." ROA.1770. According to the district court, where sex-specific policies like dress codes and restrooms apply "evenly" to males and females, no sex discrimination has occurred. ROA.1768-1769, 1771. *Bostock*, however, rejected exactly that kind of reasoning. 140 S. Ct. at 1741. Rather, the Court emphasized that Title VII focuses on "discrimination against individuals." *Id.* at 1745; *see also id.* at 1741, 1753. The Court stressed that the statute specifically speaks in terms of discrimination against "any individual" because of "such individual's ... sex." 140 S. Ct. at 1740 (quoting 42 U.S.C. § 2000e-2(a)(1)); *see also id.* at 1742 ("[T]he law makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII."). For this reason, the Court explained, "it doesn't matter if the employer treated women as a group the same when compared to men as a group." *Id.* at 1741. Indeed, the Court reasoned, when an employer discriminates against both a woman for being insufficiently feminine and a man for being insufficiently masculine, the employer "doubles" its exposure to Title VII liability rather than avoids it. *Id.*

The enforcement of sex-specific dress codes and restroom policies in ways that injure transgender employees can violate Title VII under other theories.  For example, in *Price Waterhouse*, the Supreme Court held that making employment decisions based on sex stereotyping, *i.e.,* the degree to which an individual conforms to traditional notions of what is appropriate for one's gender, is actionable discrimination under Title VII. 490 U.S. at 250 ("In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.").  Under *Price Waterhouse*, "an employer who discriminates against women because, for instance, they do not wear dresses or makeup, is engaging in sex discrimination because the discrimination would not occur but for the victim's sex."  *Smith v. City of Salem*, 378 F.3d 566, 574-575 (6th Cir. 2004).  "It follows that employers who discriminate against [someone assigned male at birth] because they *do* wear dresses and makeup, or otherwise act femininely, are also engaging in sex discrimination ...." *Id.*; *accord Bostock*, 140 S. Ct. at 1742-1743 ("So just as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes

doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same.").

None of this means that Title VII categorically prohibits sex-specific dress codes or restrooms. For example, an employer is prohibited from discriminating based on sex but not based on professionalism. If a transgender male employee is fired for wearing jeans to work, that would not be a violation of Title VII under *Bostock* if a cisgender male employee would also be fired for wearing jeans. In that case, changing the birth sex of the employee would not change the outcome, so sex is not a but-for cause of the adverse employment decision.

And Title VII only prohibits *discrimination* based on sex, not sex-based distinctions per se. Thus, in some circumstances differential sex-based treatment may not amount to prohibited discrimination when it imposes only *de minimis* harm on those who are treated differently on the basis of their sex, such as when it has only a relatively "innocuous" impact. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *see also Threat v. City of Cleveland*, 6 F.4th 672, 678 (6th Cir. 2021) (discussing "*de minimis* exception that forms the backdrop of all laws"). Thus, if an employer requires cisgender female employees and

57

cisgender male employees to use restrooms associated with their sex, there would be no Title VII problem unless a cisgender employee could articulate how requiring them to use restrooms associated with their sex causes them some cognizable harm.

As the Supreme Court noted in *Bostock*, the question whether particular applications of sex-specific dress codes or restroom policies violate Title VII when applied to transgender employees may present close calls in future cases.  140 S. Ct. at 1753.  But that only underscores the need to reverse the district court's decision.  The district court held that sex-specific dress codes and restroom policies can *never* violate Title VII.  That holding short-circuits the very case-by-case development of the law that the Supreme Court anticipated in *Bostock*.  Thus, if it is even conceivable that some sex-specific dress code or restroom policies might violate Title VII in some circumstances (*e.g.*, where applied in a manner that inflicts harms by preventing a transgender person from using the restroom consistent with his or her gender identity), the district court's decision must be reversed.

For all of those reasons, this Court should follow the Supreme Court's lead and wait for individual cases that present particular

applications of Title VII to dress code and restroom policies in order to assess whether the enforcement of those policies with respect to particular employees  might (or might not) violate Title VII.

2.    The district court also erred in preemptively holding that all "[p]olicies that enforce a sexual ethic that applies evenly to heterosexual and homosexual sexual activity" do not violate Title VII.  ROA.1767.  For many of the same reasons already discussed, the question whether a particular application of even a facially-neutral sexual conduct policy is lawful will be a fact-intensive inquiry that cannot be categorically resolved ahead of time.   But the district court's across-the-board preclearance of these kinds of policies was particularly inappropriate given that Braidwood's own complaint makes clear that its "sex-neutral" codes of sexual conduct were adopted *with the express goal of* prohibiting "homosexual or transgender behavior."  ROA.1219-1220.  Thus plaintiffs' own allegations demonstrate that there is good reason to think that even ostensibly sex-neutral sexual conduct policies may be mere "pretext" for discrimination, and that employers in fact do (or would) *not* apply the policies in a sex-neutral manner notwithstanding their facial neutrality.

*Cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993).

## IV.    The District Court Separately Erred in Certifying Two Nationwide Classes.

A party seeking class certification must prove that: "(1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common to the class [commonality]; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy of representation]."  Fed. R. Civ. P. 23(a); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).  In addition to satisfying Rule 23(a), "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)."  *Wal-Mart*, 564 U.S. at 345.  Plaintiffs here seek certification based solely on Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Here, the district court certified two classes.  First, it certified a Religious Business-Type Employers Class as to all claims.  ROA.1729. That class includes all for-profit businesses that "oppose[] homosexual or transgender behavior for sincere religious reasons."  ROA.1727.  The court further clarified that members of the class are "for-profit entities producing secular products," that faith "may be a motivating part of the businesses' missions," that the incorporating documents typically "do not include a religious purpose," and that religion "plays an important role, but is not the sole mission."  ROA.1871.  The district court also certified an All Opposing Employers Class, consisting of "every employer in the United States that opposes homosexual or transgender behavior for religious or nonreligious reasons," as to the Title VII claims only. ROA.1727, 1729; ROA.1872.  Because the court certified both classes under Rule 23(b)(2), its decision—including those claims on which the court granted summary judgment to EEOC—is binding on all class members.  The district court erred in certifying those classes for at least two reasons.

*1. Commonality.*

Neither of the classes that the district court certified satisfies Rule 23(a)'s commonality requirement. "In order to satisfy commonality[,] a proposed class must prove that the claims of every class member 'depend upon a common contention ... that is capable of classwide resolution,'" meaning that the common question "is 'of such a nature ... that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 838 (5th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350). Conducting that inquiry requires a court to examine the elements necessary to establish liability for plaintiffs' underlying claims. *See Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020). And if those elements indicate that resolving the underlying claims would depend on multiple, highly individualized inquiries, such claims are generally not "capable of classwide resolution." *E.g.*, *Wal-Mart*, 564 U.S. at 349-350, 352; *see also Stukenberg*, 675 F.3d at 843.

The court found commonality for the Religious Business-Type Employers Class as to all five claims, but provided no explanation for that conclusion. *See* ROA.1735. In explaining why that class satisfied the

related typicality requirement, however, the court stated that it "disagree[d] with [the government] that there is a need for individualized assessment of potential members' claims" on the ground that "[t]he sincerity inquiry under RFRA is generally not an exacting one." ROA.1738. That is a non-sequitur; whether a claimant's religious sincerity must satisfy an exacting standard has nothing to do with whether it requires individualized assessment (it does). And even assuming the sincerity inquiry under RFRA were capable of class-wide resolution (it is not), that would not demonstrate that RFRA claims themselves are capable of class-wide resolution because other elements of the RFRA inquiry—*e.g.*, substantial burden, compelling interest, and least restrictive means—likewise require individual determinations ill-suited for resolution on a class-wide basis.

The district court might have thought that the legal questions "common" to the Religious Business-Type Employers Class were whether RFRA, the Free Exercise Clause, and the Free Association Clause compel some exemptions to *Bostock*'s interpretation of Title VII. But the Religious Business-Type Employer Class's claims did not call on the district court to resolve questions at that level of generality and the court

did not do so. Instead, in granting summary judgment the district went much further and held that every member of the class (*i.e.*, every for-profit, secular entity for whom religion "plays an important role") is *necessarily* entitled to an exemption to *Bostock* under RFRA and/or the First Amendment. As discussed at length above, *supra* Part II, the question whether a particular employer is entitled to RFRA or First Amendment protection is a fact-intensive, individualized inquiry. That is not something that can be resolved on a class-wide basis. *See O Centro*, 546 U.S. at 431; *Merced v. Kasson*, 577 F.3d 578, 588 (5th Cir. 2009) (substantial burden analysis is a "case-by-case," "fact-specific" inquiry).

In finding that the All Opposing Employers Class had adequately shown commonality with respect to the Title VII claims, the court stated only that "[e]ach of the employers within" that class "ha[s] common questions of whether the proper reading of *Bostock* prohibits them from maintaining sex-neutral standards of conduct for their business." ROA.1736. But again, the Supreme Court has stated that "[w]hat matters to class certification is not the raising of common 'questions'— even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."

*Wal-Mart*, 564 U.S. at 350 (quotation omitted). Plaintiffs provided no evidence that all (or even many) of the employers in the class have the same set of policies, and so class litigation is unlikely to generate any common answers. The legality (or illegality) of a particular employment decision under Title VII will turn on the circumstances of that individual decision. Indeed, *Wal-Mart* itself involved a nationwide class seeking "to litigate the Title VII claims of all female employees at Wal-Mart's stores," and the Supreme Court held that such claims are too individualized to warrant class-wide resolution. *Id.* at 345.

### 2. *Rule 23(b)(2).*

The district court also erred in concluding that the classes satisfy Rule 23(b)(2). The district court offered almost no analysis on that front, stating only that "because Defendants have acted or refused to act on grounds generally applicable" to the classes, plaintiffs "satisf[y] Rule 23(b)(2)." ROA.1742. But EEOC has neither "acted" nor "refused to act" as to any class member because, with the exception of *Harris Funeral Homes*, EEOC has not pursued an enforcement action on the basis of LGBTQ discrimination against any employer asserting a religious defense. It is thus not even clear that any class member faces *any* future

harm.  *See Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 525 (5th Cir. 2007) ("Rule 23(b)(2) certification is ... inappropriate when the majority of the class does not face future harm.").

And if EEOC does "act[] or refuse[] to act" on some future, hypothetical complaint or adverse employment action, that action would not be "on grounds that apply generally to the class."  Fed. R. Civ. P. 23(b)(2).  As discussed at length above, *supra* Part II, the question whether religious or associational liberties will shield an employer from a particular application of Title VII is individualized and fact-intensive.  Similarly, any conceivable future action arising out of a class member's "sex-neutral" policy would require a fact-specific inquiry into that policy—including how it was being applied—in order to determine whether it was truly "sex-neutral" or instead being used selectively to "target homosexual or transgender employees."  ROA.1872; *cf. Wal-Mart*, 564 U.S. at 360 (explaining that a Rule 23(b)(2) class is inappropriate if "each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant").  Accordingly, the grounds of any hypothetical future enforcement action against any class

member would necessarily vary considerably from case to case, making Rule 23(b)(2) certification inappropriate.

The district court's certification under Rule 23(b)(2) is particularly problematic here, where no opportunity was provided for class members to opt out of the class. *See 20/20 Communications, Inc. v. Crawford*, 930 F.3d 715, 719 (5th Cir. 2019) (noting that "class actions bind not only named parties, but also countless unnamed parties as well," and discussing importance of opt out procedures). Because no class members were given the opportunity to opt-out, all members of the two broadly defined classes are bound by all aspects of the district court's decision—including the district court's holding that policies that discriminate against bisexuals or prohibit certain treatment for gender dysphoria necessarily violate Title VII. *See* ROA.1770-1771.

## CONCLUSION

For the foregoing reasons, the district court's decision should be reversed to the extent it granted plaintiffs' motions for class certification and partially granted plaintiffs' motion for summary judgment. And the

Court should remand this case with instructions to dismiss for lack of

jurisdiction.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

CHAD E. MEACHAM
  *Acting United States Attorney*

MARLEIGH D. DOVER
CHARLES SCARBOROUGH
*/s/ Jack Starcher*
JACK STARCHER
  *Attorneys, Appellate Staff
  Civil Division, Room 7515
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-1754*

MAY 2022

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2022, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Jack Starcher*
*Counsel for Defendants-*
*Appellees / Cross-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,987 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

/s/ *Jack Starcher*
*Counsel for Defendants-*
*Appellees/Cross-Appellants*