# In the United States Court of Appeals for the Fifth Circuit

———————

BRAIDWOOD MANAGEMENT, INCORPORATED, ON BEHALF OF ITSELF
AND OTHERS SIMILARLY SITUATED; BEAR CREEK BIBLE CHURCH,

*Plaintiffs-Appellants/Cross-Appellees*,

v.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; UNITED STATES
OF AMERICA; CHARLOTTE A. BURROWS; JOCELYN SAMUELS; JANET
DHILLON; ANDREA R. LUCAS; KEITH E. SONDERLING, IN THEIR
OFFICIAL CAPACITIES AS CHAIR, VICE-CHAIR, AND COMMISSIONERS
OF THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION;
MERRICK GARLAND, U.S. ATTORNEY GENERAL,

*Defendants-Appellees/Cross-Appellants*.

———————

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division
Case No. 4:20-cv-00824-O

———————

## BRIEF OF APPELLANTS/CROSS-APPELLEES
## BRAIDWOOD MANAGEMENT INC., ET AL.

———————

GENE P. HAMILTON
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

Counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiffs | Plaintiffs' Counsel |
|---|---|
| • Braidwood Management Inc.<br>• Bear Creek Bible Church | Jonathan F. Mitchell<br>MITCHELL LAW PLLC<br><br>Gene P. Hamilton<br>AMERICA FIRST LEGAL FOUNDATION<br><br>H. Dustin Fillmore<br>Charles W. Fillmore<br>THE FILLMORE LAW FIRM LLP |

| Defendants | Defendants' Counsel |
|---|---|
| • Equal Employment Opportunity Commission<br>• United States of America<br>• Charlotte A. Burrows<br>• Jocelyn Samuels<br>• Janet Dhillon<br>• Andrea R. Lucas<br>• Keith E. Sonderling<br>• Merrick Garland | Marleigh D. Dover<br>Charles Scarborough<br>Jack Starcher<br>Benjamin Thomas Takemoto<br>Brian Walters Stoltz<br>Eric J. Soskin<br>Michael Fraser Knapp<br><br>UNITED STATES DEPARTMENT OF JUSTICE |

| Amicus Curiae | Amicus Counsel |
|---|---|
| • Becket Fund for Religious Liberty | Luke Goodrich<br>Joseph C. Davis<br><br>BECKET FUND FOR RELIGIOUS LIBERTY |

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs-Appellants*

i

## STATEMENT REGARDING ORAL ARGUMENT

The plaintiffs-appellants respectfully request oral argument, as the issues presented in this appeal are sufficiently complex and important to warrant argument time.

# TABLE OF CONTENTS

Certificate of interested persons ................................................................. i

Statement regarding oral argument ........................................................ ii

Table of contents ..................................................................................... iii

Table of authorities ................................................................................ vi

Statement of jurisdiction ......................................................................... 2

Statement of the issues ............................................................................ 2

Statement of the case ............................................................................... 3

    I.    The EEOC's interpretation of Title VII ............................... 3

    II.   The Supreme Court's interpretation of Title VII ................. 5

    III.  Undisputed facts .................................................................. 7

    IV.  The plaintiffs' claims for relief .......................................... 9

    V.   The district court's rulings ................................................ 13

        A.   Religious Freedom Restoration Act ......................... 16

        B.   Free-exercise clause ................................................. 16

        C.   Expressive association.............................................. 17

        D.   Sex-neutral rules of conduct (claims 4 and 5) .......... 17

Summary of argument ............................................................................ 18

Standard of review ................................................................................. 20

Argument ................................................................................................ 20

    I.    The district court correctly held that the plaintiffs' claims are justiciable ........................................................................ 21

        A.   The district court correctly held that the plaintiffs have Article III standing ................................................ 21

            1.   The plaintiffs are not required to allege or prove an imminent enforcement action directed at them ............. 23

            2.   The plaintiffs are not required to violate the law in a manner that exposes them to prosecution or

enforcement    action    before    seeking    pre-
enforcement relief.........................................................30

B.      The district court correctly held that the plaintiffs' claims
        are ripe .................................................................32

II.    The district court correctly entered judgment for Braidwood on
       its RFRA and First Amendment claims .............................36

A.      Title VII, as interpreted in *Bostock*, substantially burdens
        employers who oppose homosexual or transgender
        behavior for sincere religious reasons .......................37

B.      The defendants have failed to demonstrate a compelling
        governmental interest to justify the burden on plaintiffs'
        religious exercise.................................................... 40

C.      The district court correctly entered judgment for
        Braidwood on its free-exercise claim.......................... 44

D.      The district court correctly entered judgment for
        Braidwood on its expressive-association claim........................ 44

III.   The district court correctly entered judgment for Braidwood on
       its Title VII claims...............................................................47

A.      The Declaratory Judgment Act authorizes the plaintiffs
        to seek a declaration of their rights under Title VII ................47

B.      The district court correctly held that *Bostock* allows
        employers to enforce rules of sexual conduct that apply
        equally to men and women........................................50

C.      RFRA and the free-exercise clause protect Braidwood's
        right to enforce sex-segregated restrooms and sex-specific
        dress-and-grooming codes .......................................... 51

IV.    The district court did not abuse its discretion in certifying the
       classes .............................................................................. 53

V.     The district court erred by entering judgment against
       Braidwood on some of its Title VII claims ........................... 55

iv

A.   Title VII, as interpreted in *Bostock*, does not prohibit employers from discriminating against bisexual employees ............................................................... 56

B.   Title VII, as interpreted in *Bostock*, does not prohibit employers from enforcing sex-neutral rules of conduct that prohibit hormone therapy and sex-change operations ...... 57

VI.   The district court erred by entering judgment against Bear Creek .................................................................................... 58

Conclusion ........................................................................................... 61

Certificate of service ........................................................................... 62

Certificate of compliance .................................................................... 63

Certificate of electronic compliance ................................................... 64

v

# TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) ................................................. 32

*American Booksellers Ass'n, Inc. v. Virginia*, 802 F.2d 691 (4th Cir. 1986) ............... 28

*Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979) ......... 23, 26, 27

*Bob Jones University v. United States*, 461 U.S. 574 (1983) ...................................... 43

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ............................................ passim

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) ................................ 11, 17, 43, 45

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) .................................. passim

*Carnegie Technologies, L.L.C. v. Triller, Inc.*,
39 F.4th 288 (5th Cir. 2022) ....................................................................... 20

*Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138 (5th Cir. 1993) ................... 31

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ....................................................... 40

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ..................................................... 35

*Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods*,
915 F.2d 167 (5th Cir. 1990) ...................................................................... 49

*Diamond v. Charles*, 476 U.S. 54 (1986) ................................................................ 26

*Doe v. Bolton*, 410 U.S. 179 (1973) ...................................................................... 35

*Earnest v. Lowentritt*, 690 F.2d 1198 (5th Cir. 1982) ........................................... 48

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
884 F.3d 560 (6th Cir. 2018) ......................................................... 22, 27, 49

*Employment Division, Department of Human Resources of Oregon v.
Smith*, 494 U.S. 872 (1990) ............................................................... 10, 53

*Fulton v. Philadelphia*, 141 S. Ct. 1868 (2021) .................................................. passim

*Green Valley Special Utility District v. City of Schertz*,
969 F.3d 460 (5th Cir. 2020) ................................................................ 49, 50

*Harris County v. MERSCORP Inc.*, 791 F.3d 545 (5th Cir. 2015) .......................... 48

*International Society for Krishna Consciousness of Atlanta v. Eaves*,
601 F.2d 809 (5th Cir. 1979) ............................................................. 31

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
140 S. Ct. 2367 (2020) ........................................................... 37, 39, 43

*Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010) ................................ 28

*Lowe v. Ingalls Shipbuilding, A Division of Litton Systems, Inc.*,
723 F.2d 1173 (5th Cir. 1984) ......................................................... 48

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................... 26

*New York Republican State Committee v. SEC*,
799 F.3d 1126 (D.C. Cir. 2015) ....................................................... 35

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc) ................ 48

*Our Lady of Guadalupe School v. Morrissey-Berru*,
140 S. Ct. 2049 (2020) ..................................................................... 5

*Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335 (5th Cir. 2015) ...... 60

*Prantil v. Arkema Inc.*, 986 F.3d 570 (5th Cir. 2021) ......................... 55

*Quill v. Vacco*, 80 F.3d 716 (2d Cir. 1996) ................................... 29, 35

*Regents of University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir. 2007) ................................................. 20, 53

*Roark & Hardee LP v. City of Austin*, 522 F.3d 533 (5th Cir. 2008) ......... 20

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ..................... 43, 44

*Sherbert v. Verner*, 374 U.S. 398 (1963) ..................................... 10, 39

*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950) ............... 49

*Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020) ........... 23, 26, 27

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ..................................... 21

*State v. Arlene's Flowers, Inc.*, 441 P.3d 1203 (Wash. 2019) ............... 31

*Steffel v. Thompson*, 415 U.S. 452 (1974) ....................................... 30

*Stenberg v. Carhart*, 530 U.S. 914 (2000 ................................... 24, 25

*Stewart v. Banks*, 397 F.2d 798 (5th Cir. 1968) ............................... 60

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ....................................passim

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) ........................................... 19, 44

*Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019) .................... 25, 28, 31

*United States v. Friday*, 525 F.3d 938 (10th Cir. 2008) ...........................................29

*United States v. Shkambi*, 993 F.3d 388 (5th Cir. 2021) .............................21

*Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383 (1988).....................passim

*Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338 (2011) ...........................................53

*Wardle v. Ute Indian Tribe*, 623 F.2d 670 (10th Cir. 1980) ............................... 42

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ............................... 60

**Statutes**

28 U.S.C. § 1291 ................................................................. 2

28 U.S.C. § 1331 ................................................................. 2

28 U.S.C. § 2201(a) ...........................................................47

42 U.S.C. § 2000bb-1 .....................................................36, 40

42 U.S.C. § 2000e(b) ................................................ 3, 41, 42

42 U.S.C. § 2000e-1(a) ...................................................passim

42 U.S.C. § 2000e-2(a)(1) ...............................................3, 58

42 U.S.C. § 2000e-2(a)(2) ...................................................3

42 U.S.C. § 2000e-2(e)(2) ...............................................4, 10

**Rules**

Fed. R. Civ. P. 54(c) .........................................................59

**Other Authorities**

*Baldwin v. Foxx*, EEOC Doc. No. 0120133080, 2015 WL 4397641
(EEOC July 16, 2015) ...................................................3

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41 ...................... 48

Richard A. Epstein, *The Constitutional Perils of Moderation: The Case of the Boy Scouts*, 74 S. Cal. L. Rev. 119 (2000).........................................46

John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989 (2008)....................................47

*Lusardi v. Dep't of the Army*, EEOC Appeal No. 0120133395, 2015 WL 1607756 (April 1, 2015) ........................................................................ 4

*Macy v. Holder*, EEOC Doc. No. 0120120821, 2012 WL 1435995 (EEOC Apr. 20, 2012) ......................................................................3

John McCormack, *Susan Collins Won't Cosponsor Equality Act Again*, National Review (February 25, 2021) .......................................43

Jaclyn Peiser, *Internet Detectives Are Identifying Scores of Pro-Trump Rioters. Some Have Already Been Fired*, Wash. Post ( Jan. 8, 2021) .....................47

10 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure (4th ed. 2014) ....................................................59

Since 2015, the Equal Employment Opportunity Commission (EEOC) has claimed that Title VII outlaws employment discrimination on account of "sexual orientation" and "gender identity." ROA.1380-1838. The Supreme Court recently adopted a similar interpretation of Title VII's prohibition on sex discrimination. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1737 (2020). But neither the text of Title VII nor the EEOC's regulatory guidance makes any exemptions or accommodations for employers that oppose homosexual or transgender behavior on religious grounds. The failure to provide a religious exemption to this supposed anti-discrimination requirement violates the Religious Freedom Restoration Act and the First Amendment, and the plaintiffs are seeking a declaratory judgment to that effect.

The plaintiffs are also seeking a declaration that Title VII's prohibition on "sex" discrimination, as interpreted in *Bostock*, allows any employer— whether religious or secular—to fire or refuse to hire employees who engage in homosexual or transgender behavior, by establishing rules of conduct that apply equally to men and women, and that would lead to the same result if an employee of the opposite biological sex engaged in the exact same conduct. And the plaintiffs seek a declaration that Title VII (as interpreted in *Bostock*) allows employers to continue firing or (refusing to hire) bisexual employees, so long as the employer regards bisexual behavior or orientation as equally unacceptable in a man or a woman.

The district court agreed with many (though not all) of the plaintiffs' arguments, and both sides have appealed. This Court should affirm the district

court's judgment to the extent that it accepted the plaintiffs' claims, and it should reverse to the extent the district court rejected the plaintiffs' contentions.

## STATEMENT OF JURISDICTION

The district court's subject-matter jurisdiction rests on 28 U.S.C. § 1331 because this case arises under federal law. The defendants contest Article III standing and ripeness, but the plaintiffs' claims are justiciable for the reasons provided in Part I, *infra*.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the district court entered an amended final judgment on January 12, 2022, from which both sides have appealed. ROA.1871-1873. The plaintiffs filed a timely notice of appeal on February 9, 2022, and the defendants filed a timely notice of appeal on March 11, 2022. ROA.1874; ROA.1885.

## STATEMENT OF THE ISSUES

1.  Whether the district court correctly rejected the defendants' justiciability objections.

2.  Whether the district court correctly entered judgment for Braidwood on its RFRA and First Amendment claims.

3.  Whether the district court correctly held that Title VII, as construed in *Bostock*, allows employers to enforce rules of sexual conduct that apply equally to men and women, even if those rules have the effect of excluding practicing homosexuals from employment.

4.  Whether the district court abused its discretion by certifying the plaintiff classes.

5.  Whether the district court erred by rejecting the plaintiffs' claim that Title VII, as construed in *Bostock*, allows employers to discriminate against bisexuals, so long as the employer finds bisexual orientation or conduct equally unacceptable in men and women.

6.  Whether the district court erred by entering judgment in favor of the defendants (rather than Bear Creek Bible Church) after concluding that 42 U.S.C. § 2000e-1(a) shields Bear Creek from *Bostock* and the EEOC's guidance documents.

**STATEMENT OF THE CASE**

## I.   THE EEOC'S INTERPRETATION OF TITLE VII

Title VII of the Civil Rights Act of 1964 forbids employers to discriminate against their employees or job applicants "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e-2(a)(2). These anti-discrimination requirements apply to employers with 15 or more employees. *See* 42 U.S.C. § 2000e(b).

Since 2015, the EEOC has claimed that Title VII's prohibition on "sex" discrimination also outlaws employment discrimination on account of sexual orientation or gender identity. *See Baldwin v. Foxx*, EEOC Doc. No. 0120133080, 2015 WL 4397641 (EEOC July 16, 2015) (sexual orientation); *Macy v. Holder*, EEOC Doc. No. 0120120821, 2012 WL 1435995 (EEOC Apr. 20, 2012) (gender identity); ROA.1380-1383 (EEOC guidance documents).

The EEOC's "guidance documents" demand that employers recognize same-sex marriage on the same terms as opposite-sex marriage. ROA.1381 ("Examples of sex discrimination involving sexual orientation include . . . denying spousal health insurance benefits to a female employee because her legal spouse is a woman, while providing spousal health insurance to a male employee whose legal spouse is a woman."); ROA.1383 (same). The EEOC also demands that employers allow employees into restrooms that correspond to the "gender identity" that they assert—regardless of the individual's biological sex, regardless of whether the individual has had a sex-change operation, and regardless of any objections or privacy concerns that might be raised by other employees. *See Lusardi v. Dep't of the Army*, EEOC Appeal No. 0120133395, 2015 WL 1607756 (April 1, 2015) ("Title VII is violated where an employer denies an employee equal access to a common restroom corresponding to the employee's gender identity"); ROA.1381 (same); ROA.1383 (same).

Neither the text of Title VII nor the EEOC's regulatory guidance makes any exemptions or accommodations for employers that oppose homosexual or transgender behavior on religious grounds. The only religious accommodations in Title VII appear at 42 U.S.C. § 2000e-1(a) and 42 U.S.C. § 2000e-2(e)(2), which allow religious organizations and religious schools to limit employment to members of a particular religion. The Supreme Court has also recognized a "ministerial exception" in the First Amendment, which exempts a religious group's selection of its ministers from the reach of anti-

discrimination law. *See Our Lady of Guadalupe School v. Morrissey-Berru*, [140 S. Ct. 2049](https://) (2020). This "ministerial exemption" protects the Catholic Church from being forced to hire women as priests, and it protects other churches from being forced to hire practicing homosexuals as clergy. But this "ministerial exception" is no help to Christian nonprofits or businesses that oppose homosexuality and transgender behavior on religious grounds. And the "ministerial exemption" does nothing to shield churches or religious schools that require their non-ministerial employees (such as secretaries and janitors) to refrain from homosexual or transgender behavior.

## II. THE SUPREME COURT'S INTERPRETATION OF TITLE VII

On June 15, 2020, the Supreme Court announced its ruling in *Bostock v. Clayton County*, [140 S. Ct. 1731](https://) (2020). *Bostock* holds that Title VII's prohibition on "sex" discrimination prohibits employers from firing or refusing to hire individuals "for being homosexual or transgender." *Id.* at 1737.

*Bostock* explained that an employer who fires an employee for conduct or personal attributes that it would tolerate in a member of the opposite biological sex has made the employee's sex the "but-for cause" of his discharge, and that (in the Court's view) violates the statutory command of Title VII. The Court explained:

> If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge. Or take

an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

*Id.* at 1741-42. *Bostock* also makes clear that an employer does *not* violate Title VII if it fires an employee for conduct or personal attributes that it would not tolerate in an employee of the opposite biological sex:

Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent.

*Id.* at 1742.

These statements in *Bostock* prohibit employers from enforcing sex-specific dress or grooming codes. *See Bostock*, 140 S. Ct. at 1741 ("[I]f changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred."). They also render employers incapable of preventing their employees from entering and using restrooms reserved for the opposite sex, regardless of the employee's purpose or desire for accessing the opposite-sex restroom. *See id.*; *id.* at 1745-46 ("[N]othing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond sex discrimination."). At the end of its opinion, the Court says it that it "do[es] not purport to address bathrooms, locker rooms, or anything else of the kind." *Id.* at 1753. But no court can uphold the

legality of sex-specific dress codes and restrooms under Title VII without contradicting and defying other statements that appear throughout the *Bostock* opinion.

## III. Undisputed Facts

Bear Creek Bible Church (Bear Creek) is a nondenominational church in Keller, Texas. Bear Creek employs at least 15 individuals, so it is subject to Title VII. ROA.1385 (¶ 4); Some of Bear Creek's employees hold non-ministerial positions. ROA.1386 (¶ 9).

Bear Creek believes that the Bible is the Word of God, and it includes the following statement in its bylaws and statement of faith:

> That God's plan for human sexuality is to be expressed only within the context of marriage, that God created man and woman as unique biological persons made to complete each other. God instituted monogamous marriage between male and female as the foundation of the family and the basic structure of human society. For this reason, we believe that marriage is exclusively the union of one genetic male and one genetic female (Gen 2:24; Matt 19:5-6, Mark 10:6-9; Romans 1:26-27; I Cor 6-9).

ROA.1386-1387 (¶ 12). Bear Creek requires its employees to live according to Biblical teaching on matters of sexuality and gender, and it will not consider practicing homosexuals, bisexuals, crossdressers, or transgender or gender non-conforming individuals for church employment—including employment for non-ministerial positions. ROA.1386 (¶ 11). Bear Creek does not recognize same-sex marriage and will not offer benefits to same-sex partners of its employees, and any church employee who enters into a same-sex marriage would face dismissal from employment. ROA.1386-1387 (¶¶ 11-12). Bear

Creek also separates its restrooms by biological sex, and church employees are forbidden to use restrooms designated for the opposite biological sex. ROA.1387 (¶ 14).

Braidwood Management Inc. (Braidwood) is a for-profit corporation that employs approximately 70 individuals. ROA.1389-1390 (¶ 5). Braidwood is owned by a trust controlled by Dr. Steven F. Hotze. ROA.1389-1390 (¶¶ 3-6). Dr. Hotze is a Christian, and he operates his businesses according to his Christian beliefs found in the Bible. ROA.1390 (¶¶ 8-11); ROA.1394; ROA.1396-1397. Dr. Hotze therefore does not allow Braidwood to hire or employ individuals who are known to engage in sexually immoral behavior or gender non-conforming conduct of any sort, including homosexuality, cross-dressing, and transgenderism. ROA.1390-1391 (¶¶ 12-15). Dr. Hotze also will not permit employees of Braidwood to use a restroom designated for members of the opposite biological sex—regardless of the gender identity that the employee asserts. ROA.1391 (¶ 14).

Braidwood enforces a sex-specific dress-and-grooming code that requires men and women to wear professional attire according to their biological sex. ROA.1391 (¶ 13); ROA.1399-1402. Men are forbidden to wear earrings, although women may. ROA.1401. Men who have customer contact must wear a tie (or bow tie); women are not required or even permitted to wear ties. *See id.* Women may wear skirts, blouses, shoes with heels, and fingernail polish, while men are forbidden to wear these accoutrements. ROA.1399-1402. Cross-dressing of any sort is prohibited. *See id.* Dr. Hotze enforces this sex-

specific dress-and-grooming code not only to maintain the professionalism of his businesses, but also because of his belief in the Bible, which requires men to dress as men and women to dress as women. ROA.1390-1391 (¶¶ 12-13); Deuteronomy 22:5 (KJV) ("A woman shall not wear anything that pertains to a man, nor shall a man put on a woman's garment, for all who do so are an abomination to the LORD your God.").

## IV. THE PLAINTIFFS' CLAIMS FOR RELIEF

Bear Creek and Braidwood are asserting five claims for relief.

First. Bear Creek and Braidwood claim that Title VII, as interpreted in *Bostock* and the EEOC's guidance documents, violates the Religious Freedom Restoration Act (RFRA) by preventing them from operating their places of employment in accordance with Christian teaching. ROA.1215-1216 (¶¶ 49-53). Bear Creek and Braidwood asserted this claim on behalf of a proposed class of all employers in the United States that oppose homosexual or transgender behavior for sincere religious reasons. ROA.1216 (¶ 52). And they requested a declaratory judgment that RFRA protects the putative class members' prerogatives to:

(a) Refuse to employ individuals who are engaged in sexually immoral behavior, including homosexual conduct;

(b) Refuse to employ individuals who are engaged in gender non-conforming behavior, including cross-dressing, transvestism, efforts to change or transition one's gender, or asserting a gender identity that departs from one's biological sex;

(c) Refuse to recognize same-sex marriage or offer benefits to same-sex partners of their employees;

(d) Enforce sex-specific dress and grooming codes; and

(e) Prohibit employees from entering or using restrooms designated for the opposite biological sex.

ROA.1216 (¶ 53).

Second. Bear Creek and Braidwood claim that the Free-Exercise Clause compels these same exemptions for religious employers. ROA.1216-1217. Title VII is not a "neutral law of general applicability" under *Employment Division, Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 879 (1990),[1] because it exempts religious organizations and religious schools from its prohibitions on religious discrimination,[2] and it categorically exempts Indian tribes and employers with fewer than 15 employees.[3] The plaintiffs' Free Exercise claims must therefore be analyzed under the strict scrutiny of *Sherbert v. Verner*, 374 U.S. 398 (1963), and the plaintiffs' constitutional and RFRA claims must stand or fall together. Bear Creek and Braidwood asserted this Free Exercise claim on behalf of a proposed class of all employers in the

---

1. *Id.* ("[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' *United States v. Lee,* 455 U.S. 252, 263, n. 3 (1982) (Stevens, J., concurring in judgment).").

2. 42 U.S.C. § 2000e-1(a); 42 U.S.C. § 2000e-2(e)(2).

3. *See* 42 U.S.C. § 2000e(b).

United States that oppose homosexual or transgender behavior for sincere religious reasons. ROA.1216 (¶ 57).

Third. Bear Creek and Braidwood claim that Title VII, as interpreted in *Bostock* and the EEOC's guidance documents, violates the First Amendment right of expressive association by failing to exempt employers who oppose homosexual or transgender behavior. *See Boy Scouts of America v. Dale*, 530 U.S. 640 (2000). ROA.1218. Bear Creek and Braidwood asserted this claim on behalf of a proposed class of all employers in the United States that oppose homosexual or transgender behavior for religious *or nonreligious* reasons. ROA.1218 (¶ 60). And they contend that the First Amendment right of expressive association compels the same exemptions for objecting employers— whether religious or secular—that RFRA and the Free-Exercise Clause require for objecting religious employers. ROA.1218 (¶ 61).

Fourth. Bear Creek and Braidwood claim that Title VII, as interpreted in *Bostock*, does not prohibit discrimination against bisexual employees or job applicants, so long as the employer regards bisexual behavior or orientation as equally unacceptable in a man or a woman. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1742 (2020) ("Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent."); *see also id.* at 1740 ("[F]iring [a] person for actions or attributes it would tolerate in an individual of another sex . . . discriminates against that person in violation of Title VII."). ROA.1218-1219.

The EEOC's guidance documents, however, incorrectly state that *Bostock* prohibits "firing individuals because of their sexual orientation,"[4] even though it remains legal to fire an individual because of a bisexual orientation that would not be tolerated in someone of the opposite sex. Bear Creek and Braidwood seek a declaratory judgment that Title VII allows employers to discriminate against bisexuals, so long as the employer regards bisexual behavior or orientation as equally unacceptable in a man or a woman, and they asserted this claim on behalf of a proposed class of all employers in the United States that oppose homosexual or transgender behavior for religious or non-religious reasons. ROA.1219.

Fifth. Bear Creek and Braidwood claim that Title VII, as interpreted in *Bostock*, allows employers to fire or refuse to hire individuals who engage in homosexual or transgender conduct, so long the employer has established rules of conduct that apply equally to both sexes and would lead to the same result if the employee's biological different were different. ROA.1219-1221. These rules include, but are not limited to, the following:

> No employee, male or female, may engage in a particular sexual practice associated with homosexuality.

> No employee, male or female, may seek or obtain masculinizing hormone therapy.

> No employee, male or female, may undergo surgery to modify their genitals.

---

4.   ROA.1383.

ROA.1219-1220. Rules of this sort obviously have a disparate impact on homosexual and transgender individuals. But that is not a problem under Title VII, which prohibits only discrimination on account of "sex." *See Bostock*, 140 S. Ct. at 1746-47 ("We agree that homosexuality and transgender status are distinct concepts from sex."). Sex-neutral rules of conduct remain permissible under *Bostock*, so long as the employer can truthfully assert that he would fire an employee of the opposite biological sex for engaging in the same conduct. *See Bostock*, 140 S. Ct. at 1742 ("Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent.").

Bear Creek and Braidwood seek a declaratory judgment that Title VII allows employers to refuse to employ individuals who engage in homosexual or transgender behavior, so long as they do so according to rules of conduct that apply equally to both sexes and would lead to the same result if the employee's biological sex were different. ROA.1220. And they asserted this claim on behalf of a proposed class of all employers in the United States that oppose homosexual or transgender behavior for religious or non-religious reasons. ROA.1221.

## V. THE DISTRICT COURT'S RULINGS

On May 24, 2021, the plaintiffs moved for class certification and summary judgment. ROA.813-838; ROA.839-886. On October 31, 2021, the district court issued a memorandum opinion and order granting the plaintiffs'

motion for class certification in part and denying it in part, and granting the plaintiffs' motion for summary judgment in part and denying it in part. ROA.1619-1688. On November 22, 2021, the district court amended its memorandum opinion and order. ROA.1702-1771.

The district court first held that the plaintiffs had Article III standing and their claims were ripe. ROA.1717-1724.[5] Then the district court granted in part the plaintiffs' motion for class certification. ROA.1727-1729. The district court declined to certify the proposed class of "every employer in the United States that opposes homosexual or transgender behavior for sincere religious reasons." ROA.1727. Instead, the district court decided to analyze this proposed class as two distinct subclasses: a "Church-Type Employers Class" and a "Religious Business-Type Employers Class." ROA.1728. The district court declined to certify a "Church-Type Employers Class" because it held that this subclass failed the commonality requirement of Rule 23(a)(2). ROA.1728-1829. The district court did, however, certify a "Religious Business-Type Employers Class" represented by Braidwood. ROA.1729 ("Only the Religious Business-Type Employers meet all the Rule 23 requirements for certification on all five claims."); ROA.1871.

The district court also certified the plaintiffs' second proposed class, which includes "all employers in the United States that oppose homosexual

---

5.   The district court also rejected the defendants' sovereign-immunity argument, but the government is not pursuing that issue on appeal. ROA.1724-1727.

or transgender behavior for sincere religious reasons," but only with respect to Claims 4 and 5 (which concern the scope of *Bostock*'s holding). ROA.1729. The district court declined to certify this class with respect to the expressive-association claim (Claim 3), because it held that the class members lacked "*common* expressive association" and therefore could not satisfy Rule 23(a)(2)'s commonality requirement. ROA.1729.

On the merits, the district court held that the plaintiffs were entitled to judgment on some but not all of their claims. The district court first held that Bear Creek Bible Church was shielded from *Bostock* and the EEOC's guidance documents by the statutory exemption for "religious corporations" in 42 U.S.C. § 2000e-1(a),"[6] and ruled that the defendants were therefore entitled to summary judgment on all of Bear Creek's claims. ROA.1744 ("Because Bear Creek Church is exempt from Title VII pursuant to its terms, its RFRA claim—and all four remaining claims under Title VII—must be dismissed. Therefore, Defendants' Motion for Summary Judgment is GRANTED with respect to Bear Creek Church's Title VII claims."). The district court, however, held that Braidwood did not qualify for this statutory

---

6. *See* 42 U.S.C. § 2000e-1(a) ("This subchapter shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.").

exemption in 42 U.S.C. § 2000e-1(a),[7] so it proceeded to consider each of the five claims asserted by Braidwood and the Braidwood-represented classes.

## A. Religious Freedom Restoration Act

The district court granted summary judgment to Braidwood on its RFRA claim, holding that Title VII, as construed in *Bostock* and the EEOC's guidance documents, "substantially burdens Braidwood's religious exercise in conducting its business." ROA.1746. The district court also held that the EEOC had failed to demonstrate a "compelling" interest in its refusal to exempt or accommodate employers with religious objections to homosexual or transgender behavior. ROA.1747-1748 & n.22.

## B. Free Exercise Clause

The district court also granted summary judgment to Braidwood on its Free Exercise claim. ROA.1748-1752. The district court held that Title VII could not qualify as a "generally applicable and facially neutral law" under *Smith* because the statute is riddled with exemptions. ROA.1749-1750 (citing *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021)); ROA.1750 ("'[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise.'" (quoting *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021)). Strict scrutiny therefore applied, and the district court held that the defendants had

---

7.  ROA.1745 ("Braidwood does not qualify for Title VII's statutory exemption").

failed to demonstrate that their refusal to provide exemptions or accommodations to religious for-profit employers was "narrowly tailored" to advance a "compelling" governmental interest. ROA.1751-1752.

## C.    Expressive Association

The district court granted summary judgment to Braidwood on its expressive-association claim. ROA.1752-1756. The district court held that "for-profit businesses like Braidwood may pursue a right of association claim," and that "Braidwood is engaged in overt expression regarding its religious views of homosexuality and transgender behavior." ROA.1754-1755. And the court concluded that the defendants had failed to satisfy the strict scrutiny required by *Boy Scouts*. ROA.1756 ("For the same reasons that Defendants do not have a compelling interest in forcing an organization to retain, as a scoutmaster, a member who is a gay rights activist, Defendants do not have a compelling interest in forcing Religious Business-Type Employers to hire and retain individuals that engage in conduct that is contrary to the employers' expressive interests.").

## D.    Sex-Neutral Rules of Conduct (Claims 4 and 5)

The district court granted summary judgment to Braidwood on some but not all of its claims regarding the scope of *Bostock*'s holding. ROA.1756-1771. The district court rejected Braidwood's claim that Title VII, as construed in *Bostock*, allows employers to discriminate against bisexuals, and granted summary judgment to the defendants on Claim 4. ROA.1765-1766. The dis-

trict court also rejected Braidwood's claim that Title VII (as construed in *Bostock*) allows employers to enforce sex-neutral rules of conduct that prohibit their male and female employees from taking hormone therapy or undergoing sex-change operations. ROA.1770.

But the district court agreed with Braidwood that employers may "enforce a sexual ethic that applies evenly to heterosexual and homosexual sexual activity" without running afoul of *Bostock*. ROA.1766-1767. The district court also held that *Bostock* did not prohibit employers from enforcing sex-specific dress codes, or banning its employees from entering restrooms reserved for the opposite biological sex. ROA.1768-1771.[8]

## SUMMARY OF ARGUMENT

The Court should reject each of the arguments presented in the defendants' cross-appeal. The district court correctly found that the plaintiffs have Article III standing and that their claims are ripe, as the *in terrorem* effects from the EEOC's guidance documents and its previous lawsuits against religious employers present a "credible threat" and instill an "actual and well-founded fear" that Bear Creek or Braidwood might face enforcement pro-

---

8. The plaintiffs did not argue before the district court that Title VII, as construed in *Bostock*, permitted employers to enforce sex-specific dress codes and restrooms. They had contended only that RFRA and the First Amendment protect the rights of employers to enforce sex-segregated restrooms and sex-specific dress-and-grooming codes. ROA.1210-1211; ROA.1216-1218.

ceedings for operating their places of employment in accordance with the teachings of their faith.

The district court also correctly entered judgment for Braidwood on its RFRA and First Amendment claims, as the interpretations of Title VII in *Bostock* and the EEOC guidance documents substantially burden the plaintiffs' religious freedom and expressive association, and there is no compelling interest in refusing to exempt or accommodate religious employers when Title VII provides secular exemptions for small employers and Indian tribes. *See Fulton*, 141 S. Ct. at 1881-82; *Tandon*, 141 S. Ct. at 1296. The district court also correctly held that *Bostock* allows employers to enforce sex-neutral rules of sexual conduct that apply equally to men and women, even if those rules have the effect of excluding practicing homosexuals from employment. Finally, the defendants come nowhere close to showing that the district court abused its discretion in certifying the plaintiff classes.

The Court should, however, reverse the district court's judgment in three respects. First, the district court erred by rejecting the plaintiffs' claim that Title VII, as construed in *Bostock*, allows employers to discriminate against bisexual employees, so long as the employer finds bisexual orientation or conduct equally unacceptable in men and women. ROA.1765-1766. The district court also erred in rejecting the plaintiffs' claim that Title VII (as construed in *Bostock*) allows employers to establish sex-neutral rules that prohibit their male and female employees from taking hormone therapy or undergoing sex-change operations. ROA.1770. Finally, the district court's

conclusion that 42 U.S.C. § 2000e-1(a) shielded Bear Creek from *Bostock* and the EEOC's guidance documents should have led the district court to enter judgment for Bear Creek rather than the defendants.

## STANDARD OF REVIEW

The district court's standing and ripeness determinations are reviewed de novo. *See Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 542 (5th Cir. 2008) ("[W]e review all justiciability issues, including standing and ripeness, de novo."). The district court's decision to grant or deny a motion for summary judgment is likewise subject to de novo review. *See Carnegie Technologies, L.L.C. v. Triller, Inc.*, 39 F.4th 288, 293 (5th Cir. 2022) ("We review grants of summary judgment *de novo* and apply the same standard applicable to the district court.").

The district court's class-certification decisions are reviewed for abuse of discretion. *See Regents of University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 380 (5th Cir. 2007) ("We review class certification decisions for abuse of discretion").

## ARGUMENT

We will first respond to the arguments in the defendants' cross-appeal. *See* Sections I-IV, *infra*. Then we will present the arguments in the plaintiffs' appeal, which challenges the district court's decision to reject some (though not all) of the plaintiffs' claims concerning the scope of *Bostock*, as well as its decision to enter judgment against Bear Creek. *See* Sections V-VI, *infra*.

# I. THE DISTRICT COURT CORRECTLY HELD THAT THE PLAINTIFFS' CLAIMS ARE JUSTICIABLE

The defendants dispute the ripeness of the plaintiffs' claims, as well as the plaintiffs' Article III standing. Neither argument has merit.

## A. The District Court Correctly Held That The Plaintiffs Have Article III Standing

The defendants' brief leads with ripeness and addresses Article III standing afterward. But the Court should resolve Article III standing first because "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016); *see also United States v. Shkambi*, 993 F.3d 388, 389 (5th Cir. 2021) ("Article III jurisdiction is always first." (citation and internal quotation marks omitted)). In addition, the Supreme Court has recently cast doubt on whether "ripeness" doctrines can defeat justiciability once Article III standing has been established. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014);[9] *id.* at 167-68 (considering ripeness only after resolving the plain-

---

9. *See Susan B. Anthony List*, 573 U.S. at 167 (2014) ("Respondents contend that these 'prudential ripeness' factors confirm that the claims at issue are nonjusticiable. But we have already concluded that petitioners have alleged a sufficient Article III injury. To the extent respondents would have us deem petitioners' claims nonjusticiable 'on grounds that are "prudential," rather than constitutional,' '[t]hat request is in some tension with our recent reaffirmation of the principle that "a federal court's obligation to hear and decide" cases within its jurisdiction "is virtually unflagging." . . . . [W]e need not resolve the continuing vitality of the prudential ripeness doctrine in this case because the 'fitness' and 'hardship' factors are easily satisfied here." (citations omitted)).

tiffs' Article III standing); Appellees' Br. at 15 (acknowledging that Article III standing and ripeness "often overlap in practice" (citation and internal quotation marks omitted)). For these reasons, the Court should rule on Article III standing before considering the defendants' ripeness objections.

The EEOC is interpreting and enforcing Title VII in a manner that compels religious organizations to employ individuals who are engaged in homosexual and transgender behavior. ROA.1380-1384; *see also EEOC v. R.G. & G.R. Harris Funeral Homes Inc.*, 884 F.3d 560 (6th Cir. 2018). This inflicts Article III injury by forcing the plaintiffs to run the risk of an EEOC enforcement action if they operate their places of employment in accordance with the teachings of their faith. The plaintiffs' Article III injury is clearly set forth in the declarations of Pastor Salvesen and Dr. Hotze, as well as the undisputed evidence submitted in this case. ROA.1385-1388 (Salvesen Declaration); ROA.1390-1402 (Hotze Declaration).

The defendants claim that the plaintiffs lack Article III standing because the EEOC has not taken any enforcement action against them yet, and because no employee or job applicant has complained to the EEOC about the plaintiffs' employment policies. *See* Appellees' Br. at 35-36. The defendants also insist that the plaintiffs must show that they have violated (or are about to violate) the EEOC's interpretation of Title VII with respect to a particular employee or job applicant. *See id.* ("[P]laintiffs would have to employ or receive an employment application from an individual engaged in 'homosexual or transgender behavior' and subject that individual to an adverse employ-

ment action; that individual would also have to file a charge with the EEOC.").

None of that defeats the plaintiffs' standing or refutes their showing of Article III injury. A litigant who brings a pre-enforcement lawsuit is not required to allege or prove an imminent enforcement action directed at him specifically. And he is not required to violate the law in a manner that exposes himself to penalties as a prerequisite to seeking pre-enforcement relief. A plaintiff needs only to show a "credible threat"[10] or an "actual and well-founded fear"[11] that he *might* be subject to enforcement proceedings—and the plaintiffs have done more than enough to satisfy these requirements for a pre-enforcement challenge.

### 1. The Plaintiffs Are Not Required To Allege Or Prove An Imminent Enforcement Action Directed At Them

A litigant seeking pre-enforcement relief is not required to allege an imminent or threatened enforcement action directed *at him*. That much is clear from *Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020), where this Court allowed a student group to bring a pre-enforcement challenge to university speech codes despite "declarations by University officials" that "the University lacks any intention to penalize the intended conduct of Speech First's members." *Id.* at 336; *see also id.* ("[A] plaintiff who mounts a pre-

---

10. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (1979); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020).

11. *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988).

enforcement statutory challenge on First Amendment grounds need not show that the authorities have threatened to prosecute him" (citation and internal quotation marks omitted)). It is also clear from the Supreme Court's pronouncements on pre-enforcement challenges outside the First Amendment context. In *Doe v. Bolton*, 410 U.S. 179 (1973), the Court allowed doctors to bring a pre-enforcement challenge to Georgia's abortion law, "despite the fact that the record does not disclose that any one of them has been prosecuted, *or threatened with prosecution*, for violation of the State's abortion statutes." *Id.* at 188 (emphasis added). It was enough for the doctors to show that the Georgia abortion statute was "recent and not moribund," and that it was the successor to another Georgia abortion statute under which *some* physicians were prosecuted. They did not need to allege or prove an "imminent or threatened" prosecution directed at them specifically. They needed only to establish a credible threat that the statute would be enforced against physicians generally, and that it was not a defunct or antiquated statute that was no longer being enforced against anyone.

And in *Stenberg v. Carhart*, 530 U.S. 914 (2000), the Supreme Court permitted abortion providers to challenge Nebraska's partial-birth abortion statute on the ground that it would prohibit the dilation and evacuation (D&E) procedure—despite the fact that the Attorney General of Nebraska had specifically disclaimed an intent to enforce the statute against any doctor who performed D&E abortions. *See id.* at 938-46. The Court allowed the doctors to raise this pre-enforcement challenge because "some present pros-

ecutors and future Attorneys General *may choose to pursue* physicians who use D&E procedures, the most commonly used method for performing previability second trimester abortions. All those who perform abortion procedures using that method must fear prosecution, conviction, and imprisonment." *Id.* at 945 (emphasis added). The Court found that this mere *possibility* of future prosecution—even though it had been specifically disclaimed by the current Attorney General—not only imposed an Article III injury on abortion providers but also imposed an "undue burden" on women seeking abortions. *See id.* at 945-46.

Finally, the Eighth Circuit's ruling in *Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019), allowed a Christian videography business (Telescope Media) to bring a pre-enforcement First Amendment challenge to the Minnesota Human Rights Act—even though Telescope Media had not yet entered the wedding-video business, and even though it was not facing any enforcement action (or any impending or threatened enforcement) from the state authorities. *See id.* at 749-50. The Eighth Circuit held that Telescope Media had alleged a "credible threat of enforcement" sufficient to establish standing because Minnesota had "publicly announced" that its statute would require wedding vendors to provide equal services for same-sex and opposite-sex weddings, and the state had already enforced the Act against one wedding vendor who refused to rent out a venue for a same-sex wedding. *See id.* It was enough for Telescope Media to allege that it intended to violate the Minnesota Human Rights Act and that the state authorities had enforced the

statute against a similar religious objector. The Court did not require Telescope Media to allege a threatened enforcement action directed at it specifically.

The defendants are correct to observe that an "injury" under Article III must be "actual or imminent," and not "conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted); *see also* Appellees' Br. at 34-35. But the defendants are mischaracterizing the relevant "injury" in this case. In a pre-enforcement challenge, a plaintiff is not required to prove that he is facing an "actual or imminent" *enforcement action*. Instead, the injury comes from the *fear* or the *threat* that he might be subjected to enforcement proceedings if he acts in a desired manner—and from the chilling effect that this fear imposes on his constitutional freedoms. *See American Booksellers Ass'n*, 484 U.S. at 393 (an "actual and well-founded *fear* that the law will be enforced against them" suffices to confer standing in a pre-enforcement suit) (emphasis added); *Susan B. Anthony List*, 573 U.S. at 159 (a "credible *threat*" of prosecution or enforcement establishes standing in pre-enforcement litigation) (emphasis added); *Babbitt*, 442 U.S. at 298 (same); *Speech First*, 979 F.3d at 335 (same). *That* injury is "actual or imminent" even if it never leads to an actual prosecution or enforcement action brought against the plaintiff.[12]

---

12. *See also Diamond v. Charles*, 476 U.S. 54, 64 (1986) ("[P]ossible criminal prosecution" enough to confer Article III standing in a pre-enforcement lawsuit).

The uncontested evidence in this case shows that the EEOC: (1) Has announced through its adjudications and guidance documents that Title VII prohibits employers from discriminating against individuals who engage in homosexual or gender non-conforming behavior;[13] (2) Refuses to recognize or acknowledge any religious exemptions to these supposed requirements of Title VII;[14] and (3) Has already sued at least one religious employer for discriminating against a transgender employee, despite the protections conferred by the Religious Freedom Restoration Act and despite the employer's sincere religious objections to gender non-conforming behavior.[15] And the unrebutted declarations from Pastor Salvesen and Dr. Hotze show that the plaintiffs regard the EEOC's actions as a threat that they will likewise face investigation or enforcement action if a job applicant or employee complains to the EEOC about their employment policies. ROA.1388 (¶ 17); ROA.1392 (¶ 18).

The fears expressed in the Salvesen and Hotze declarations are "actual and well-founded,"[16] and the threats that they perceive are both "credible" and "substantial."[17] A "credible threat" can arise from the government's

---

13. ROA.1380-1384.
14. ROA.1380-1384.
15. *See EEOC v. R.G. & G.R. Harris Funeral Homes Inc.*, 884 F.3d 560 (6th Cir. 2018).
16. *American Booksellers Ass'n*, 484 U.S. at 393.
17. *Susan B. Anthony List*, 573 U.S. at 159; *Babbitt*, 442 U.S. at 298; *Speech First*, 979 F.3d at 330.

prosecution of *others*, even if the plaintiff himself has never been prosecuted or directly threatened by the authorities. *See Doe*, 410 U.S. at 188; *Telescope Media Group*, 936 F.3d at 749-50; *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010) ("[A] threat of government prosecution is credible if . . . there is a history of past prosecution or enforcement under the challenged statute." (citation and internal quotations omitted)). And the EEOC's actions against Harris Funeral Homes are all that is needed to establish a "credible threat" that the plaintiffs (and other religious employers) may face investigation or enforcement action if they refuse to employ individuals engaged in homosexual conduct or gender non-conforming behavior—especially when the EEOC refuses to disavow the possibility of enforcing *Bostock* against the plaintiffs and other employers with sincere religious objections to homosexuality and transgenderism.

Consider the Supreme Court's ruling in *American Booksellers*. The court of appeals recognized that the plaintiffs in that case had never been prosecuted or even *threatened* with prosecution under the statute. *See American Booksellers Ass'n, Inc. v. Virginia*, 802 F.2d 691, 693 (4th Cir. 1986) ("[T]here has been no proof that the Booksellers have been prosecuted, *threatened with prosecution*, or have detrimentally changed their behavior as a result of the amendment." (emphasis added)). Yet the Supreme Court allowed the pre-enforcement challenge, because the plaintiffs had alleged a credible *fear* of prosecution despite the absence of a specific threat. *See American Booksellers Ass'n*, 484 U.S. at 393. Consider also the Second Circuit's ruling in *Quill v.*

*Vacco*, [80 F.3d 716](#) (2d Cir. 1996), *rev'd on other grounds*, *Vacco v. Quill*, [521 U.S. 793](#) (1997), which allowed doctors to bring a pre-enforcement challenge over a statute outlawing physician-assisted suicide, even though the district attorney *said* that he would not bring criminal charges against them. *Id.* at 723. In the court's view, it was enough that the district attorney had criminally prosecuted a *non-physician* for helping his wife commit suicide under an entirely different criminal statute:

> Although District Attorney Morgenthau argues in his brief on appeal that appellants have not shown that they are in any jeopardy of prosecution in New York County, a recent indictment by a New York County grand jury demonstrates the contrary. A newspaper report printed on December 15, 1995 disclosed the following: 'Yesterday, District Attorney Robert M. Morgenthau of Manhattan announced that a grand jury had indicted [George] Delury, an editor who lives on the Upper West Side, on manslaughter charges for helping his 52-year-old wife, Myrna Lebov, commit suicide last summer.' Carey Goldberg, *Suicide's Husband Is Indicted; Diary Records Pain of 2 Lives,* N.Y. Times, Dec. 15, 1995, at B1. The physician plaintiffs have good reason to fear prosecution in New York County.

*Id.* at 723 (2d Cir. 1996), *rev'd on other grounds*, *Vacco v. Quill*, [521 U.S. 793](#) (1997) (footnote omitted). And the EEOC wants to contend that its decision to sue Harris Funeral Homes does *not* give the plaintiffs "reason to fear" future investigation and enforcement action?[18]

---

18. The defendants cite *United States v. Friday*, [525 F.3d 938, 955](#) (10th Cir. 2008), but that case has nothing to do with Article III standing. It held only that a plaintiff had failed to demonstrate that it would be "futile" to

### 2. The Plaintiffs Are Not Required To Violate The Law In A Manner That Exposes Them To Prosecution Or Enforcement Action Before Seeking Pre-Enforcement Relief

The defendants also appear to be contending that the plaintiffs must wait until an actual job applicant or employee emerges who is engaged in homosexual or transgender behavior, and then sue the EEOC for declaratory relief once it becomes certain that the employee will file a charge with the EEOC. *See* Appellees' Br. at 35-36 ("[P]laintiffs would have to employ or receive an employment application from an individual engaged in 'homosexual or transgender behavior' and subject that individual to an adverse employment action; that individual would also have to file a charge with the EEOC. EEOC would then have to exercise its discretion to pursue an enforcement action."). But a litigant is not required to wait until he needs to break the law—or violate the law as interpreted by the EEOC—before he can sue for pre-enforcement relief. And the defendants' stance would leave the plaintiffs subject to penalties and lawsuits if a court rejects their belated claims for declaratory relief against the EEOC. The entire point of declaratory judgments and pre-enforcement challenges is to allow litigants to seek judicial declarations of their rights *before* exposing themselves to punishment or enforcement actions. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be

---

apply for a permit to shoot an endangered species simply by observing that the government had previously denied a permit application.

entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1154 (5th Cir. 1993) ("'The purpose of the Declaratory Judgment Act is to settle 'actual controversies' *before* they ripen into violations of law or breach of some contractual duty.'" (citation omitted)). Yet the defendants' argument—if accepted by this Court—would thrust the plaintiffs into the very dilemma that a pre-enforcement challenge is supposed to avoid. As this Court has eloquently explained:

> To insist that a person must break the law in order to test its constitutionality is to risk punishing him for conduct which he may have honestly thought was constitutionally protected. Not only is this prima facie unfair, but it discourages people from engaging in protected activity and enforcing constitutional rights.

*International Society for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 821 (5th Cir. 1979).

The defendants' stance is also incompatible with *Telescope Media*, which allowed a Christian wedding vendor to launch a pre-enforcement challenge to a state anti-discrimination law before it had even entered the wedding-video business. *See Telescope Media Group*, 936 F.3d at 749-50. Here, too, it is untenable to require a wedding vendor to wait until a same-sex couple appears and requests its services before seeking declaratory relief, because an unsuccessful lawsuit will leave the wedding vendor exposed to penalties from the state over its refusal to provide the requested services. *See, e.g.*, *State v. Arlene's Flowers, Inc.*, 441 P.3d 1203 (Wash. 2019), cert. denied, 2021 WL 2742795

(July 2, 2021). For the same reason, a Christian employer has standing to seek declaratory relief against the EEOC before it is forced to take action against an actual homosexual or transgender job applicant or employee, which would leave the employer on the hook for penalties if the courts wind up rejecting its RFRA and First Amendment claims.

### B. The District Court Correctly Held That The Plaintiffs' Claims Are Ripe

It is far from clear whether a court may reject a claim as "unripe" once Article III standing has been established. *See Susan B. Anthony List*, 573 U.S. at 167; note 9, *supra*, and accompanying text. But even assuming that the ripeness doctrine has independent work to do, the defendants' ripeness objections are without merit. In determining whether a claim is ripe, a court must consider: (1) "the fitness of the issues for judicial decision"; and (2) "the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). The undisputed evidence in this case shows that each of these factors is satisfied.

A claim is "fit for judicial decision" if it presents a pure question of law that will not be clarified by further factual development. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (finding the "fitness" factor to be "easily satisfied" because "petitioners' challenge to the Ohio false statement statute presents an issue that is 'purely legal, and will not be clarified by further factual development.'" (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 581 (1985)). The defendants do not dispute this,

but they insist that the Court should nonetheless wait because each of the plaintiffs' claims (according to the defendants) should be evaluated in an employee-specific and fact-intensive matter. *See* Appellees' Br. at 21-28.

None of this defeats ripeness because there are no disputed questions of fact in this case,[19] and the *only* issues for this Court to resolve concern the meaning of RFRA, the First Amendment, and Title VII. How can these issues *not* be "fit for judicial decision"? None of the answers to these legal questions will be affected by the facts surrounding a particular future employment action. It remains a purely legal question whether Title VII (as construed by the EEOC) "substantially burdens" the religious freedom of those that do not wish to employ individuals who engage in homosexual or transgender behavior. It also remains a purely legal question whether the government's interest in enforcing *Bostock* is "compelling" enough to force RFRA and First Amendment claims to give way. And it remains a purely legal question whether *Bostock* allows employers to discriminate against bisexuals, or enforce rules of conduct that apply equally to men and women yet disproportionately affect homosexual or transgender employees and job applicants. The defendants also never explain how these any of claims would become *more* "fit for judicial decision" if the plaintiffs were forced to wait until the EEOC specifically threatens them with enforcement proceedings over

---

19. The defendants are not questioning the sincerity of the plaintiffs' religious beliefs, and they do not contest any of the factual claims asserted in the Salvesen and Hotze declarations.

their refusal to employ a particular homosexual or transgender individual. Nothing in the resolution of these legal questions depends on the facts of a particular employee or job applicant, so it is not apparent how anything would be gained from telling the plaintiffs to return to court later.

As for "hardship to the parties": The Court's answer to this question should mirror its answer on the Article III standing issues, and the Supreme Court's opinion in *Susan B. Anthony List* suggests that the standing and ripeness inquiries merge in pre-enforcement litigation. *See Susan B. Anthony List*, 573 U.S. at 167-68. So if the Court finds the plaintiffs are suffering "injury in fact" from the *in terrorem* effects of the EEOC's guidance documents and its lawsuit against Harris Funeral Homes, then there will by definition be "hardship" to the plaintiffs from prolonging this injury and delaying the resolution of their claims. *See id.* ("Denying prompt judicial review would impose a substantial hardship on petitioners, forcing them to choose between refraining from core political speech on the one hand, or engaging in that speech and risking costly Commission proceedings and criminal prosecution on the other.").

* * *

If the defendants' justiciability objections were accepted by this Court, it would establish a cat-and-mouse game in which the EEOC remains free to sue any religious employer (such as Harris Funeral Homes) over its refusal to employ homosexual or transgender individuals, while simultaneously remaining able to swat away pre-enforcement lawsuits by claiming that it hasn't

threatened that particular employer with investigations or enforcement proceedings. It would also force every employer with religious objections to *Bostock* to wait until they must violate Title VII—and expose to themselves to penalties and lawsuits—before seeking a judicial declaration of their rights. A regime of this sort would never be tolerated in any other context—not in cases involving abortion rights,[20] not in cases challenging laws against doctor-assisted suicide,[21] and not with regard to any First Amendment activity other than speech or conduct that offends the LGBTQ community.[22]

The defendants want this Court to create a new allowance for governmental entities to deter disfavored speech and conduct by firing occasional shots across the bow while insulating their threats from pre-enforcement review and forcing everyone to choose between self-censorship and exposure to possible future enforcement proceedings. But the established rules governing pre-enforcement challenges are not subject to a political-correctness exception,[23] and they do not allow the EEOC to keep religious organizations guessing as to whether they can operate their places of employment in accordance

---

20. *See Doe v. Bolton*, 410 U.S. 179, 188 (1973).

21. *See Quill v. Vacco*, 80 F.3d 716, 723 (2d Cir. 1996), *rev'd on other grounds*, *Vacco v. Quill*, 521 U.S. 793 (1997).

22. *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988); *New York Republican State Committee v. SEC*, 799 F.3d 1126, 1135-36 (D.C. Cir. 2015) ("For many decades, the courts have shown special solicitude to pre-enforcement challenges brought under the First Amendment").

23. *See City of Chicago v. Morales*, 527 U.S. 41, 81 (1999) (Scalia, J., dissenting).

with the teachings of their faith. The EEOC guidance documents—along with its lawsuit against Harris Funeral Homes—are more than enough to strike "an actual and well-founded fear"[24] into the heart of the plaintiffs and other religious employers throughout the United States who decline to employ homosexuals or transgender individuals on account of their religious faith.

## II. The District Court Correctly Entered Judgment For Braidwood On Its RFRA And First Amendment Claims

The Religious Freedom Restoration Act "was designed to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014). It prohibits the federal government from substantially burdening the exercise of religion. 42 U.S.C. § 2000bb-1. The only exception is when the federal government demonstrates that the application of the burden to the affected individual represents the "least restrictive means" of advancing "a compelling governmental interest." The interpretations of Title VII adopted by the EEOC and by the Supreme Court in *Bostock* substantially burden the plaintiffs' religious freedom—as well as the freedom of all employers who oppose homosexual or transgender behavior for sincere religious reasons. And there is no compelling governmental interest in refusing to exempt religious employers from these novel anti-discrimination edicts.

---

24. *American Booksellers Ass'n*, 484 U.S. at 393 (1988).

### A. Title VII, As Interpreted in *Bostock*, Substantially Burdens Employers Who Oppose Homosexual Or Transgender Behavior For Sincere Religious Reasons

The Supreme Court has explained that requiring individuals to "engage in conduct that seriously violates their religious beliefs" imposes a substantial burden on their exercise of religion. *Hobby Lobby*, 573 U.S. at 720. If an employer sincerely believes that the conduct demanded by the state would violate its religious convictions, then the courts are forbidden to question the reasonableness of that belief. *See Hobby Lobby*, 134 S. Ct. at 2778 ("[C]ourts have no business addressing whether the religious belief asserted in a RFRA case is reasonable." (parentheses omitted)). The *only* question to resolve is whether the regulation substantially burdens the objecting employer's ability to conduct his business in accordance with those beliefs. *See id.* at 2779 (when plaintiffs "sincerely believe" that compliance with the regulation "lies on the forbidden side of the line, . . . it is not for us to say that their religious beliefs are mistaken or insubstantial."); *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) ("[U]nder RFRA, the Departments must accept the sincerely held complicity-based objections of religious entities. That is, they could not 'tell the plaintiffs that their beliefs are flawed' because, in the Departments' view, 'the connection between what the objecting parties must do . . . and the end that they find to be morally wrong . . . is simply too attenuated.'" (quoting *Hobby Lobby*, 573 U.S. at 723-24)).

Title VII, as interpreted in *Bostock* and the EEOC's guidance documents, substantially burdens the plaintiffs' religious freedom by prohibiting them from operating their places of employment in accordance with Christian teaching. The plaintiffs have sincere and deeply held religious beliefs that marriage is limited to a man and a woman, that sex is to be reserved for marriage, and that men and women are to dress and behave in accordance with distinct and God-ordained, biological sexual identity. ROA.1385-1402. Title VII, as interpreted in *Bostock*, requires that the plaintiffs operate their businesses in a manner contrary to their religious beliefs by denying them the ability to prescribe standards of conduct and deportment for their employees. At the same time, the plaintiffs believe that they are called by God to obey the civil authorities. So they are caught in a bind, and until this Court grants the declaratory relief that the plaintiffs seek, the plaintiffs have no way to avoid violating their religious beliefs. The EEOC's guidance documents announcing this interpretation of Title VII refuse to recognize or acknowledge any protections for religious employers under RFRA or the First Amendment,[25] and the EEOC's lawsuit against Harris Funeral Homes makes clear that the Commission has no desire to accommodate employers with sincere religious objections to homosexual and transgender behavior. All of this communicates an unmistakable threat to every religious employer in the United States: Comply with the EEOC's interpretation of Title VII or risk

---

25.  ROA.1380-1384.

investigation and enforcement proceedings. Putting an employer to this choice imposes a "substantial burden" on the exercise of religion. *See, e.g.*, *Sherbert v. Verner*, 374 U.S. 398, 403-06 (1963); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) ("[A] law that 'operates so as to make the practice of . . . religious beliefs more expensive' in the context of business activities imposes a burden on the exercise of religion." (quoting *Braunfeld v. Brown*, 366 U.S. 599, 605 (1961)).

The defendants do not question the sincerity of the plaintiffs' religious convictions, and they do not (and cannot)[26] question the reasonableness of their belief that Title VII (as interpreted in *Bostock* and the EEOC's guidance documents) substantially burdens their religious exercise. Instead, the defendants complain that the district should not have evaluated the "substantial burden" issue on a classwide basis. *See* Appellees' Br. at 40-41; *id.* at 42-43. But that is an argument against the propriety of class certification or classwide relief; it does not show that *Braidwood* failed to establish a substantial burden on its RFRA claim. And in all events, the proposed class was defined to include only those employers "that oppose[] homosexual or transgender behavior for sincere religious reasons,"[27] so each of the class members will by definition encounter "substantial burdens" from the threats directed at religious employers that refuse to kowtow to the EEOC's guid-

---

26. *See Hobby Lobby*, 573 U.S. at 723-24; *Little Sisters*, 140 S. Ct. at 2383 (2020).
27. ROA.1727.

ance documents. The defendants suggest that this class definition is overin-clusive,[28] but that objection can be resolved by tweaking the class defini-tion;[29] it does not justify reversing the summary judgment that Braidwood obtained.

### B. The Defendants Have Failed To Demonstrate A Compelling Governmental Interest To Justify The Burden On Plaintiffs' Religious Exercise

Having shown a "substantial burden" on the plaintiffs' religious liberty, the burden now shifts to the government to demonstrate that the EEOC's interpretation of Title VII advances a "compelling governmental interest" and is "the least restrictive means of furthering that compelling governmen-tal interest." 42 U.S.C. § 2000bb-1(b). This is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), and the EEOC comes nowhere close to satisfying this standard.

The relevant "governmental interest" cannot be described with vague abstractions, such as "promoting equality" or "preventing injustice." *See Hobby Lobby*, 573 U.S. at 726 (rejecting the government's attempt to frame the "governmental interests" in generalized terms). Instead, a court must

---

28. *See* Appellees' Br. at 42 ("[T]he mere fact that an employer 'opposes homosexual or transgender behavior' does not necessarily mean that their religious beliefs compel them to refuse to employ individuals who engage in that conduct.").

29. The Court could, for example, redefine the certified class to include on-ly employers "that oppose *employing* homosexual or transgender indi-viduals for sincere religious reasons."

"'look beyond broadly formulated interests' and . . . 'scrutinize the asserted harm of granting specific exemptions to particular religious claimants'—in other words, to look to the marginal interest in enforcing the contraceptive mandate in these cases." *Id.* (quoting *Gonzales v. O Centro Espírita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)). The relevant question is not whether Title VII's prohibition on "sex" discrimination, taken by itself, advances a compelling governmental interest. It is instead whether the EEOC's *refusal to exempt religious objectors* advances such an interest. *See Fulton*, 141 S. Ct. at 1881 ("The question . . . is not whether the City has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to CSS."). And the EEOC cannot possibly show that the enforcement of Title VII is a policy of such overriding importance that no exceptions can be made.

Start with the fact that Title VII itself limits its coverage to businesses with 15 or more employees. 42 U.S.C. § 2000e(b) ("'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year"). Congress was satisfied to use a rough-and-ready cutoff to regulate larger businesses without even attempting to impose this anti-discrimination rule on everyone. If Congress didn't think the interests advanced by Title VII were important enough to extend to small employers, then the EEOC cannot establish that the supposed "interests" behind its policy are of such "compelling" importance that no exemptions

can be made for religious believers. *See Fulton*, <u>141 S. Ct. at 1882</u> (holding that the existence of exceptions "undermines the City's contention that its non-discrimination policies can brook no departures"). Title VII also exempts Indian tribes from its coverage. *See* <u>42 U.S.C. § 2000e(b)</u>; *Wardle v. Ute Indian Tribe*, <u>623 F.2d 670, 672</u> (10th Cir. 1980) ("Indian tribes and businesses operating on or near Indian reservations are excluded from the employment discrimination prohibitions of Title VII."). So the defendants must find some way to explain how the government's "interest" in enforcing Title VII was not quite "compelling" enough to persuade Congress to extend the statute to small employers or Indian tribes, yet *is* compelling enough to prevail over another person's religious freedom. *See Fulton*, <u>141 S. Ct. at 1882</u> ("The City offers no compelling reason why it has a particular interest in denying an exception to CSS while making them available to others.").

The EEOC must also explain how its refusal to exempt religious employers advances a "compelling" government interest when Congress has repeatedly failed to enact explicit statutory anti-discrimination protections for homosexual and transgender employees—and when Congress has (at least as of this date of this brief) refused to enact legislation that would exempt Title VII from the requirements of RFRA. The House of Representatives did pass the "Equality Act" last year, which would strip religious employers of RFRA protections in lawsuits brought to enforce *Bostock*. But this bill has not passed the Senate—and it has no prospect of passage unless the Senate eliminates the filibuster or the bill is amended to strengthen protections for religious ob-

jectors. *See* John McCormack, *Susan Collins Won't Cosponsor Equality Act Again*, National Review (February 25, 2021), available at https://bit.ly/3yzAQxN (last visited August 1, 2022). It's hard to understand how a supposed governmental "interest" in forcing religious employers to hire homosexual and transgender employees can be deemed "compelling" when Congress repeatedly considers and fails to enact legislation that would accomplish this result. *See Little Sisters*, 140 S. Ct. at 2392 (Alito, J., concurring) ("We can answer the compelling interest question simply by asking whether *Congress* has treated the provision of free contraceptives to all women as a compelling interest.").

The government *does* have a compelling interest in eradicating *racial* discrimination, or at least the courts have so held. *See Hobby Lobby*, 573 U.S. at 733 ("The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race"); *Bob Jones University v. United States*, 461 U.S. 574, 604 (1983). And at least one Supreme Court decision has held that the governmental interest in eradicating discrimination against *women* is sufficiently "compelling" to override claims of constitutional right. *See Roberts v. United States Jaycees*, 468 U.S. 609, 623-24 (1984). But one cannot leap from those decisions to say that *any* anti-discrimination law will automatically advance a "compelling governmental interest." Indeed, any such claim would require the overruling of *Boy Scouts*, 530 U.S. at 648, where the Supreme Court refused to allow a state's anti-discrimination law to prevail over a First Amendment claim.

### C. The District Court Correctly Entered Judgment For Braidwood On Its Free-Exercise Claim

The plaintiffs are entitled to judgment on their free-exercise claim for the same reasons. Title VII's prohibition against "sex" discrimination cannot qualify as "neutral law of general applicability" under *Smith* because of its statutory exemptions, and the defendants do not argue to the contrary. *See Tandon*, 141 S. Ct. at 1296 ("[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise."); *Fulton*, 141 S. Ct. at 1877-81 (laws are not "generally applicable" if they allow for the possibility of exemptions, even if those exemptions are never granted). Strict scrutiny therefore applies, and the plaintiffs' free-exercise claim stands or falls with their RFRA claim.

### D. The District Court Correctly Entered Judgment For Braidwood On Its Expressive-Association Claim

The First Amendment protects the "right to associate for the purpose of engaging in . . . activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984). "[I]mplicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* at 622. And there is a corresponding right to exclude from a group those whose pres-

ence would compromise the expressive commitments of the group. *See Boy Scouts*, [530 U.S. at 648](#).

Title VII operates to require employers to associate with employees. But many places of employment operate under the rubric of expressive association. That is especially true for churches and overtly Christian nonprofits or businesses. But it is equally true of a secular employer or business that operates according to a publicly stated set of values. And in these situations, requiring an organization to hire and employ individuals whose lifestyles and behaviors are contrary to the values of the organization violates the freedom of association. "The First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private." *Boy Scouts*, [530 U.S. at 648](#). The government can no more force an association that opposes homosexuality or transgender behavior to hire individuals engaged in that conduct than it can force a gay-rights organization to hire an avowed opponent of homosexuality.

In this case, the plaintiffs run their places of employment as a way of expressing deep and sincere religious commitments, including a commitment to their understanding of Christian values and ethics in the operation of the business. [ROA.1385-1402](#). Title VII (as interpreted in *Bostock*) requires the plaintiffs to employ individuals whose behavior compromises the expression of those values, and it prevents the plaintiffs from excluding employees who will subvert the religious mission of their organization. This again triggers

strict scrutiny, which the defendants cannot meet for the reasons provided in Sections II.A-B, *supra*.

The defendants correctly observe that the plaintiffs must show that they engage in "expressive association." Appellees' Br. at 46-47. But the Salvesen and Hotze declarations supply all that is needed on that front. ROA.1386-1387 (¶¶ 12-13); ROA.1390 (¶¶ 8-11). Bear Creek Bible Church has an explicit statement of faith that declares that "God's plan for human sexuality is to be expressed only within the context of marriage, that God created man and woman as unique biological persons made to complete each other." ROA.1386-1387 (¶ 12). And Braidwood is organized and operates as an overtly and unapologetically Christian business. ROA.1390 (¶¶ 8-11). The defendants try to characterize Braidwood as a mere profit-generating enterprise, but *Hobby Lobby* makes clear that for-profit corporations can exercise religion—and it follows that for-profit businesses can express and espouse Christian beliefs about marriage and human sexuality as well. And each of the plaintiffs is far more overt and explicit about its beliefs than the Boy Scouts of America, which merely required its scouts to be "clean" and "morally straight." *See* Richard A. Epstein, *The Constitutional Perils of Moderation: The Case of the Boy Scouts*, 74 S. Cal. L. Rev. 119 (2000).

It is undisputable that the employment of a person engaged in homosexual or transgender behavior would compromise the message that Bear Creek and Braidwood are attempting to convey as overtly Christian entities—in the same way that the inclusion of a homosexual scoutmaster would significantly

affect the Boy Scouts' expressive communications. The defendants' efforts to distinguish *Boy Scouts* are unavailing, as Bear Creek and Braidwood are *far* more explicit about their opposition to homosexual conduct than the Boy Scouts has ever been. And the defendants' suggestion that compelled *employment* is somehow less offensive to the First Amendment than compelled *membership* falls flat. *See* Appellees' Br. at 49-50. Employment of an individual signifies that the employer is at least equanimous toward the employee's conduct and behavior outside the office—that is why Capitol rioters lost their jobs after they were identified on social media. *See* Jaclyn Peiser, *Internet Detectives Are Identifying Scores of Pro-Trump Rioters. Some Have Already Been Fired*, Wash. Post ( Jan. 8, 2021), available at https://wapo.st/3wvuE7K (last visited on August 1, 2022). The compulsory inclusion of an employee whose lifestyle contradicts the values of an organization will by definition "significantly affect" the employer's ability to communicate those values.

## III. The District Court Correctly Entered Judgment For Braidwood On Its Title VII Claims

### A. The Declaratory Judgment Act Authorizes The Plaintiffs To Seek A Declaration Of Their Rights Under Title VII

The defendants complain that the plaintiffs failed to identify a cause of action for Claims 4 and 5. *See* Appellees' Br. at 50-51. But the cause of action for those claims rests squarely on the Declaratory Judgment Act, which authorizes defendants in an anticipated lawsuit to seek a judicial declaration of their rights before they are sued. *See* 28 U.S.C. § 2201(a); John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989, 1014 (2008) ("[T]he Declaratory Judg-

ment Act . . . authorizes parties who otherwise would be only defendants to become plaintiffs."); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45-46.

The defendants claim that this Court has rejected the notion that the Declaratory Judgment Act can provide an "independent" cause of action. *See* Appellees' Br. at 51. But those cases hold only that the Declaratory Judgment Act cannot create a cause of action when there is no cause of action that would authorize the *anticipated* lawsuit. *See Harris County v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015) ("[T]he Declaratory Judgment Act *alone* does not create a federal cause of action." (emphasis added)); *Okpalobi v. Foster*, 244 F.3d 405, 423 n.31 (5th Cir. 2001) (en banc) ("[T]he Declaratory Judgment Act . . . does not provide an *additional* cause of action with respect to the underlying claim." (emphasis added)); *see also Earnest v. Lowentritt*, 690 F.2d 1198, 1203 (5th Cir. 1982) ("28 U.S.C. § 2201 . . . does not provide an *independent* cause of action for determination of the constitutionality of a statute" (emphasis added)). In a declaratory-judgment claim, the relevant cause of action is the declaratory *defendant's* anticipated lawsuit against the declaratory plaintiff. *See Lowe v. Ingalls Shipbuilding, A Division of Litton Systems, Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984) ("[T]he underlying cause of action which is thus actually litigated is the declaratory defendant's, not the declaratory plaintiff's"). That is what courts look to in determining

whether a claim "arises under" federal law,[30] and that is what courts look to when determining whether a cause of action exists. *See Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 171 (5th Cir. 1990) ("Since it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action."); *Green Valley Special Utility District v. City of Schertz*, 969 F.3d 460, 500 (5th Cir. 2020) (Oldham, J., concurring) ("[T]he Declaratory Judgment Act . . . does not create a *standalone* cause of action. Rather, . . . [i]t allows parties who would otherwise be defendants to seek relief as plaintiffs." (emphasis added)). There is no dispute that Title VII would provide a cause of action for the defendants to sue the plaintiffs (and the proposed class members). *See Harris Funeral Homes*, 884 F.3d at 556-57; Appellees' Br. at 35-36. Nothing more is needed to establish a cause of action in a declaratory-judgment suit. *See Collin County*, 915 F.2d at 170 ("The Declaratory Judgment Act is designed to afford parties, threatened with liability, but otherwise without a satisfactory remedy, an early adjudication of an actual controversy. . . . [A] party who has an interest in the outcome of future litigation can petition the court

---

30. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950) (noting that the well-pleaded complaint rule in federal declaratory-judgment actions is applied to declaratory defendant's anticipated lawsuit).

for a declaration of its rights and liabilities."); *Green Valley*, [969 F.3d at 500](#) (Oldham, J., concurring).

### B. The District Court Correctly Held That *Bostock* Allows Employers To Enforce Rules Of Sexual Conduct That Apply Equally To Men And Women

Title VII's prohibition on "sex" discrimination does not prevent employers from firing or refusing to hire individuals who engage in homosexual acts, as long as the employer does so by establishing rules of conduct that apply equally to both sexes and would lead to the same result if the employee's biological sex were different. An employer who would fire both men and women for engaging in a particular sexual practice associated with homosexuality has not engaged in "sex" discrimination if that employer would fire a member of the opposite biological sex for engaging in the exact same sexual act. The district court's holding on this point is unassailable, and it is compelled by the formalism of the *Bostock* opinion. [ROA.1766-1767](#).

The defendants note that employers could use this allowance to adopt policies for the avowed purpose (or hidden pretext) of excluding homosexuals from employment. *See* Appellees' Br. at 59-60. But none of that is a problem under Title VII, which prohibits discrimination on account of "sex" and not "sexual orientation." *See Bostock*, [140 S. Ct. at 1746-47](#) ("We agree that homosexuality and transgender status are distinct concepts from sex."). As long as an employer enforces its rules of conduct equally against men and women,

it cannot be found guilty of discriminating "because of . . . sex"—even when the employer is discriminating against those who engage in homosexual acts.

### C. RFRA and The Free-Exercise Clause Protect Braidwood's Right To Enforce Sex-Segregated Restrooms And Sex-Specific Dress-And-Grooming Codes

The district court's holding on the restroom and dress-code issues presents a much closer question. On the one hand, *Bostock* claims that its holding stops short of abolishing sex-segregated restrooms or sex-specific dress-and-grooming codes. *See Bostock*, 140 S. Ct. at 1753 ("[W]e do not purport to address bathrooms, locker rooms, or anything else of the kind."). Yet there is language throughout *Bostock* that confidently proclaims that employers violate Title VII whenever an employee's biological sex is the "but-for cause" of an adverse employment action—which seems to leave no room for sex-segregated restrooms or sex-specific dress-and-grooming codes. *See Bostock*, 140 S. Ct. at 1739 ("So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law."); *id.* at 1741 ("[I]f changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred."). The Court's opinion talks out of both sides of its mouth, which may have been necessary to stitch together a six-justice majority for its judgment but leaves both lower courts and litigants in a state of confusion.

The plaintiffs did not argue in the district court that *Bostock* allows employers to enforce sex-segregated restrooms or sex-specific dress-and-

grooming codes. Instead, they pinned their restroom and dress-code claims on RFRA and the First Amendment, which would shield those policies regardless of how the courts ultimately construe Title VII and *Bostock*. ROA.1216-1218. The district court, however, went a step further and held that restroom and dress-code policies do not implicate Title VII's prohibition on "sex" discrimination, even in the wake of *Bostock*'s holding. ROA.1768-1770.

The defendants are correct to observe that the district court's holding on these issues is difficult to square with the statements in *Bostock* that equate "sex" discrimination with but-for causation. *See* Appellees' Br. at 52-57. An employee's biological sex is a "but-for" cause that determines how he must dress and which restrooms he must use, and if the employee's biological sex were different he would subjected to a different set of rules. But it is also absurd to claim that Title VII abolishes sex-segregated restrooms and sex-specific dress-and-grooming codes, and the defendants are not willing to take *Bostock* to its logical conclusion by insisting that Title VII "categorically" prohibits employers from imposing these policies. *See* Appellees' Br. at 57-58.

The plaintiffs, for their part, are content to rely on RFRA and the First Amendment to protect their right to enforce sex-segregated restrooms and sex-specific dress-and-grooming codes, and it is unnecessary for this Court to resolve whether Title VII or *Bostock* allow these policies if it concludes that RFRA or the First Amendment secures these protections. If this Court re-

jects the plaintiffs' RFRA and First Amendment claims, then the Supreme Court may need to revisit the rationale of *Bostock* to avoid a regime in which employees have a statutory right to cross-dress and enter restrooms reserved for the opposite biological sex.

## IV. The District Court Did Not Abuse Its Discretion In Certifying The Classes

The defendants also ask this Court to vacate the district court's class-certification order. But appellate review of class-certification rulings is highly deferential,[31] and the district court did not abuse its discretion.

The defendants claim that the classes fail the "commonality" requirement of Rule 23(a)(2). *See* Appellees' Br. at 62-65. But commonality requires only a single common question of law and fact,[32] and each of the certified classes includes *multiple* legal questions common to the class members. For the first class of Religious Business-Type Employers, the common legal questions include: (1) Whether the government has a "compelling" interest in enforcing *Bostock* against employers who oppose homosexual or transgender conduct for sincere religious reasons; (2) Whether Title VII, as construed in *Bostock*, qualifies as a "generally applicable" law under *Smith*; (3) Whether *Bostock* prohibits employment discrimination against bisexuals; and (4)

---

31. *See Regents*, 482 F.3d at 380 ("We review class certification decisions for abuse of discretion").

32. *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 360 (2011) ("[E]ven a single [common] question will do." (citation and internal quotation marks omitted)).

Whether *Bostock* allows employers to establish sex-neutral rules of conduct that have the effect of excluding homosexual or transgender employees. ROA.1215-1221; ROA.1733-1734. Issues (1), (3), and (4) are also common to members of the second certified class, which includes employers with religious or non-religious objections to homosexual or transgender conduct.

The defendants do not deny any of this, but they complain that the common legal questions require "a fact-intensive, individualized inquiry." Appellees' Br. at 64. That is demonstrably wrong. The answers to the common legal questions in this lawsuit *do not depend* on factual allegations. The plaintiffs are contending that there is no compelling governmental interest in enforcing *Bostock*'s holding *as a matter of law* because: (1) Title VII contains statutory exceptions that are incompatible with the idea of a compelling interest in uniform enforcement; and (2) Congress has repeatedly failed to enact explicit statutory anti-discrimination protections for homosexual and transgender employees. *See supra* at 42-43. This argument in no way depends on the particular factual circumstances of an individual class member. The same goes for whether Title VII qualifies as a "generally applicable law" under *Smith*, as well as the plaintiffs' claims concerning the scope of *Bostock*'s holding. These are pure questions of law, and the answers to these common legal questions do not in any way turn on the facts surrounding any individual class member.

The defendants also suggest that individual class members may have differing policies with respect to homosexual or transgender employees and job

applicants. *See* Appellees' Br. at 64-65. That does not defeat commonality or typicality because the representative class members are seeking a declaration of the class members' right to *choose* whether to adopt such policies—which presents a legal question common to every class member—and the plaintiffs are not required to show or allege that every single class member will adopt employment policies that affect homosexuals or transgender people. *See Prantil v. Arkema Inc.*, 986 F.3d 570, 581-82 (5th Cir. 2021) ("Rule 23(b)(2) does not require 'a specific policy uniformly affecting—and injuring—each [plaintiff] . . . so long as declaratory or injunctive relief "settling the legality of the [defendant's] behavior with respect to the class as a whole is appropriate."'" (quoting *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 847-48 (5th Cir. 2012)).

## V. THE DISTRICT COURT ERRED BY ENTERING JUDGMENT AGAINST BRAIDWOOD ON SOME OF ITS TITLE VII CLAIMS

The district court rejected the plaintiffs' claim that Title VII, as construed in *Bostock*, allows employers to discriminate against bisexual employees, so long as the employer finds bisexual orientation or conduct equally unacceptable in men and women. ROA.1765-1766. The district court also rejected the plaintiffs' claim that Title VII (as construed in *Bostock*) allows employers to establish sex-neutral rules that prohibit their male and female employees from taking hormone therapy or undergoing sex-change operations. ROA.1770. The district court's holdings on these points should be reversed.

**A. Title VII, As Interpreted In *Bostock*, Does Not Prohibit Employers From Discriminating Against Bisexual Employees**

The EEOC insists that Title VII prohibits discrimination on the basis of any and all "sexual orientations"[33]— even though that is decidedly not what *Bostock* held. *Bostock* held that employers violate Title VII's prohibition on "sex" discrimination if they fire (or refuse to hire) individuals for being "homosexual or transgender." *Bostock*, 140 S. Ct. at 1737. *Bostock* did not hold that an employer violates Title VII whenever it discriminates on account of "sexual orientation," and it did not hold that an employer engages in "sex" discrimination when it fires (or refuses to hire) bisexual employees.

Indeed, the *Bostock* opinion is incompatible with the view that discrimination against bisexual employees violates Title VII. Consider the following passage from *Bostock*:

> Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent.

*Bostock*, 140 S. Ct. at 1742. An employer who discriminates against *all* bisexual employees — regardless of whether they are male or female — cannot possibly be engaged in "sex" discrimination under *Bostock*. That is because the

---

33. The EEOC's guidance documents state that *Bostock* prohibits "firing individuals because of their sexual orientation." ROA.1232. And its website states (incorrectly) that *Bostock* interpreted Title VII to prohibit employment discrimination against an individual "on the basis of sexual orientation." *See* https://bit.ly/3zIR9J7 (last visited on August 1, 2022).

"same trait" (sexual attraction toward members of both sexes) is treated exactly the same regardless of whether that "trait" appears in a woman or a man.

The EEOC ignores this feature of *Bostock* and pretends as though the Supreme Court interpreted Title VII as outlawing *all* discrimination on account of sexual orientation. The Biden Administration is taking the same approach in its efforts to extend *Bostock* to every federal statute that prohibits discrimination on account of "sex." *See, e.g.*, Department of Health and Human Services, Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972 (May 10, 2021), available at https://bit.ly/3yBxeeF (last visited August 1, 2022). But the fact remains that discrimination against bisexuals is not "sex" discrimination—so long as the employer regards bisexuality as equally intolerable in men and women.

### B. Title VII, As Interpreted In *Bostock*, Does Not Prohibit Employers From Enforcing Sex-Neutral Rules Of Conduct That Prohibit Hormone Therapy And Sex-Change Operations

Title VII's prohibition on "sex" discrimination does not prevent employers from firing or refusing to hire individuals who engage in transgender conduct, so long as the employer establishes rules of conduct that apply equally to both sexes and would lead to the same result if the employee's biological sex were different. A employer may, for example, fire or refuse to hire a female employee who takes masculinizing hormone therapy, if that employ-

er would likewise fire or refuse to hire a man who subjects himself to the exact same regimen. An employer may also establish a policy against hiring employees who have surgery performed to modify their genitals, so long as the employer enforces that policy equally against men and women.

The district court acknowledged that "men and women would be treated evenly" under these policies, but nonetheless held that these policies violate Title VII because they "would *only* function to discriminate against individuals with gender dysphoria." ROA.1770. But Title VII does not prohibit discrimination against transgender individuals or people with gender dysphoria; it prohibits discrimination "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). Until Congress amends this statutory language to encompass discrimination on account of gender identity or gender dysphoria, there is no basis for disapproving these policies under Title VII or *Bostock*.

## VI. THE DISTRICT COURT ERRED BY ENTERING JUDGMENT AGAINST BEAR CREEK

The district court held that Bear Creek Bible Church was shielded from *Bostock* and the EEOC's guidance documents by the statutory exemption for "religious corporations" in 42 U.S.C. § 2000e-1(a). ROA.1710-1713; ROA.1743-1744. Yet the district court thought this warranted entry of judgment for the *defendants* on all of Bear Creek's claims. ROA.1744 (citing 42 U.S.C. § 2000e-1(a)); ROA.1871-1873. This Court should reverse and direct entry of judgment for Bear Creek.

Bear Creek has contended throughout this litigation that it cannot be subjected to the interpretations of Title VII expressed in the EEOC's guidance documents, and it has sought declaratory relief that will prevent the defendants from enforcing those interpretations of Title VII against Bear Creek. The district court *agreed* with Bear Creek that the defendants are powerless to enforce the EEOC guidance documents against Bear Creek. But it found that those protections were conferred by the statutory exemption in 42 U.S.C. § 2000e-1(a), which obviated the need for the district court to resolve whether RFRA, the First Amendment, or *Bostock* provide additional sources of protection for Bear Creek. In these circumstances, the Court should have entered judgment for Bear Creek by declaring that 42 U.S.C. § 2000e-1(a) prevents the defendants from enforcing the EEOC's guidance documents against Bear Creek given its status as a religious corporation.

It does not matter that the plaintiffs sought this relief by relying on different legal theories, and it does not matter that the plaintiffs failed to mention 42 U.S.C. § 2000e-1(a) in their pleadings. *See* 10 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2664 (4th ed. 2014) ("[T]he legal theories set out in the complaint are not binding on plaintiff."). A court is required to award the relief that is supported by the evidence and the law—regardless of whether a litigant asked for that relief in its pleadings. *See* Fed. R. Civ. P. 54(c) ("A . . . final judgment should grant the relief to which each party is entitled, *even if the party has not demanded that relief in its pleadings.*" (emphasis added)); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct.

2292, 2307 (2016); *Stewart v. Banks*, 397 F.2d 798, 799 (5th Cir. 1968) ("[A] final judgment must grant the relief to which the party in whose favor it is rendered is entitled even if the party has not demanded such relief in his pleadings."). And the parties fully briefed the implications of 42 U.S.C. § 2000e-1(a) after the district court requested supplemental briefing, so the issues have been vetted and subjected to adversarial testing. ROA.1529-1548; ROA.1602-1607; ROA.1609-1618. *See Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335, 340 (5th Cir. 2015) ("The discretion afforded by Rule 54(c) thus assumes that a plaintiff's entitlement to relief not specifically pled has been tested adversarially, tried by consent, or at least developed with meaningful notice to the defendant."). A conclusion that 42 U.S.C. § 2000e-1(a) protects Bear Creek from the interpretations of Title VII expressed in *Bostock* and the EEOC's documents requires a judgment for Bear Creek, not the defendants.

The district court also should have resolved Bear Creek's remaining claims even if it believed that the protections conferred by 42 U.S.C. § 2000e-1(a) were dispositive. There is no assurance that the appellate courts will ultimately agree with the district court's broad construction of 42 U.S.C. § 2000e-1(a), and Bear Creek needs a resolution of its claims in the event that 42 U.S.C. § 2000e-1(a) is construed more narrowly by the Fifth Circuit or the Supreme Court. We therefore respectfully ask this Court to resolve Bear Creek's claims for declaratory relief alongside Braidwood's, regardless of whether this Court agrees with the district court's interpretation of 42

U.S.C. § 2000e-1(a), as this case could be heard by the en banc Fifth Circuit or the Supreme Court, and it will further judicial economy if those courts have the benefit of this panel's rulings on the issues.

## CONCLUSION

The judgment of the district court should be affirmed to the extent it certified the plaintiff classes and entered judgment in favor of Braidwood and the certified classes. The judgment of the district court should be reversed to the extent it entered judgment in favor of the defendants on any of the claims asserted by Bear Creek or Braidwood.

Respectfully submitted.

/s/ Jonathan F. Mitchell

GENE P. HAMILTON
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: August 1, 2022

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF SERVICE

I certify that on August 1, 2022, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Fifth Circuit and served through CM/ECF upon:

MARLEIGH D. DOVER
CHARLES SCARBOROUGH
JACK STARCHER
Attorneys, Appellate Staff
Civil Division, Room 7515
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 305-1754 (phone)
charles.scarborough@usdoj.gov
john.e.starcher@usdoj.gov

*Counsel for Defendants-Appellees*

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

### with type-volume limitation, typeface requirements, and type-style requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 14,969 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.

                                  /s/ Jonathan F. Mitchell
                                  JONATHAN F. MITCHELL

Dated: August 1, 2022               *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF ELECTRONIC COMPLIANCE

Counsel also certifies that on August 1, 2022, this brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, through the court's CM/ECF document filing system, https://ecf.ca5.uscourts.gov/

Counsel further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.


 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiffs-Appellants*