No. 22-10145

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

BRAIDWOOD MANAGEMENT, INCORPORATED, on behalf of itself and others similarly situated; BEAR CREEK BIBLE CHURCH,

Plaintiffs-Appellants/Cross-Appellees,

v.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION; UNITED STATES OF AMERICA; CHARLOTTE A. BURROWS; JOCELYN SAMUELS; JANET DHILLON; ANDREA R. LUCAS; KEITH E. SONDERLING, in their official capacities as chair, vice chair, and commissioners of the Equal Employment Opportunity Commission; MERRICK GARLAND, U.S. Attorney General,

Defendants-Appellees/Cross-Appellants

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division,
No. 4:18-cv-0824 (Hon. Reed O'Connor)

## COMBINED RESPONSE AND REPLY BRIEF FOR
## APPELLEES/CROSS-APPELLANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

CHAD E. MEACHAM
  *Acting United States Attorney*

CHARLES SCARBOROUGH
JACK STARCHER
  *Attorneys, Appellate Staff
  Civil Division, Room 7515
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-1754*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................1

ARGUMENT .......................................................................4

I.  The District Court Lacked Jurisdiction ...........................4

  A.  Plaintiffs lack standing ........................................4

      1. *Pre-enforcement review is the exception,*
         *not the rule* .................................................5

      2. *Plaintiffs face no credible threat of prosecution* .................7

      3. *As-applied pre-enforcement challenges are*
         *significantly harder to bring than facial challenges* ........16

      4. *Plaintiffs demonstrate no actual chill* ..............................21

  B.  Plaintiffs' claims are not ripe ...............................24

II.  The District Court Erred in Granting Summary Judgment to
     Plaintiffs on Their RFRA and First Amendment Claims..............30

  A.  Plaintiffs are not entitled to summary judgment on their
      RFRA and Free Exercise claims ....................................30

  B.  Plaintiffs are not entitled to summary judgment on their
      Free Association claim ..................................................40

III.  The District Court Erred in Granting Summary Judgment to
      Plaintiffs on Any of Their Title VII Claims....................43

IV.  The District Court Separately Erred in Certifying Two
     Nationwide Classes ........................................................49

V.    The District Court Correctly Dismissed Bear Creek's Claims
      For Lack of Jurisdiction .................................................................. 52

CONCLUSION ........................................................................................ 56

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967), *abrogated on other grounds by*
*Califano v. Sanders*, 430 U.S. 99 (1977) ........................................... 24

*Baldwin v. Department of Transp.*, EEOC Appeal No. 0120133080,
2015 WL 4397641 (July 15, 2015) ....................................................... 23

*Bostock v. Clayton County*,
140 S. Ct. 1731 (2020) .................................................. 3, 46, 47, 48, 49

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ............................................................. 40, 41, 43

*Brown v. Collier*,
929 F.3d 218 230 (5th Cir. 2019) ........................................................ 29

*Burwell v. Hobby Lobby*,
573 U.S. 682 (2014) ............................................................. 6, 27, 40

*Calderon v. Ashmus*,
523 U.S. 740 (1998) ............................................................................ 51

*Center for Individual Freedom v. Carmouche*,
449 F.3d 655 (5th Cir. 2006) ............................................................... 21

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ............................................................................ 45

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ............................................................................ 51

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................................ 20

*Companion Prop. & Cas. Ins. Co. v. Palermo*,
723 F.3d 557 (5th Cir. 2013) ............................................................... 35

*Curay-Cramer v. Ursuline Acad. of Wilmington*,
450 F.3d 130 (3d Cir. 2006) ................................................................ 54

*Doe v. Bolton*,
   410 U.S. 179 (1973) ............................................................... 17

*EEOC v. Mississippi Coll.*,
   626 F.2d 477 (5th Cir. 1980) ................................................ 54

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*,
   884 F.3d 560 (6th Cir. 2018) ................................ 7, 10, 33, 37

*Franciscan Alliance v. Becerra*,
   No. 21-11174, 2022 WL 3700044 (August 26, 2022) ..................... 14, 15

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ........................................................ 28, 51

*Google, Inc. v. Hood*,
   822 F.3d 212 (5th Cir. 2016) ............................. 18, 19, 22, 23

*Houston Chronicle Publ'g Co. v. City of League City*,
   488 F.3d 613 (5th Cir. 2007) ................................................ 21

*International Soc'y for Krishna Consciousness of Atlanta v. Eaves*,
   601 F.2d 809 (5th Cir. 1979) .......................................... 19, 26

*International Tape Mfrs. Ass'n v. Gerstein*,
   494 F.2d 25 (5th Cir. 1974) ................................................. 30

*Jackson v. Vannoy*,
   49 F.3d 175 (5th Cir. 1995) ................................................. 25

*Little v. Wuerl*,
   929 F.2d 944 (3d Cir. 1991) ................................................. 54

*Lusardi v. Dep't of the Army*, EEOC Appeal No. 0120133395,
   2015 WL 1607756 (Apr. 1, 2015) .......................................... 23

*Macy v. Department of Justice*, EEOC Appeal No. 0120120821,
   2012 WL 1435995 (Apr. 20, 2012) ........................................ 23

*Maguire v. Marquette Univ.*,
   814 F.2d 1213 (7th Cir. 1987) ............................................. 54

*Masat v. United States,*
    745 F.2d 985 (5th Cir.1984) .............................................................. 36

*National Park Hosp. Ass'n v. Department of the Interior,*
    538 U.S. 803 (2003) ......................................................................... 26

*New Hampshire Right to Life Political Action Comm. v. Gardner,*
    99 F.3d 8 (1st Cir. 1996) ................................................................. 17

*Newsome v. EEOC*
    301 F.3d 227 (5th Cir. 2002) ........................................................... 12

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998) ........................................................................... 44

*Peterson v. Bell Helicopter Textron, Inc.,*
    806 F.3d 335 (5th Cir. 2015) ............................................................ 55

*Roberson-King v. Louisiana Workforce Comm'n,*
*Office of Workforce Dev.,*
    904 F.3d 377 (5th Cir. 2018) ..................................................... 13, 27

*Sample v. Morrison,*
    406 F.3d 310 (5th Cir. 2005) ........................................................... 24

*School of the Ozarks v. Biden,*
    41 F.4th 992 (8th Cir. 2022) ..................................................... 19, 20

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ........................................... 16, 17, 21, 22

*Speech First, Inc. v. Schlissel,*
    939 F.3d 756 (5th Cir. 2019) ..................................................... 16, 17

*Susan B. Anthony List v. Driehaus*
    573 U.S. 149 (2014) ................................... 4, 7, 10, 11, 12, 22, 23

*Tagore v. United States,*
    735 F.3d 324 (5th Cir. 2013) ............................................................. 5

*Telescope Media Grp. v. Lucero,*
    936 F.3d 740 (8th Cir. 2019) ........................................................... 10

*Threat v. City of Cleveland*,
  6 F.4th 672 (6th Cir. 2021) ................................................................ 44

*20/20 Commc'ns, Inc. v. Crawford*,
  930 F.3d 715 (5th Cir. 2019) ............................................................. 52

*United States v. Quaintance*,
  608 F.3d 717 (10th Cir. 2010) ............................................................ 32

*U.S. Navy Seals 1-26 v. Biden*,
  27 F.4th 336 (5th Cir. 2022), *preliminary injunction
  partially stayed*, 142 S. Ct. 1301 (2022) ....................................... 7, 50

*Virginia v. American Booksellers Ass'n*,
  484 U.S. 383 (1988) ............................................................................ 17

*Whole Woman's Health v. Jackson*,
  142 S. Ct. 522 (2021) ........................................................................... 5

*Younger v. Harris*,
  401 U.S. 37 (1971) ............................................................................... 12

## Statutes:

42 U.S.C. § 300gg–13(a)(4) ...................................................................... 27

42 U.S.C. § 2000e-1(a) .............................................................................. 54

42 U.S.C. § 2000e-2(a) .............................................................................. 40

## Other Authority:

EEOC, *Compliance Manual on Religious Discrimination* § 12-I(C)(3)
  (Jan. 15, 2021), https://www.eeoc.gov/laws/guidance/
  section-12-religious-discrimination .................................................. 12

## INTRODUCTION

The decision below is remarkable in numerous respects. In the absence of any concrete controversy or credible threat that EEOC will enforce Title VII against plaintiffs, the district court provided broad, declaratory relief under the guise of pre-enforcement review. It did so in the absence of any particular facts, notwithstanding the individualized, context-specific analysis that is necessary to resolve claims under the Religious Freedom Restoration Act (RFRA) and the Free Exercise Clause. Instead, the court issued a series of categorical, abstract rulings untethered to specific facts. And to cap it all off, the district court extended its ruling far beyond the plaintiffs in this case, concluding that its analysis applied equally to two ill-defined Rule 23 classes comprised of "every employer in the United States" that "opposes homosexual or transgender conduct" for any reason. As explained in the government's opening brief, that decision violates numerous Article III limitations on the authority of the federal courts and disregards repeated admonitions from this Court and the Supreme Court about how courts must evaluate religious liberty defenses.

In response, plaintiffs principally attempt to recharacterize what the district court did to make it seem more defensible. Plaintiffs suggest that the district court did not improperly prejudge the potential RFRA defenses of thousands of employers without any fact development or individualized analysis. Instead, plaintiffs claim, the district court merely answered abstract legal questions like whether Title VII is a law of general applicability, and whether the government's interest in preventing workplace discrimination is sufficiently compelling.

Putting aside the fact that federal courts do not have authority to issue advisory opinions making those kinds of general pronouncements of law in a vacuum, that is not what plaintiffs asked for and that is not what the district court did. Far from merely declaring that RFRA and the Free Exercise Clause may compel exemptions to Title VII in appropriate cases (a proposition no one disputes), the court held that *all* applications of Title VII to a broadly defined category of future cases *necessarily* violate RFRA and the Free Exercise Clause. Nor did the court simply determine Title VII's application to a particular set of facts; it instead held that a broad swath of employer actions categorically do not violate Title VII's anti-discrimination guarantees. Those holdings flout

basic jurisdictional limitations under Article III and well-established principles requiring individualized assessments of claims under RFRA and the Free Exercise Clause.

Indeed, even plaintiffs are unwilling to defend key parts of the district court's decision. They appear to concede (Pls. Br. 40 & n.29) that the court's definition of the religious-employers class is impermissibly overbroad, suggesting in a footnote that this Court can just reformulate the class definition on its own to exclude hundreds or thousands of class members whose religious beliefs do not compel them to discriminate against LGBTQ employees. Plaintiffs also abandon the district court's holding that Title VII on its face does not implicate policies that require transgender employees to dress or use bathrooms according to their sex assigned at birth instead of their gender identity. As plaintiffs appear to concede (Pls. Br. 51-52), that holding cannot be reconciled with the reasoning of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).

Those concessions underscore the many flaws in the district court's decision. Rather than carve up the district court's order to try to find some version of the decision that can be salvaged consistent with Article

III, this Court should vacate the decision in its entirety and remand with instructions to dismiss for lack of jurisdiction.

## ARGUMENT

## I. The District Court Lacked Jurisdiction.

### A. Plaintiffs lack standing.

A plaintiff can demonstrate a cognizable injury sufficient to demonstrate standing to bring a pre-enforcement challenge only if it establishes both that (1) it has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and (2) there is a "substantial risk" that the statute will be enforced against them. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 159 (2014) (quotation omitted). As explained in the government's opening brief, plaintiffs have failed to establish that they face a substantial threat of enforcement.

Plaintiffs respond by citing cases in which this Court and others have allowed pre-enforcement challenges to proceed, and then asserting that those cases establish that pre-enforcement review must also be available here. Pls. Br. 23-32. But plaintiffs fail to grapple with the numerous salient differences between those cases and this one—

differences that confirm plaintiffs do not have standing to seek pre-enforcement review here.

1. *Pre-enforcement review is the exception, not the rule.*

For starters, plaintiffs act as though pre-enforcement review is the norm. It is not. As the Supreme Court recently emphasized, there is no "unqualified right to pre-enforcement review," even for claims raising fundamental constitutional rights. *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 537-538 (2021). Instead, many statutory and constitutional rights "are as a practical matter asserted typically as defenses," not in "pre-enforcement cases." *Id.* at 538. That is because even in cases raising important individual rights, courts may not "disregard the traditional limits on the jurisdiction of federal courts just to see a favored result win the day." *Id.* Plaintiffs are therefore wrong to contend that it is "untenable," Pls. Br. 31, to require individuals to wait for their constitutional claims to ripen into a concrete Article III dispute. On the contrary, that is the "typical[]" course, *Whole Woman's Health*, 142 S. Ct. at 537, particularly in the employment context. *See, e.g.*, *Tagore v. United States*, 735 F.3d 324 (5th Cir. 2013) (RFRA raised only after plaintiff had been fired for conduct allegedly required by her faith).

Indeed, plaintiffs' insistence that pre-enforcement review must be available to them now is particularly difficult to swallow given that plaintiffs here assert a statutory right to violate the statutory rights of others—hypothetical future employees who are obviously not a part of this litigation.

It is telling that successful pre-enforcement challenges under RFRA in particular are so rare. RFRA has existed for almost 30 years. Yet plaintiffs identify only one case where the courts allowed a pre-enforcement RFRA challenge to proceed: *Burwell v. Hobby Lobby*, 573 U.S. 682 (2014). That is not surprising, given that RFRA claims are extremely fact dependent. *See infra* pp. 31-40. And as discussed in more detail below, *Hobby Lobby* and the other pre-enforcement challenges to the Affordable Care Act's (ACA) contraceptive mandate were unique in that they involved claims that required no additional factual development to evaluate. *Infra* p. 27.

The rarity of pre-enforcement RFRA claims belies plaintiffs' suggestion that it is problematic or unfair to require employers to wait to assert religious liberty defenses until a concrete employment dispute arises. Indeed, in contrast to the scarcity of pre-enforcement RFRA

claims, RFRA is frequently raised as a defense only after the challenged government action has occurred. *See, e.g., Equal Emp't Opportunity Comm'n v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018) (RFRA raised as defense during course of Title VII enforcement action); *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336 (5th Cir. 2022) (per curiam) *preliminary injunction partially stayed*, 142 S. Ct. 1301 (2022) (resolving RFRA claims against military vaccine requirement only after it went into effect and plaintiffs' requests for religious exemptions were denied). There is thus nothing unusual or untoward about the prospect that employers may have to wait until a concrete factual dispute arises to assert their constitutional and RFRA rights against a particular enforcement action. Indeed, in many cases (including this one), Article III's limitations on the judicial power of the federal courts compel that result.

2. *Plaintiffs face no credible threat of prosecution.*

Plaintiffs acknowledge that pre-enforcement review is available only where a plaintiff can demonstrate that there exists a "credible" and "substantial" threat of prosecution. *Susan B. Anthony*, 573 U.S. at 158, 159; *see also* Pls. Br. 26. In arguing that they can satisfy that standard,

plaintiffs (like the district court) tacitly acknowledge that some history of enforcement against similarly situated employers is critical. On that score, plaintiffs place substantial reliance on the single instance in which the Equal Employment Opportunity Commission (EEOC) enforced Title VII against an employer that eventually asserted a RFRA defense—*Harris Funeral Homes*.[1] Plaintiffs and the district court claim that this single enforcement action creates a credible fear that EEOC will enforce Title VII notwithstanding valid religious liberty concerns, such that plaintiffs have standing now to seek a pre-enforcement declaration that they are categorically immune from Title VII enforcement for certain broadly defined conduct. *See, e.g.*, Pls. Br. 29. But far from helping their case, every stage of the *Harris Funeral Homes* litigation underscores that

---

[1] At one point in their brief, plaintiffs refer to EEOC's "previous lawsuits"—plural—"against religious employers." Pls. Br. 18. That use of the plural appears to have been a typo, as plaintiffs have only identified one lawsuit where EEOC has ever enforced Title VII's prohibition against LGBTQ discrimination against a religious employer over religious objection.

plaintiffs have not satisfied the demanding standard for pre-enforcement review.

First, plaintiffs are wrong to claim that EEOC ignored Harris Funeral Homes' religious liberty claim in deciding to bring that enforcement action. The employer never raised any religious defense before the agency. Harris Funeral Homes raised its RFRA defense for the first time late in the district court litigation: Eight months passed (during which time the employer filed a Motion to Dismiss and an initial answer to the complaint) without any mention of RFRA or religious liberty. It was only after EEOC filed an amended complaint, which merely corrected the spelling of the employee's first name, that Harris Funeral Homes first asserted that its decision was protected by the Free Exercise Clause and RFRA. *See* Answer of Defendant R.G. & G.R. Harris Funeral Homes, Inc. to Plaintiffs' Amended Complaint at 5, *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 100 F. Supp. 3d 594 (E.D. Mich. 2016 (No. 2:14-cv-13710), Dkt. 22 (Affirmative Defenses 12-13). It is no surprise, then, that EEOC did not consider the employer's unarticulated religious liberty concerns in deciding to bring an enforcement action under Title VII (particularly given that it was not otherwise apparent to

EEOC that Harris Funeral Homes operated as a religious entity). Plaintiffs provide no basis to think that they would similarly fail to raise a RFRA defense with EEOC if they were ever subject to a similar complaint under Title VII.[2]

Second, the Sixth Circuit's decision in *Harris Funeral Homes* demonstrates why EEOC did not immediately dismiss its Title VII claims when the employer finally raised its RFRA defense. The Sixth Circuit unanimously held that the employer's RFRA defense there failed at three critical steps—substantial burden, compelling interest, and narrow tailoring. *See* 884 F.3d at 585-587. Whether or not this Court would agree with the details of the Sixth Circuit's analysis is beside the point. What matters is that *Harris Funeral Homes* demonstrates that RFRA defenses to Title VII enforcement can present difficult, fact-intensive questions that cannot be categorically resolved ahead of time in the abstract. The only thing that can be said with certainty at this time is

---

[2] *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019), is inapposite for this reason. *See* Pls. Br. 31-32. There, the Eighth Circuit found a "credible threat of enforcement" because State authorities had asserted a clear intent to enforce the statute against similarly situated businesses and had brought an enforcement proceeding. 936 F.3d at 750 (quoting *Susan B. Anthony*, 573 U.S. at 159).

that RFRA may provide a defense to a Title VII enforcement action and that EEOC should take RFRA's requirements seriously. But of course, EEOC has already said that. *See infra* pp. 12-13.

That scant history of enforcement stands in stark contrast to the facts presented in the pre-enforcement cases that plaintiffs cite. For example, in *Susan B. Anthony* the plaintiff had already been investigated under the challenged statute for specific past statements, and that investigation had advanced to a probable cause determination. After that investigation was dismissed on mootness grounds, the plaintiff brought a facial, pre-enforcement challenge to the statute in anticipation of a future enforcement action arising out of materially similar speech. Furthermore, enforcement proceedings of the kind plaintiffs challenged were "not a rare occurrence." 573 U.S. at 164 (noting that the state commission "handles about 20 to 80" such cases per year (quotation omitted)). Based on all those facts, the Supreme Court held that the threat of future enforcement was sufficiently substantial to justify a pre-enforcement challenge. *Id*. at 165. And the Court signaled that all those facts were critical to its decision. The Court contrasted the facts before it with other cases where plaintiffs lacked pre-enforcement standing

because they did not express "an intent to engage in the same speech that was the subject of a prior enforcement proceeding" or "had never been threatened with prosecution." *Id.* at 166 (discussing *Younger v. Harris*, 401 U.S. 37 (1971)).

Plaintiffs also claim that they can establish a credible fear of enforcement because the "uncontested evidence" establishes that EEOC "[r]efuses to recognize or acknowledge any religious exemptions to" Title VII's prohibition against sex discrimination. Pls. Br. 27. But the "uncontested evidence" establishes just the opposite. EEOC has an entire guidance manual addressing religious discrimination, and EEOC expressly instructs its investigators to "take great care" in cases where Title VII's prohibitions intersect with "the rights of employers under the First Amendment and RFRA." EEOC, *Compliance Manual on Religious Discrimination* § 12-I(C)(3) (Jan. 15, 2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination (recognizing "nuanced balancing" required and instructing investigators to "take great care"). Those are not just empty words—EEOC *in fact* takes the potential religious liberty implications of Title VII actions very seriously. *See, e.g.*, *Newsome v. EEOC*, 301 F.3d 227, 229-230 (5th Cir.

2002) (per curiam).  Plaintiffs have never disputed that EEOC has such guidance, that EEOC investigators follow that guidance, or that EEOC does not enforce Title VII where it concludes that doing so would likely violate RFRA or the First Amendment.

To the extent plaintiffs fault EEOC for refusing to *preemptively* declare immune from Title VII any employers who assert that discrimination was based on sincerely held religious beliefs, *Harris Funeral Homes* again underscores why EEOC cannot categorically disavow enforcement of Title VII in that way.  Whether the evidence EEOC acquires will show that any particular employment decision amounts to sex discrimination in the first place is a complex, case-specific question that cannot be answered ahead of time in the abstract.  *See, e.g.*, *Roberson-King v. Louisiana Workforce Comm'n, Office of Workforce Dev.*, 904 F.3d 377, 380-382 (5th Cir. 2018) (discussing *McDonnell Douglas* burden-shifting framework for evaluating Title VII discrimination claims).  And layered on top of that uncertainty, *Harris Funeral Homes* demonstrates that the further question whether *enforcing* Title VII would run afoul of religious liberty protections under a particular set of facts is also a complicated question.  It is simply not possible for EEOC

(or a court, for that matter) to definitively say ahead of time that enforcement of Title VII against employers who have certain sincerely held religious beliefs will always violate RFRA.

This Court's recent decision in *Franciscan Alliance v. Becerra*, No. 21-11174, 2022 WL 3700044 (August 26, 2022), does not compel a contrary conclusion. There, the Court principally addressed pre-enforcement standing concepts in the course of analyzing whether the government established that the plaintiff's claims were moot in light of the case's lengthy factual and procedural history. 2022 WL 3700044 at *3-6. As this Court noted, to show the case was moot the government had the "burden" to demonstrate that "that it is absolutely clear the allegedly wrongful behavior" that formed the basis of the plaintiff's claim "could not reasonably be expected to recur." *Id.* at *5. In that context, this Court concluded that lingering "prosecutorial indecision" was enough to show that the government had not carried its high burden to establish that the case was moot, relying on a number of facial, pre-enforcement standing

cases in support of that conclusion.  *Id.*  Here, the government has made no argument that plaintiffs' claims are moot.

This Court only briefly addressed standing in *Franciscan Alliance*, concluding that the plaintiff there had standing "to seek a [plaintiff-specific] permanent injunction against future regulations that may require it to perform abortions or gender-reassignment surgeries."  2022 WL 3700044 at *8.  That kind of limited injunction against the application of regulations that would require a *particular plaintiff* to engage in certain specific conduct is far afield from the broad, class-wide claims that plaintiffs bring here.  The plaintiff in *Franciscan Alliance* had also made clear that it was *already* engaged in the precise conduct that it sought to protect via injunction—*i.e.*, the plaintiff was refusing "to perform abortions or gender-reassignment surgeries."  Here, as discussed in the government's opening brief (at 28-29), plaintiffs identify no particular employment decision that could subject them to an EEOC enforcement action.  And instead of a narrow injunction preventing enforcement under certain proscribed facts, plaintiffs here seek broadly sketched declaratory relief covering a range of hypothetical future employment actions.  Indeed, the relief this Court discussed in

*Franciscan Alliance*—an injunction against enforcing regulations to require the plaintiff "to perform specific abortions or gender-reassignment surgeries" that it opposes for religious reasons—is similar in many ways to the RFRA claim the Supreme Court considered in *Hobby Lobby*. As discussed in more detail below, plaintiffs' claims here are materially different. *See infra* p. 27.

In any event, *Franciscan Alliance* does not address the various pre-enforcement standing issues that the government raises here, including the specific factors that make enforcement against plaintiffs unduly speculative (*supra* pp. 7-14), the heightened standard for as-applied pre-enforcement standing (*infra* pp. 16-21), and the lack of alleged chill (*infra* pp. 21-23). Nor does *Franciscan Alliance* say anything at all about ripeness. *See infra* Part I.B.

### 3. *As-applied pre-enforcement challenges are significantly harder to bring than facial challenges.*

Plaintiffs rely on *Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020), for the proposition that "[a] litigant seeking pre-enforcement relief is not required to allege an imminent or threatened enforcement action directed at *him*." Pls. Br. 23. But plaintiffs disregard this Court's discussion in *Speech First* of the critical difference between as-applied

challenges, like the ones plaintiffs seek to bring, and facial challenges. In assessing standing to bring pre-enforcement suits, "[t]he distinction between facial and as-applied challenges bears legal significance." *Speech First*, 979 F.3d at 334-335 (alteration in original) (quoting *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019)). When dealing with pre-enforcement challenges to statutes that "facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id.* at 335 (quoting *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)). But as-applied challenges work differently. For an as-applied challenge, "[t]here must be some evidence that [a] rule would be applied *to the plaintiff* in order for that plaintiff to bring an as-applied challenge." *Id.* (alterations in original) (emphasis added) (quoting *Schlissel*, 939 F.3d at 766).

Other than a single, recent out-of-circuit case (*see supra* p. 10 n.2), all of the cases that plaintiffs rely on involved *facial* pre-enforcement challenges. *See Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988) (holding that "plaintiffs had standing to bring pre-enforcement facial challenge based on … infringement of First Amendment rights of

book-buyers"); *Doe v. Bolton*, 410 U.S. 179, 192-194 (1973) (similarly allowing pre-enforcement review of facial challenge seeking to invalidate statutory provisions in all applications). Plaintiffs, in contrast, have brought an as applied challenge to Title VII—seeking a declaration that certain hypothetical future employment actions either fall outside of Title VII's prohibitions, or would be protected by RFRA or the Free Exercise Clause of the First Amendment.

This Court's decision in *Google, Inc. v. Hood*, 822 F.3d 212 (5th Cir. 2016), demonstrates how difficult it is to obtain pre-enforcement review of that kind of as-applied challenge. There, this Court concluded that pre-enforcement review was not available because "adjudicating whether federal law would allow an enforcement action" under particular facts would require the Court to evaluate various "hypothetical situations" that may never come to pass. *Id.* at 227. Whereas a facial challenge can result in a clear, across-the-board statement that a law is unconstitutional, the declaratory relief the plaintiff sought in *Google*—as here—"covers a fuzzily defined range of enforcement actions that do not appear imminent." *Id.* This Court therefore refused to allow an as-applied pre-enforcement challenge and directed the district court to

dismiss the plaintiff's claims for lack of jurisdiction. *Id.* This Court should follow the same course here.

It makes sense that it is more difficult to establish jurisdiction over as-applied pre-enforcement challenges for ripeness reasons as well. As discussed below, *see infra* Part I.B, whereas facial challenges will often present purely legal questions that "will gain little from a more complete record," *International Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 822 (5th Cir. 1979), the same is not true of as-applied challenges. Such challenges usually require a court to engage in a fact- and case-specific inquiry that cannot be conducted in advance and in the abstract, which is precisely what the ripeness doctrine prohibits. *See Google, Inc.*, 822 F.3d at 227 (finding no jurisdiction over pre-enforcement claims where "[w]e cannot on the present record predict what conduct [the government] might one day try to prosecute under [the challenged] law").

Plaintiffs' lack of standing is confirmed by the Eighth Circuit's recent decision in *School of the Ozarks, Inc. v. Biden*, 41 F.4th 992 (8th Cir. 2022). That case involved a materially similar challenge to the one plaintiffs bring here: the religious college there challenged a Department

of Housing and Urban Development (HUD) memorandum explaining that the Fair Housing Act's (FHA) prohibition on sex discrimination prohibits sexual-orientation and gender-identity discrimination. The Eighth Circuit held that the religious-college plaintiff did not have standing, rejecting the college's argument that "there is an imminent threat" "that the government will enforce the [FHA] against the College." *Id.* at 998-999. The court reasoned that the memorandum did not "require that HUD reach the specific enforcement decision that the College's current housing policies violate federal law." *Id.* at 998. In particular, the memorandum "[said] nothing of how [RFRA]" "may limit enforcement of the [FHA's] prohibition on sex discrimination as applied to the College." *Id.* Additionally, the court reasoned that "it is speculative that HUD will file a charge of discrimination against the College." *Id.* As the court explained, the college's assertion to the contrary assumed that a discrimination complaint will be filed; that "HUD will charge the College with sex discrimination, even though HUD has never enforced the [FHA's] sex-discrimination prohibition against" a similarly situated college in the past; and that the College will be "subject to penalties." *Id.* at 1000. The court held that "[t]his is the kind of 'highly

attenuated chain of possibilities' that 'does not satisfy the requirement that threatened injury must be certainly impending.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).

4. *Plaintiffs demonstrate no actual chill.*

This case also does not present a situation where plaintiffs' activities will be chilled in the absence of pre-enforcement review. As this Court has "repeatedly held, in the pre-enforcement context" the "'[c]hilling [of] a plaintiff's speech'" generally forms the "'constitutional harm adequate to satisfy the injury-in-fact requirement.'" *Speech First*, 979 F.3d at 330-331 (first alteration in original) (quoting *Houston Chronicle Publ'g Co. v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007)); *see also Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) ("As the district court noted, '[t]he First Amendment challenge has unique standing issues because of the chilling effect, self-censorship, and in fact the very special nature of political speech itself.'").

In nearly all the cases plaintiffs cite, the party bringing the pre-enforcement challenge expressly alleged that the government action— and the accompanying fear of enforcement—had actually chilled their

exercise of constitutional rights. For example, in *Speech First*, this Court noted that the plaintiff "insists that its members' First Amendment rights have been chilled" and "their speech deterred, by the prospect of adverse application of the policies." 979 F.3d at 330. Similarly in *Susan B. Anthony*, the plaintiff alleged that its speech already "had been chilled" by the challenged statute and that it also "face[d] the prospect of its speech and associational rights again being chilled and burdened" by the thread of future enforcement. 573 U.S. at 155 (alteration in original).

Here, in contrast, the district court noted that "[p]laintiffs have made it clear that they have no intention" of altering or discontinuing the relevant employment policies. ROA.1721. In other words, plaintiffs have acknowledged that they suffer no actual chill or present harm from the nebulous prospect of future enforcement. As this Court has held, mere "invocation of the First Amendment" and a general fear of prosecution "cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Google*, 822 F.3d at 228. Thus, in cases like this one where there is no actual chill alleged, and it is not possible to "say at this early stage" that any potential enforcement action that EEOC might bring against plaintiffs "would necessarily violate the Constitution" or

RFRA, there is no constitutional injury sufficient to confer Article III standing. *Id.*

The lack of any allegation of actual chill here is important for another reason: Actual chill can serve as a useful litmus test for whether a plaintiff faces a sufficiently credible threat of prosecution. Here, EEOC has understood Title VII to prohibit discrimination based on sexual orientation and gender identity for almost a decade. *See, e.g.*, *Macy v. Dep't of Justice*, EEOC Appeal No. 0120120821, 2012 WL 1435995 (Apr. 20, 2012); *Baldwin v. Department of Transp.*, EEOC Appeal No. 0120133080, 2015 WL 4397641 (July 15, 2015); *Lusardi v. Department of the Army*, EEOC Appeal No. 0120133395, 2015 WL 1607756 (Apr. 1, 2015). Yet despite that long-standing interpretation, plaintiffs have never altered their behavior in response to what they now claim to be a "substantial" threat of enforcement at some point in the indeterminate future. *See Susan B. Anthony*, 573 U.S. at 164. That plaintiffs do not allege any actual chill casts serious doubt on plaintiffs' assertion that they have a significant fear of enforcement.

## B. Plaintiffs' claims are not ripe.

Plaintiffs offer little in the way of response to the government's ripeness arguments. Instead, they suggest that this Court can simply ignore the ripeness problems with their claims if it concludes that plaintiffs have standing. Pls. Br. 32. That is not correct. This Court has made clear that ripeness is an independent and "essential component[]" of "Article III's case-or-controversy requirement" because a court has no power to decide disputes that are not yet justiciable. *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005) (per curiam).

As the Supreme Court has explained, ripeness does work independent of standing by "prevent[ing] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also [protecting] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977);

*see also, e.g.*, *Jackson v. Vannoy*, 49 F.3d 175, 176 (5th Cir. 1995) (holding that plaintiff had standing, but that him claim was not ripe).[3]

Plaintiffs may mean to highlight that the various pre-enforcement cases they cite elsewhere in their brief, Pls. Br. 23-29, did not raise ripeness concerns.  But that does not indicate that pre-enforcement cases are exempt from Article III's prohibition against judicial resolution of claims that are not ripe.  To the contrary, it only highlights how different plaintiffs' claims are from the claims in those cases.

Unlike the claims plaintiffs raise here, in each of the cases plaintiffs cite, no further factual development was required.  In many of those cases, the plaintiffs brought facial constitutional challenges to statutes. *See supra* pp. 16-21.  As this Court has explained, facial challenges

---

[3] The Supreme Court's discussion in *Susan B. Anthony* about whether *prudential* ripeness concerns alone could be sufficient to justify dismissal of an otherwise justiciable claim do not suggest otherwise.  *See* Pls. Br. 21 & n.9.  Indeed, as plaintiffs acknowledge, Pls. Br. 21, the Supreme Court in *Susan B. Anthony* separately evaluated Article III ripeness after it concluded that the plaintiff had standing.  If ripeness has no "independent work to do," as plaintiffs suggest (Pls. Br. 32), there would have been no reason for the Court to address ripeness at all.  And in any event, neither the Supreme Court nor this Court have ever held that a court can disregard prudential ripeness problems so long as it concludes that a party has standing.  To do so would require this Court to effectively overturn the entire doctrine of prudential ripeness.

generally present purely legal questions, such that "[e]fforts to resolve such a facial challenge will gain little from a more complete record." *International Soc'y for Krishna Consciousness*, 601 F.2d at 822. As-applied challenges like the ones plaintiffs bring are different. *See id.* (contrasting facial challenge with as-applied attack on "particular" applications of the law). As explained in the government's opening brief, Gov. Br. 19-34, "further factual development" would "significantly advance" this Court's ability to resolve plaintiffs' claims such that "judicial resolution of the question[s] presented here should await a concrete dispute about a particular" application of Title VII. *National Park Hosp. Ass'n v. Department of Interior*, 538 U.S. 803, 812 (2003) (quotation omitted).

*Susan B. Anthony*—the principal authority plaintiffs rely on for their assertion that this Court can skip over Article III's ripeness requirement—is particularly inapposite. There, the plaintiff had already been investigated under the challenged statute for specific statements, and that investigation had advanced to a probable cause determination. Once that investigation was dismissed, the plaintiff brought a facial, pre-enforcement challenge to the statute in anticipation of a future

enforcement action arising out of materially similar speech. And the plaintiffs there explicitly alleged that their underlying free speech rights had in fact been chilled by the clear, specific threat of future enforcement.

*Hobby Lobby* and the other pre-enforcement challenges to the ACA's contraceptive mandate similarly involved claims that required no factual development to evaluate. There, the statute and implementing regulations unambiguously required employers to do something specific, *i.e.*, to cover "preventive care and screenings," including a variety of contraceptive methods. *Hobby Lobby*, 573 U.S. at 682 (quoting 42 U.S.C. § 300gg-13(a)(4)). Nor was there any question that the statute and regulations required Hobby Lobby to engage in specific conduct that it found religiously objectionable. But Title VII's broad prohibition against sex discrimination is quite different: Although Title VII prohibits discrimination based on certain characteristics, whether a particular employment decision will ultimately be deemed discriminatory is a fact-intensive inquiry. *See, e.g.*, *Roberson-King*, 904 F.3d at 380-382

(discussing *McDonnell Douglas* burden-shifting framework for evaluating Title VII discrimination claims).

Plaintiffs alternatively seek to avoid ripeness problems by framing their claims at a very high level of generality. This dispute is ripe, plaintiffs suggest, because "the only issues" their claims raise "concern the meaning of RFRA, the First Amendment, and Title VII." Pls. Br. 33 (emphasis omitted). With no citation or explanation, plaintiffs assert that none of those questions "will be affected by the facts surrounding a particular future employment action." *Id.* But as explained at length in the government's opening brief (at 19-34), that is simply not correct.

Plaintiffs state (again with no citation or explanation) that the questions whether Title VII promotes a compelling interest and whether it "substantially burdens" the religious freedom of employers who "do not wish to employ" LGBTQ employees are "purely legal question[s]." Pls. Br. 33. Not so. As the Supreme Court and this Court have held, RFRA claims demand a granular, plaintiff-specific inquiry focused on specific employment practices applied to individual employees. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (court must weigh "harm of granting [a] specific exemption[] to [a]

particular religious claimant[]"); *Brown v. Collier*, 929 F.3d 218, 230 (5th Cir. 2019) (substantial burden analysis is fact-specific); *see also* Gov. Br. 22-28 (collecting cases).

Indeed, plaintiffs' assertion that there are "no disputed questions of fact in this case," Pls. Br. 33, is correct only to the extent that there are not yet any facts here to dispute. Plaintiffs have not identified any specific employment action that might provide the basis for a Title VII enforcement action, nor has EEOC conducted any investigation or threatened to enforce Title VII under any particular facts. But that does not make plaintiffs' claims "purely legal." It makes them unsuitable for resolution at all, because RFRA requires courts to assess things like substantial burden on religious beliefs, the government's compelling interest in the actions alleged to burden plaintiff's religious exercise, and the availability of less restrictive means to serve those interests. *See infra* Part II.A.

And even accepting that plaintiffs' claims might raise *some* questions that are "purely legal," Pls. Br. 32, a declaratory judgment resolving only those questions would itself raise a host of threshold and jurisdictional problems. For example, plaintiffs at times suggest that all

they sought from the district court was a declaration that RFRA and the First Amendment compel EEOC to offer some "exemptions or accommodations for employers that oppose homosexual or transgender behaviors" in appropriate circumstances. Pls. Br. 1, *see also* Pls. Br. 27, 28 (similar). But a declaratory judgment merely stating that RFRA and the Free Exercise Clause may affect a religious employer's obligations under Title VII would be an advisory opinion. That kind of declaration would do nothing to resolve any particular case, nor would it provide plaintiffs with any meaningful protection or redress. Importantly, that kind of general declaration would not foreclose any investigation or enforcement action under Title VII—the mere fact that religious liberties may limit application of Title VII in *some* circumstances does not answer the question whether the application of Title VII is limited in a specific case. That is exactly what the ripeness doctrine is designed to prevent. *See International Tape Mfrs. Ass'n v. Gerstein*, 494 F.2d 25, 28 (5th Cir. 1974) (where claim is not ripe, "court's adjudication [of that claim] would be an advisory opinion treating a hypothetical case").

## II. The District Court Erred in Granting Summary Judgment to Plaintiffs on Their RFRA and First Amendment Claims.

### A. Plaintiffs are not entitled to summary judgment on their RFRA and Free Exercise claims.

Nowhere in their responsive brief do plaintiffs even acknowledge, much less address, the extensive case law from both the Supreme Court and this Court emphasizing that RFRA challenges are fact-intensive and require a case-by-case assessment that turns on both the precise religious practices of the plaintiff and the particulars of the governmental action at issue. *See* Gov. Br. 22-24. As explained in the government's opening brief (at 38-39), that fact-specific standard is unworkable at the level of generality at which the district court analyzed plaintiffs' RFRA claims.

1. *Substantial burden.*

Plaintiffs are wrong to claim that the government "do[es] not question" whether Braidwood (and all other religiously motivated businesses) have shown that Title VII necessarily imposes a "substantial burden" on their exercise of religion by requiring them to refrain from discriminating against its employees based on their sex. Pls. Br. 39. As plaintiffs acknowledge elsewhere in their brief, while courts generally do not question the sincerity of individuals' religious beliefs, courts can and

must evaluate whether the challenged government action imposes a substantial burden on an individual's religious practice. *See* Pls. Br. 37. *But see, e.g.*, *United States v. Quaintance*, 608 F.3d 717, 718-719, 722 (10th Cir. 2010) (rejecting RFRA defense because defendants did not show "sincere religious conviction").

In response, plaintiffs provide only a conclusory assertion of substantial burden untethered to any specific facts. Plaintiffs jump from broadly articulated religious beliefs—that marriage is limited to a man and a woman, and that people must dress and behave in accordance with their sex assigned at birth—to an assertion that being required even to *employ* people who engage in contrary conduct (even entirely outside of work) necessarily imposes a substantial burden on religious practice for employers that hold those beliefs. The Sixth Circuit rejected that argument in *Harris Funeral Homes*, holding that merely retaining a transgender employee did not burden the funeral home's religious practice because, "as a matter of law, tolerating [a transgender employee's] understanding of her sex and gender identity is not tantamount to supporting it." 884 F.3d at 588. And for good reason: Accepting plaintiffs' theory—whereby mere employment of a person who

engages in some conduct that the employer's religion prohibits automatically demonstrates a "substantial burden" on the employer's religious practice—could have far reaching consequences. Under that theory, an employer could be empowered to fire a working mother because the employer's religious beliefs call for women to stay home with children. Or an employer who believes women must wear hijabs could rely on RFRA to discriminate against women who do not share those beliefs.

Even assuming that simply employing an LGBTQ person might impose a "substantial burden" on religious practice in some cases for some employers, neither plaintiffs nor the district court acknowledge the myriad circumstances in which compliance with Title VII's prohibition on sex discrimination might not impose a substantial burden on an employers' exercise of religion. For example, many employers who oppose what plaintiffs refer to as "homosexual or transgender conduct" for religious reasons may feel no burden on their religious practice—let alone a substantial one—from merely employing a person who is gay or transgender. Indeed, religious businesses across the country likely employ many individuals who do not personally ascribe to every aspect

of the employer's religious beliefs, and experience no burden on their religious practice as a result.  That may be true even for employers like Braidwood that strive to operate their businesses in accordance with biblical teachings.

It is not hard to imagine other examples, such as a religious employer that prohibits male employees from wearing jewelry under a sex-specific dress code adopted for religious reasons.  The employer fires a gay man or a transgender woman employee under that policy for wearing earrings.  The employer claims its no-jewelry policy is religiously motivated, and that being required to employ men or transgender women who wear jewelry imposes a substantial burden on its religious practice.  But suppose that further investigation reveals that straight, cisgender male employees are allowed to wear rings and necklaces and even simple stud or hoop earrings.  A court may well conclude that, under those facts,

continuing to employ the gay or transgender employee would not impose any burden on the employer's religious practice.[4]

Neither EEOC nor this Court can (or should) prejudge these hypothetical cases at this juncture. What matters is that these kinds of difficult future cases may exist, which is fatal to the district court's holding that *all* applications of Title VII with respect to *all* religious employers necessarily impose a substantial burden on those employers' exercise of religion. The district court therefore fundamentally erred in purporting to adjudicate all possible RFRA defenses for a nationwide class of employers *ex ante* and *en grosse*. And because the district court only considered plaintiffs' RFRA claims class-wide, this Court should vacate and remand the district court's decision on that basis alone. *See Companion Prop. & Cas. Ins. Co. v. Palermo*, 723 F.3d 557, 561 (5th Cir. 2013) ("Appellate 'powers are limited to reviewing issues raised in, *and*

---

[4] These hypotheticals also underscore why plaintiffs are wrong to say that their claims are ripe because they raise purely legal questions that "will [not] be affected by the facts surrounding a particular future employment action." Pls. Br. 33.

*decided by,* the [district] court.'" (quoting *Masat v. United States,* 745 F.2d 985, 988 (5th Cir.1984)) (alteration in original)).

Even considering the RFRA claim just as to Braidwood itself (which the district court never did), plaintiffs acknowledge elsewhere in their brief (Pls. Br. 40 & n.29, 46-47) that there are several analytical leaps between concluding that an employer (like Braidwood) opposes "homosexual or transgender conduct" for sincerely held religious reasons and concluding that merely employing a person who engages in that conduct substantially burdens the employer's religious practice.

First, plaintiffs agree that the class definition is overbroad because it is not limited to employers who oppose for religious reasons both LGBTQ "conduct" and even *employing* individuals who engage in that "conduct." Pls. Br. 40 & n.29. But implicit in that concession is a recognition that there is a critical difference between (1) a religious employer's *beliefs* about what conduct is appropriate and (2) how merely employing someone who engages in conduct outside of work that is inconsistent with those beliefs might substantially burden the employer's religious *practice.* Yet Braidwood has never explained how, precisely, its beliefs about LGBTQ people translate into religious practice, let alone

how that practice is burdened by Title VII's prohibition against sex discrimination.

Second, in defending the district court's analysis of plaintiffs' associational rights, plaintiffs walk through a complex series of unsupported assertions to try to explain how employing an LGBTQ person must *necessarily* communicate that the employer approves of the employees' conduct outside of work. Pls. Br. 46-47. That chain of supposition underscores that the relationship between employees and their employers—and how the beliefs and actions of the one may or may not be associated with the other—are complex and case-specific.

Despite all of this, Braidwood has never provided any explanation as to how simply employing LGBTQ people would impose a substantial burden on its religious practice. Braidwood is required to do so, as indicated by *Harris Funeral Home*, where the employer articulated (and the court was then able to evaluate and reject) specific ways in which employing a transgender employee would supposedly burden its religious practice. *See* 884 F.3d at 586 (employer claimed that presence of transgender employee would "present a distraction that will obstruct [employer's] ability to serve grieving families"); *id.* at 587 (employer

claimed that being forced to purchase female attire for employee was tantamount to subsidizing her gender identity).  On this record, the district court therefore had no basis to grant summary judgment even as to Braidwood itself.

### 2. Compelling Interest.

Plaintiffs are equally wrong in defending the district court's conclusory holdings that the government failed to demonstrate either a compelling interest in eradicating employment discrimination because of sex or that Title VII is the least restrictive means of achieving that interest.  Plaintiffs—like the district court—fault the government for defining its "compelling interest" in preventing discrimination based on sex at a high level of generality.  Pls. Br. 41.  But that is simply a reflection of the basic faults in plaintiffs' RFRA claim:  Because plaintiffs asked for a preemptive declaration that enforcing Title VII necessarily violates RFRA in a broad set of hypothetical cases, the government's interest in enforcing Title VII in those cases was necessarily articulated in similarly broad terms.  Plaintiffs cannot frame their claims in

generalized terms and then criticize the government for responding at a similar level of generality.

Plaintiffs alternatively claim that EEOC "cannot possibly show that the enforcement of Title VII is a policy of such overriding importance that no exceptions can be made" for "religious objectors." Pls. Br. 41 (emphasis omitted). But the EEOC has never suggested that it will not recognize "exceptions" for religious objectors; as discussed above, EEOC acknowledges RFRA's protections and takes care to respect employers' religious liberties in deciding whether and how to enforce Title VII. *See supra* pp. 12-13. That plaintiffs disagree with EEOC's decision to continue litigating its enforcement action against Harris Funeral Homes even after the company belatedly raised its RFRA defense does not demonstrate otherwise. The district court did not simply declare that EEOC must make some exceptions for "religious objectors" in appropriate cases under RFRA or the First Amendment. It held that EEOC may not enforce Title VII's prohibition on discrimination on the basis of sex (to include sexual orientation and gender identity, as the Supreme Court held in *Bostock*) against *any* religious employers, regardless of the facts

of any particular case. As already explained above, that holding is untenable under both Article III and RFRA.

Finally, there can be no doubt that the government has a compelling interest in preventing discrimination on the basis of sex in employment, just as it has a compelling interest in preventing employment discrimination on the basis of race. The Supreme Court in *Hobby Lobby* made clear that the government's "interest in providing an equal opportunity to participate in the workforce without regard to race" is necessarily compelling, and that "prohibitions on racial discrimination are precisely tailored to achieve that critical goal." *Hobby Lobby*, 573 U.S. at 733. The same is true with respect to sex, which is included alongside race in a parallel list of terms in Title VII. *See* 42 U.S.C. § 2000e-2(a). Plaintiffs' only response is to invoke *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), claiming that the Supreme Court there somehow rejected the proposition that the government has a compelling interest "in providing an equal opportunity to participate in the workforce without regard" to sex. Pls. Br. 43. But *Boy Scouts* involved *membership* in an expressive group and says nothing whatsoever about employment, let alone the nature of the government's interests in

preventing workplace discrimination.  *See* 530 U.S. at 648.  And in any event *Boy Scouts* specifically cautioned that an "expressive association can[not] erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message."  *Id.* at 653.

### B.  Plaintiffs are not entitled to summary judgment on their Free Association claim.

As explained in the government's opening brief (at 46-50), plaintiffs' Free Association claim fails for two reasons: (1) plaintiffs have not established that they are a group that engages in expressive association, and (2) even assuming plaintiffs are engaged in expressive conduct, the district court erred by concluding that the class has established that employing an individual engaged in what plaintiffs call "homosexual or transgender behavior," ROA.1727, would necessarily "significantly burden" that expression, *Boy Scouts*, 530 U.S. at 653.

On the first point, plaintiffs complain that "for-profit corporations can exercise religion," and that "it follows that for-profit businesses can express and espouse Christian beliefs about marriage and human sexuality as well." Pls. Br. 46.  The government did not suggest otherwise in its opening brief.  *See* Gov. Br. 47.  The problem is that the district

court held that *every* member of a broadly defined class of for-profit businesses *necessarily* engages in expressive associational conduct regarding their beliefs. Plaintiffs offer no defense of that class-wide holding. *See* Pls. Br. 46.

Even as to Braidwood itself, plaintiffs have not established that the mere employment of a person engaged in conduct Braidwood finds objectionable would significantly interfere with its ability to express whatever message it wants to communicate about "marriage and human sexuality." Pls. Br. 46. Plaintiffs' attempts to explain why that would be so only underscores why their Free Association claim must fail. Plaintiffs assert that (1) it "is undisputable" that the employment of person who is gay would compromise the message that religious employers like Braidwood are "attempting to convey as overtly Christian entities"; (2) "[e]mployment of an individual signifies that the employer is at least equanimous toward the employee's conduct and behavior outside the office"; and (3) "compulsory inclusion of an employee whose lifestyle contradicts the values of an organization will by definition 'significantly affect' the employer's ability to communicate those values." Pls. Br. 46-47. None of these arguments has merit.

For starters, none of these assertions is indisputable. Indeed, many employers—including religious ones—would be surprised to know that they are clearly communicating that they are "at least equanimous toward" every aspect of their employees' "conduct and behavior outside the office." Pls. Br. 47. But in any event, *Boy Scouts* forecloses plaintiffs' argument, which boils down to an assertion that "mere acceptance of a member from a particular [protected] group would impair" their expressive message. *Boy Scouts*, 530 U.S. at 653. The Supreme Court clearly warned, however, that an "expressive association can[not] erect a shield against antidiscrimination laws" like Title VII simply by making that kind of assertion. *Id.* This Court should therefore vacate the district court's class-wide grant of summary judgment on plaintiffs' Free Association claim.

## III. The District Court Erred in Granting Summary Judgment to Plaintiffs on Any of Their Title VII Claims.

1. Plaintiffs concede, Pls. Br. 52-53, that the district court erred in holding that Title VII categorically permits employers to adopt workplace policies implementing "sex-specific dress codes," ROA.1770, and "policies that promote privacy, such as requiring the use of separate

bathrooms on the basis of biological sex," ROA.1771. As plaintiffs acknowledge, the reasoning of *Bostock* compels the conclusion that dress codes and restroom policies may violate Title VII when they are enforced in a manner that results in adverse employment actions against LGBTQ employees based on their sex. For the reasons given in the government's opening brief (at 52-59), the Court should therefore vacate that portion of the district court's decision.[5]

2. The district court also erred in preemptively holding that "[p]olicies that enforce a sexual ethic that applies evenly to heterosexual and homosexual sexual activity" can never violate Title VII. ROA.1767. For reasons already discussed, whether a particular application of even a facially neutral sexual conduct policy is lawful will be a fact-intensive inquiry that cannot be categorically resolved ahead of time.

---

[5] As noted in the government's opening brief (at 57), this does not mean that sex-specific dress codes or restrooms are now unlawful. Title VII only prohibits *discrimination* based on sex, not sex-based distinctions per se. Thus, in some circumstances differential sex-based treatment may not amount to prohibited discrimination when it imposes only *de minimis* harm on those who are treated differently on the basis of their sex, such as when it has only a relatively "innocuous" impact. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *see also Threat v. City of Cleveland*, 6 F.4th 672, 678 (6th Cir. 2021) (discussing "*de minimis* exception that forms the backdrop of all laws").

The district court's across-the-board preclearance of these kinds of policies was particularly inappropriate here, given that Braidwood's complaint makes clear that its "sex-neutral" codes of sexual conduct were adopted *with the express goal of* prohibiting "homosexual or transgender behavior." ROA.1219-1220 (seeking declaratory relief that Title VII permits "establishing sex-neutral rules of conduct that exclude practicing homosexual and transgender individuals from employment"). Indeed, many of the policies that plaintiffs asked the district court to pre-clear as lawful are in no way sex-neutral, as they are expressly directed at same-sex conduct rather than sexual conduct generally. *See* R.1219-1220, at ¶ 66 (listing policies that prohibit "enter[ing] a gay bar or gay bathhouse," "engag[ing] in the sexual practices associated with homosexuality," and "us[ing] Grindr (or other dating apps used primarily by [gay people])"). In short, plaintiffs' own allegations demonstrate that even an ostensibly sex-neutral policy may be a mere pretext for discrimination, and that employers may *not* apply the policies in a sex-neutral manner notwithstanding their facial neutrality. *Cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993).

Plaintiffs' only response is to claim that adopting a policy with the purpose of discriminating against LGBTQ employees is just fine under Title VII, because Title VII only prohibits discrimination on account of "sex" not "sexual orientation." Pls. Br. 50. But that assertion is squarely foreclosed by *Bostock*, which held that, "[w]hen an employer fires an employee for being homosexual or transgender, it necessarily [also] intentionally discriminates against that individual in part because of sex." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1734 (2020).

3.      The district court correctly held that the government was entitled to summary judgment on two of plaintiffs' claims, holding that (1) policies that discriminate against employees engaged in bisexual conduct violate Title VII, and (2) policies that discriminate against employees receiving certain gender-affirming treatment violate Title VII. Plaintiffs challenge those holdings, but their arguments on this score are difficult to square with their concession that the district court could not, consistent with *Bostock*'s reasoning, declare sex-specific bathrooms and dress-codes to be categorically exempt from Title VII. That same reasoning compelled the district court's grant of summary judgment in

the government's favor on plaintiffs' "bisexual conduct" and gender-confirming treatment claims.

As to prohibitions against bisexual employees, the district court properly recognized that it is impossible to define bisexuality without reference to both the employee's sex and the sex of the employee's partners. Or framed another way, the simple "but-for" test described in *Bostock* also covers bisexual employees. *See* 140 S. Ct. at 1741. Steve would not be fired under a policy prohibiting bisexual conduct if he engages in relationships with Samantha and Catherine. But changing the sex of one of those partners would change the result: Steve would be fired under such a policy if his relationships are with Samuel and Catherine.

Plaintiffs' sole response is to invoke the same arguments that the Supreme Court expressly rejected in *Bostock*, claiming that Title VII has no application if an employer "is equally happy to fire male *and* female employees" who engage in bisexual conduct. *Bostock*, 140 S. Ct. at 1742; *see* Pls. Br. 56. But as the Supreme Court explained, that kind of equal-opportunity discrimination "doubles rather than eliminates Title VII liability." *Bostock*, 140 S. Ct. at 1742-1743.

As for prohibitions against employees who obtain certain gender-affirming treatment, the district court correctly observed that these policies "*explicitly* target transgender individuals." ROA.1687 (emphasis added). Here again, plaintiffs' only response is to raise an argument that is squarely foreclosed by *Bostock*. They claim that intentionally discriminating against transgender people is acceptable under Title VII because "Title VII does not prohibit discrimination against transgender individuals or people with gender dysphoria; it prohibits discrimination 'because of … sex.'" Pls. Br. 58 (alteration in original). *Bostock*, however, clearly rejected that distinction between transgender discrimination and sex discrimination, because "[w]hen an employer fires an employee for being homosexual or transgender, it necessarily [also] intentionally discriminates against that individual in part because of sex." *Bostock*, 140 S. Ct. at 1734.

4. A final note regarding plaintiffs' Title VII claims: Many of plaintiffs' arguments with respect to Title VII indicate that their real quarrel here is not with potential EEOC *enforcement* of Title VII but with *Bostock*'s *interpretation* of Title VII itself. For example, plaintiffs repeatedly assert that "the interpretations of Title VII in *Bostock* and the

EEOC guidance documents substantially burden" their religious exercise, even though EEOC's guidance documents merely summarize *Bostock*'s holding. *See, e.g.*, Pls. Br. 19. And plaintiffs repeatedly criticize the Supreme Court's reasoning in *Bostock* both directly (saying that the Court's opinion "talks out of both sides of its mouth" with respect to dress codes and bathrooms, Pls. Br. 51) and indirectly (pressing arguments that the Court squarely rejected in *Bostock,* Pls. Br. 50, 58). But of course, this kind of pre-enforcement lawsuit does not provide a vehicle for plaintiffs to relitigate or collaterally challenge *Bostock*. And to the extent there is some uncertainty as to precisely what *Bostock* does and does not allow, that only underscores the need for case-by-case analysis rather than blunderbuss decisions granting sweeping, categorical exemptions from Title VII without regard to the facts of individual cases. *See Bostock*, 140 S. Ct. at 1754 (contemplating that difficult questions about "how … doctrines protecting religious liberty interact with Title VII are" to be resolved in "future cases").

## IV. The District Court Separately Erred in Certifying Two Nationwide Classes.

As explained in the government's opening brief, the district court erred in certifying two classes because neither class satisfies Rule 23(a)'s

commonality requirement, or Rule 23(b)(2)'s requirement that the "[d]efendants have acted or refused to act on grounds generally applicable" to the class as a whole.  Gov. Br. 62-67.

As with their response to the ripeness problems with their claims, plaintiffs attempt to avoid the defects in class certification by asserting that the district court's decision involved only "pure questions of law." Pls. Br. 54.  But as already discussed at length, each of plaintiffs' claims necessarily turns on individualized questions of fact that cannot be answered class-wide.  *Supra* Part II.

Plaintiffs identify a few legal questions that the district court arguably addressed in its RFRA analysis, but none of these is framed at the level of specificity necessary to advance the resolution of their RFRA claims.  Plaintiffs say that the question whether the government has a compelling interest in enforcing Title VII is a question of law that "in no way depends on the particular factual circumstances of an individual class member."  Pls. Br. 54.  But that claim is foreclosed by precedent from both this Court and the Supreme Court emphasizing the individualized, case-specific analysis required under RFRA.  *See U.S. Navy Seals 1-26*, 27 F.4th at 350 (compelling interest must be focused on

"particular claimant"); *O Centro*, 546 U.S. at 430-431; *City of Boerne v. Flores*, 521 U.S. 507, 544 (1997) (Scalia, J., concurring in part) (observing that "the abstract proposition that government should not, even in its general, nondiscriminatory laws, place unreasonable burdens upon religious practice[] … must ultimately be reduced to concrete cases").

In any event, the district court did not (and could not) merely "carve[] out" the particular legal questions that plaintiffs identify and resolve those questions in isolation. *Calderon v. Ashmus*, 523 U.S. 740, 746-747 (1998). Instead, class certification is only appropriate to "resolve" an "entire case or controversy," not to have legal issues "determined in anticipation" of further litigation without resolving the actual claims. *Id.*

Nor are plaintiffs correct that all the district court did here was to declare that "the class member[s] [have a] right to choose whether to adopt" discriminatory policies. Pls. Br. 55 (emphasis omitted). The district court did not merely say that employers may adopt certain policies; it held that all such policies are categorically immune from any scrutiny under Title VII. And as demonstrated by the various hypotheticals discussed above, *supra* pp. 33-34, the question whether any

particular application of an employment policy is discriminatory under Title VII—and if so, whether it is nonetheless protected under RFRA or the First Amendment—is fact-intensive and cannot be resolved class-wide.

Finally, as noted in the government's opening brief (at 67), the district court's certification under Rule 23(b)(2) was particularly problematic here, because "class actions bind not only named parties, but also countless unnamed parties as well." *20/20 Commc'ns, Inc. v. Crawford*, 930 F.3d 715, 719 (5th Cir. 2019). Thus, both the district court's favorable and unfavorable holdings, including its broad holding that policies discriminating against bisexual employees or employees that obtain certain gender-affirming treatments necessarily violate Title VII, bind all class members in any future enforcement actions brought by EEOC. Plaintiffs offer no defense of that extraordinary result.

## V.  The District Court Correctly Dismissed Bear Creek's Claims For Lack of Jurisdiction.

Plaintiffs fault the district court for dismissing Bear Creek's claims for lack of jurisdiction. Pls. Br. 58-60. But for all of the reasons discussed above, that was the right result because neither Bear Creek nor Braidwood have standing to bring this pre-enforcement action, and their

claims are not ripe.  *See supra* Part I.  This Court therefore can (and should) affirm the dismissal of Bear Creek's claims for lack of jurisdiction.

In any event, plaintiffs are wrong to argue that the district court was required to grant Bear Creek declaratory relief that it never asked for.  As plaintiffs acknowledge, Bear Creek did not ask the district court to declare that it was categorically immune from Title VII under the statutory exemption for "religious corporations."  Pls. Br. 58-59 (quoting 42 U.S.C. § 2000e-1(a)).  Thus, even assuming the district court was correct to hold that this provision shielded all of Bear Creek's

employment decisions,[6] the district court was not required to *sua sponte* grant Bear Creek declaratory relief on that basis.

Plaintiffs argue otherwise by citing various sources indicating that district courts have discretion under Federal Rule of Civil Procedure 54(c) to grant relief that was not expressly requested in the complaint.  Pls. Br. 59-60.  But the fact that district courts have some discretion to grant a

---

[6] The government does not agree with the district court's sweeping statement that Title VII's religious organization exemption permits not only "religious discrimination" but also "other forms of discrimination under Title VII, so long as the employment decision was rooted in religious beliefs." ROA.1712.  Title VII provides that the statutes "shall not apply to … "religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on … of its activities." 42 U.S.C. § 2000e-1(a).  The district court interpreted this language to mean that qualifying employers may take any discriminatory employment actions—even those implicating protected classifications other than religion—so long as the employment action is based on the employer's sincere religious beliefs.  *See* ROA.1710-1713.  The government is aware of no other decision that has ever interpreted the exemption so broadly.  Furthermore, the district court's decision is inconsistent with the decisions of multiple courts of appeals, including this Court, which have interpreted the exemption to only allow for religious entities to consider employees' religion in making employment decisions.  *See EEOC v. Mississippi Coll.*, 626 F.2d 477, 489 (5th Cir. 1980); *Curay-Cramer v. Ursuline Acad. Of Wilmington*, 450 F.3d 130, 142 (3d Cir. 2006); *Little v. Wuerl*, 929 F.2d 944, 946-948 (3d Cir. 1991); *Maguire v. Marquette Univ.*, 814 F.2d 1213, 1218 (7th Cir. 1987).  But because the district court relied on that analysis to grant summary judgment in the government's favor, the government does not challenge that erroneous analysis on appeal.

party relief that was not expressly included in the pleading does not mean that a district court is *required* to grant plaintiffs relief that they did not ask for. *See Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335, 340 (5th Cir. 2015) (discussing the "discretion afforded by Rule 54(c)," noting that only "Rule 54(c) *authorizes*" (but does not require) "district courts to grant any appropriate relief following a general prayer by the plaintiff" (emphasis added)). To the contrary, this is a matter left to the district court's discretion. And plaintiffs cite no case in which this Court (or any other) has held that a district court abused its discretion where, as here, it declined to give a party declaratory relief that it did not request.

Nor is there any indication that the district court abused its discretion here. Plaintiffs expressly asked the district court to amend its judgment to provide the exact relief they now seek from this Court. But the district court denied that motion and fully explained its reasons for doing so. *See* ROA.1869-1870 (explaining that plaintiffs' motion did not satisfy Federal Rule of Civil Procedure 59(e)'s requirements and that "granting injunctive relief to the Church-Type Employers would have been inappropriate" given the district court's interpretation of Title VII).

## CONCLUSION

For the foregoing reasons, the district court's decision should be reversed to the extent it granted plaintiffs' motions for class certification and partially granted plaintiffs' motion for summary judgment. This Court should also remand with instructions to dismiss for lack of jurisdiction.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

CHAD E. MEACHAM
  *Acting United States Attorney*

CHARLES SCARBOROUGH
*/s/ Jack Starcher*
JACK STARCHER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7515*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

AUGUST 2022

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2022, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Jack Starcher*
*Counsel for Defendants-*
*Appellees/Cross-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,635 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

<u>/s/ *Jack Starcher*</u>
*Counsel for Defendants-*
*Appellees/Cross-Appellants*