# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 20, 2023

Lyle W. Cayce
Clerk

———————

No. 22-10145

———————

BRAIDWOOD MANAGEMENT, INCORPORATED,
*on behalf of itself and others similarly situated*;
BEAR CREEK BIBLE CHURCH,

>                              *Plaintiffs–Appellants*
>                              *Cross-Appellees*,

*versus*

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION;
UNITED STATES OF AMERICA; CHARLOTTE A. BURROWS;
JOCELYN SAMUELS; JANET DHILLON; ANDREA R. LUCAS;
KEITH E. SONDERLING,
*in their official capacities as chair, vice-chair, and commissioners of
the Equal Employment Opportunity Commission*;
MERRICK GARLAND, *U.S. Attorney General*,

>                              *Defendants–Appellees*
>                              *Cross-Appellants*.

———————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:18-CV-824

———————————————————

Before SMITH, CLEMENT, and WILSON, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

In *Bostock v. Clayton County*, 140 S. Ct. 1731, 1740–41, 1743 (2020),

No. 22-10145

the Court determined that Title VII of the Civil Rights Act of 1964 forbids employers from discriminating against homosexuals and transgender persons, holding that such discrimination is "on the basis of sex." Yet the Court punted on how religious liberties would be affected by its ruling and on the practical scope of the Title VII protections afforded by *Bostock*. Instead, the Court identified three potential avenues of legal recourse for religious and faith-based employers to shield themselves from any potential infringement of their religious rights. The avenues were Title VII's religious exception, 42 U.S.C. § 2000e–1(a), the ministerial exception of the First Amendment, and the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb–2000bb-4. *Bostock*, 140 S. Ct. at 1754.

In expanding discrimination "on the basis of sex" to include sexual orientation and concepts of gender identity such as transgenderism, the *Bostock* Court gave little guidance on how courts should apply those defenses and exemptions to religious employers. Addressing those issues of first impression, we affirm in large part, reverse in part, and remand.

## I.
## A.

This is a suit by two Texas employers: Braidwood Management, Inc. ("Braidwood"), and Bear Creek Bible Church ("Bear Creek"). Braidwood is a management company that employs the workers of Hotze Health & Wellness Center, Hotze Vitamins, and Physicians Preference Pharmacy International LLC. Steven Hotze controls or owns the business entities and is the sole trustee and beneficiary of the trust that owns Braidwood. He is also the sole board member of Braidwood, serving as President, Secretary, and Treasurer. Braidwood has close to seventy employees who work at those entities.

Hotze runs his corporations as "Christian" businesses—*to-wit*, he does not permit Braidwood to employ individuals who engage in behavior he

considers sexually immoral or gender non-conforming, nor does he allow Braidwood to recognize homosexual marriage. To Hotze, that would "lend approval to homosexual behavior and make him complicit in sin." Hotze also gives a nonreligious reason for refusing to recognize same-sex marriage: He will not allow Braidwood to recognize same-sex marriage because Texas continues to define marriage in heterosexual terms.

Braidwood enforces a sex-specific dress code that disallows gender-non-conforming behavior. For example, "biological" men must wear professional attire, including a tie, if they have contact with customers. On the other hand, "biological" women may not wear a tie but may wear skirts, blouses, shoes with heels, and fingernail polish; men are forbidden from wearing those accessories, because "cross-dressing" is strictly forbidden. Hotze also does not countenance Braidwood employees' using a restroom opposite their biological sex, regardless of any asserted gender identity. There is no record evidence of any job applicant or employee of Braidwood who has claimed he was discriminated against under these policies.

Bear Creek is a nondenominational church whose bylaws state that "marriage is exclusively the union of one genetic male and one genetic female." Accordingly, the church requires its employees to live according to its professed views on Biblical teaching. To that end, Bear Creek will not hire "practicing homosexuals, bisexuals, crossdressers, or transgender or gender non-conforming individuals." The church asserts that any employee who enters into a homosexual marriage will be fired. Bear Creek, like Braidwood, requires each employee to use the restroom of his or her biological sex. Bear Creek has over fifteen employees, some of whom are non-ministerial, and so is subject to Title VII. Finally, Bear Creek also asserts that it is compelled to obey civil authorities per Biblical teachings.

The church avers that it employed three persons who participated in

No. 22-10145

conduct that it considered immoral and against its religious values, but Bear Creek never fired any of them based on its values. The first was a homosexual pedophile caught molesting children after he left Bear Creek's employment. The second was dismissed for poor performance, and only after dismissal did Bear Creek discover the former employee was gay. The third engaged in cross-dressing but voluntarily left before Bear Creek took any employment action. Two of the three were pastors. The other was an administrative staff member.

As per their closely held religious beliefs, Braidwood and Bear Creek assert that Title VII, as interpreted in the EEOC's guidance and *Bostock*, prevents them from operating their places of employment in a way compatible with their Christian beliefs. These two plaintiffs have implicitly asserted that they will not alter or discontinue their employment practices. And all parties admitted in district court that numerous policies promulgated by plaintiffs (such as those about dress codes and segregating bathroom usage by solely biological sex) already clearly violate EEOC guidance. Both plaintiffs also contend that they are focused on individuals' behavior, not their asserted identity. Thus, for example, plaintiffs will hire homosexual employees who follow their code of sexual conduct. Although the EEOC has not brought an enforcement action against either party, it has not forsworn or disclaimed its willingness to bring an enforcement action against plaintiffs or other similarly-situated members of their proposed classes.

## B.

Title VII forbids employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The act also prohibits an employer from "limit[ing], segregat[ing], or classify[ing] . . . employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities

No. 22-10145

or otherwise adversely affect his status as an employee, because of such individual's . . . sex." *Id.* § 2000e-2(a)(2). Either the EEOC or an affected employee (if the EEOC declines to act) is statutorily authorized to bring an enforcement action. *Id.* § 2000e-5(f)(1).

The EEOC has not historically enforced Title VII's prohibitions against religious entities' engaging in potential discrimination against homosexuals and gender non-conformists. In one case, however, the EEOC brought an enforcement action against an avowedly Christian funeral home that prohibited a biological male from cross-dressing per the employee's claimed gender identity as female.[1] Despite the employer's sincere religious objections to gender-non-conforming conduct, *see* 884 F.3d at 567, the EEOC took the position that the employer's RFRA defense was invalid, *see id.* at 585.[2]

Still, most Title VII suits are brought by employees, not the EEOC. Moreover, the EEOC alleges that it counsels its investigators to respect employers' religious liberties when deciding whether to bring an enforcement action; it has a guidance manual that instructs its investigators on addressing potential religious-discrimination issues.

---

[1] *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).

[2] In the Sixth Circuit, the EEOC prevailed, as the court held that Title VII did not substantially burden the employer's religious practice and was the least restrictive method to further the government's compelling interest. 884 F.3d at 585–95. The court rejected the employer's claim that employing a transgender person would burden its religious practice. The court dismissed the position that the presence of the transgender employee would "present a distraction that will obstruct [the defendant's] ability to serve grieving families" and that purchasing female attire for the employee would subsidize the employee's claimed gender identity. *Id.* at 586–87. *Harris* was consolidated with *Bostock* at the Supreme Court. The EEOC asserts that the funeral home did not articulate its religious liberty concerns until well after the enforcement action was initiated, eight months into litigation.

No. 22-10145

But even before *Bostock*, the EEOC interpreted statutory prohibitions on sex discrimination to include sexual orientation and gender identity.[3] The EEOC has stated that employers must treat homosexual marriage as the same as heterosexual marriage, and bathroom policy should be dictated by an employee's asserted gender identity as distinguished from his or her biological sex.[4] The EEOC has no official guidance indicating any exemptions for employers that oppose homosexual or transgender behavior on religious grounds.

Then in *Bostock*, 140 S. Ct. at 1740–41, the Court ruled that discrimination based on sexual orientation or transgender status is discrimination "because of sex" and thus falls within the ambit of Title VII. The Court explained that an employer that fires an employee for conduct or attributes it would permit in a member of the other biological sex makes sex the "but-for cause" of the termination, violating Title VII. *Id.* That said, an employer would not violate Title VII if it takes adverse employment action against an employee for conduct or attributes that it would tolerate in neither sex. *Id.* at 1742.

Still, *Bostock* is delphic, with a nebulous description of the scope of its ruling. For example, the Court recognized that "[b]ecause RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases." *Id.* at 1754. But the Court declined to expound on what that might mean in

---

[3] *See Baldwin v. Foxx*, EEOC Appeal No. 0120133080, 2015 WL 4397641, at *10 (July 15, 2015); *see also Macy v. Holder*, EEOC Appeal No. 0120120821, 2012 WL 1435995, at *5 (Apr. 20, 2012).

[4] *See Lusardi v. McHugh*, EEOC Appeal No. 0120133395, 2015 WL 1607756, at *10 (Apr. 1, 2015). The EEOC's brief stated that it "has understood Title VII to prohibit discrimination based on sexual orientation and gender identity for almost a decade."

No. 22-10145

practice or how the Court would "address bathrooms, locker rooms, or any-thing else of the kind." *Id.* at 1753.

## C.

Plaintiffs sued the EEOC and related governmental defendants (col-lectively, "the EEOC") in 2018, seeking declaratory judgments. The district court stayed proceedings pending the resolution of *Bostock*, and post-*Bostock*, plaintiffs amended their complaint to seek a declaratory judgment on the fol-lowing five statements (some capitalization altered):

1. The Religious Freedom Restoration Act compels exemptions to *Bos-tock*'s interpretation of Title VII ("RFRA claim");
2. The Free-Exercise Clause compels exemptions to *Bostock*'s interpre-tation of Title VII ("free exercise claim");
3. The First Amendment right of expressive association compels exemp-tions to *Bostock*'s interpretation of Title VII ("expressive association claim");
4. Title VII, as interpreted in *Bostock*, does not prohibit discrimination against bisexual employees ("bisexual orientation claim");
5. Title VII, as interpreted in *Bostock*, does not prohibit employers from establishing sex-neutral rules of conduct that exclude practicing homosexuals and transgender people from employment ("sex-neutral rules of conduct claim").

In addition to bringing claims on behalf of themselves, plaintiffs moved to certify two classes: all employers that oppose homosexual or trans-gender behavior for sincere religious reasons and all employers that oppose homosexual or transgender behavior for religious or nonreligious reasons. All claims are asserted on behalf of the sincere-religious-objector class, but only claims 3–5 are asserted on behalf of the nonreligious-objector class.

The EEOC moved for summary judgment based on standing, ripe-

ness, and sovereign immunity.[5]  It also moved for summary judgment on substantive grounds, averring that it did not violate plaintiffs' religious rights and that *Bostock* prohibits the policies on which plaintiffs want declaratory relief.  Plaintiffs similarly sought summary judgment on substantive grounds.

## D.

The district court, in pertinent part, initially denied the EEOC's motion to dismiss for want of jurisdiction,[6] ruling that plaintiffs had established a "credible fear" of EEOC enforcement, conferring Article III standing.  The court separately held that plaintiffs' claims were ripe because the issues presented were purely legal with no need for further factual development.  The court held that waiting and withholding review would force plaintiffs between Scylla and Charybdis:  Violate either Title VII and EEOC guidance or violate their sincere religious beliefs.  *See Steffel v. Thompson*, 415 U.S. 452, 462 (1974).

Next, the court modified the classes that plaintiffs moved to certify.  First, the court certified a religious-business-type employers' class for all of Braidwood's claims.[7]  Then the claims of Bear Creek were separated into a church-type employers' class, which the court held was statutorily exempt

---

[5] The EEOC is not pursuing the sovereign-immunity defense on appeal.

[6] The district court had previously ruled that plaintiffs did not have standing to sue the Attorney General and granted the EEOC's motion to dismiss those claims.  After plaintiffs amended their complaint to reassert claims against the Attorney General, the district court again ruled that plaintiffs did not have standing to sue the Attorney General and dismissed all claims against him.  Plaintiffs do not appeal that decision.

[7] The class appears to comprise "for-profit entities producing a secular product.  While faith may be a motivating part of the businesses' missions, their incorporating documents generally do not include a religious purpose.  For an employer like Braidwood, religion plays an important role but is not the sole mission of the organization."  Note that this class definition does not reference opposing homosexual or transgender behavior.

No. 22-10145

from Title VII. The court declined to certify that class and entered judgment against Bear Creek.[8] Finally, the court accepted plaintiffs' proposed class definition for an "All Opposing Employers Class," defined as "every employer in the United States that opposes homosexual or transgender behavior for religious or nonreligious reasons." That class was certified only for claims 4 and 5.

On the merits, the court granted summary judgment in favor of the religious-business-type employer class for claims 1–3: The court ruled that the class was protected under RFRA and the First Amendment. For the RFRA claim, the court determined that Title VII substantially burdened the class members. Next, the court decided that the EEOC did not have a compelling interest in failing to provide a religious exemption to all class members. Moreover, the EEOC had not selected the least restrictive means to further any compelling interest.

For the free exercise claim, the district court ruled that Title VII is not a generally applicable statute because it has individualized exemptions.[9] Thus, strict scrutiny applies. Next, relying on *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), and *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014), the court concluded that the EEOC had not shown a compelling interest in light of the exemption system, which undermined the EEOC's contention that all discrimination had to be eliminated under Title VII. Again, in the alternative, Title VII was not sufficiently narrowly tailored.

Relying on *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), the

---

[8] We interpret the district court to apply this holding only to Bear Creek.

[9] Although the court acknowledged the EEOC's argument that it should avoid adjudicating the constitutional grounds if relief was granted on statutory grounds, the court, as a matter of judicial economy, continued its analysis anyway.

No. 22-10145

district court ruled that the members of the religious-business-type-employers class engaged in expressive association and therefore had a right not to associate with persons engaging in homosexual or transgender conduct. Again, the court held that the EEOC had failed to show a compelling interest that would defeat the associational right.

Additionally, the court determined, as a matter of law, that the sex-neutral policies of both classes pertaining to sexual conduct, dress codes, and bathrooms did not violate Title VII. Those policies applied equally to both sexes. On the other hand, the court granted summary judgment in the EEOC's favor on the entirety of claim 4 regarding bisexual orientation and employer policies regulating sex-reassignment surgery and hormone treatment for claim 5.[10]

The court then separately denied plaintiffs' motion to alter or amend the final judgments in pertinent part. Both plaintiffs and the EEOC timely appealed.

## II.

We review issues of Article III standing and ripeness *de novo*. *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015). We consider a summary judgment *de novo* as well. *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994). We review *de novo* whether the district court applied the correct legal standard in its decision on class certification. *Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 380 (5th Cir. 2007). But the decision to certify a class is reviewed for abuse of discretion. *Pederson v. La. State Univ.*, 213 F.3d 858, 866 (5th Cir. 2000). "Where a district court premises its legal analysis on an erroneous under-

---

[10] The EEOC argues that the district court failed to address its argument that plaintiffs did not identify a cause of action for claims 4–5.

No. 22-10145

standing of governing law, it has abused its discretion." *Regents*, 482 F.3d at 380.

Where, as here, issues of both Article III jurisdiction and class certification are presented, we usually answer class-certification issues first, as they are "logically antecedent" to Article III justiciability concerns and often implicate statutory standing. *Pederson*, 213 F.3d at 866 n.5 (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999)). The district court and the parties have chosen to address Article III standing concerns before discussing class certification. Because the class-certification issue is not outcome-determinative, we do the same.

## III.

To begin, plaintiffs' claims are justiciable. Despite the EEOC's protestations that no one has brought a Title VII enforcement action against these plaintiffs, the plaintiffs have established a credible fear of such an action sufficient to establish standing. The case is ripe because no further facts are required to adjudicate plaintiffs' specific claims, and there is a hardship to them in withholding judgment. Finally, plaintiffs have a valid cause of action.

## A.

The EEOC spends a tremendous amount of briefing arguing that the district court issued an impermissible advisory opinion. The EEOC proffers a smorgasbord of potential faults with the court's standing analysis, the most compelling being that the EEOC has not undertaken any enforcement action against plaintiffs and that plaintiffs have not suffered any harm nor any credible threat of harm from the EEOC's guidance. True, the line between a declaratory judgment and an advisory opinion is fine, and classifying this case requires us to run headlong into the ongoing battle over standing. But we must ignore the tempting feast of fallacies that the EEOC offers to stray from our "'virtually unflagging obligation' to hear and decide a case" within our

jurisdiction.[11]

Standing is a constitutional requirement. Article III limits the federal judiciary to the resolution of "Cases" and "Controversies."[12] On the other hand, courts are law-declaring institutions. "Rudimentary justice requires that those subject to the law must have the means of knowing what it prescribes . . . . [O]ne of emperor Nero's nasty practices was to post his edicts high on the columns so that they would be harder to read and easier to transgress."[13] Jurisdictional obtuseness leads to despotism. And *ubi jus ibi remedium*.[14]

Yet "[f]ederal courts do not possess a roving commission to publicly opine on every legal question . . . . [F]ederal courts do not issue advisory opinions." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). There is no "unqualified right to pre-enforcement review," even for claims raising fundamental constitutional rights. *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 537–38 (2021). So, to establish standing, plaintiffs have the burden to demonstrate (1) that they have suffered an injury, (2) "fairly traceable to the defendant's allegedly unlawful conduct," and (3) "likely to be redressed by the requested relief." *California v. Texas*, 141 S. Ct. 2104, 2113

---

[11] *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

[12] U.S. Const. art. III, § 2. "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976) (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)).

[13] Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989).

[14] Where there is a right, there is a remedy. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (quoting 3 William Blackstone, Commentaries *23).

No. 22-10145

(2021) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)).

The disputed prong here is injury. Any injury to plaintiffs must be "concrete and particularized" and "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations removed). The EEOC accurately notes that it has taken no enforcement action against these plaintiffs. And plaintiffs do not allege that they are aware of any applicants or current employees engaged in "homosexual or transgender behavior" or that they have taken any adverse employment action that could violate *Bostock*'s interpretation of Title VII. Thus, the EEOC says there is no standing.

Additionally, a plaintiff can demonstrate a cognizable injury in a pre-enforcement challenge only if it establishes that (1) it has "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and (2) "there exists a credible threat of prosecution thereunder."[15] Plaintiffs allege the credible threat is the *in terrorem* effects from the EEOC's guidance documents and its previous lawsuit against a religious employer in *Harris*.[16] Both conjointly present a credible threat that Bear Creek and Braidwood will face enforcement actions for operating their places of employment in accordance with their faith. No party truly contests the facts, which indicate that plaintiffs' employment policies facially violate the EEOC's guidance, though they have not been actuated against any specific individual. Still, plaintiffs allege that, to establish standing, they are not required to violate the law and expose themselves to potential penalties—they merely need to show that this credible threat or well-founded fear exists.

---

[15] *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Prong one is not in question.

[16] *See supra* note 2.

No. 22-10145

Plaintiffs point to numerous cases in which courts have allowed pre-enforcement actions to proceed.[17]  For example, though *Lopez v. Candaele* is not controlling on this court, plaintiffs advance its theory of standing, namely, "a threat of government prosecution is credible if . . . there is a 'history of past prosecution or enforcement under the challenged statute.'"[18]  Further, in each of the listed cases, courts allowed litigation to proceed based on a credible-threat analysis without a showing of specific targeting.

On the other hand, the EEOC denies the existence of any such credi-

---

[17] The most prevalent are *Susan B. Anthony*, 573 U.S. at 158–61 (holding that a state government's credible threat of prosecting the plaintiffs under a statute criminalizing false statements about candidates during a political campaign established standing in a facial pre-enforcement challenge); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 391–93 (1988) (permitting a pre-enforcement suit by booksellers against a law prohibiting the commercial display of sexual or sadomasochistic material "harmful to juveniles" because the booksellers alleged an actual and well-founded fear of enforcement and there was a danger of self-censorship); *Doe v. Bolton*, 410 U.S. 179, 188 (1973), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (permitting a facial challenge to a Georgia abortion law because there was a credible threat that the statute would be enforced and was not moribund); *Stenberg v. Carhart*, 530 U.S. 914, 945–46 (2000) (allowing a pre-enforcement challenge to an abortion statute when there was a possibility of future prosecution under the statute); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 336 (5th Cir. 2020) (holding in a facial challenge to a free-speech regulation that plaintiffs had established standing even though it was stipulated that the regulations would not be directed at plaintiffs specifically); *accord Telescope Media Grp. v. Lucero*, 936 F.3d 740, 749–50 (8th Cir. 2019) (allowing a pre-enforcement, as-applied challenge to continue because Minnesota had publicly announced an intent to enforce its statute forcing wedding vendors to service homosexual and heterosexual marriages equally and had previously enforced the act against a non-compliant wedding vendor).

[18] *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010) (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)).  *See also Holder v. Humanitarian L. Project*, 561 U.S. 1, 15–16 (2010) (permitting pre-enforcement review of a criminal statute because plaintiffs alleged they had performed now-prosecuted activities before the enactment of the challenged statute, the Attorney General had prosecuted cases under the statute involving the statutory terms at issue, and the government did not affirmatively declare it would not prosecute the plaintiffs).

No. 22-10145

ble threat.  It notes that before an EEOC enforcement action can proceed, (1) a plaintiff must employ or receive an application from an individual against whom it would subject to what the EEOC considers an adverse employment action; (2) the plaintiff must subject the employee to an adverse employment action; (3) the employee would have to file a charge with the EEOC, and finally, (4) the EEOC would have to exercise its discretion to pursue said action.  The EEOC states that this turn of events is highly speculative and not concrete, and plaintiffs, especially Braidwood, have provided no evidence that they have ever received an application from a protected party.  Moreover, a general fear of prosecution "cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016).

On this point, the EEOC alleges it has no history of taking adverse actions against parties like these plaintiffs.  Indeed, the EEOC shows some evidence that it takes religious defenses seriously.[19]  The EEOC emphasizes that Braidwood and Bear Creek can point to only one case—*Harris*—in which it took the position that a particular employer's RFRA defense was invalid.  The EEOC indicates that that one case is not a strong enough foundation to hoist the flag of standing.

The EEOC also stresses the posture of this case, which is an as-applied pre-enforcement challenge to how RFRA interacts with Title VII and *Bostock*, as distinguished from a facial challenge.  In assessing standing to bring pre-enforcement suits, "[t]he distinction between facial and as-applied

---

[19] *See Newsome v. EEOC*, 301 F.3d 227, 229–30 (5th Cir. 2002) (per curiam) (noting that the EEOC dismissed a charge where the employer offered evidence it fell under the religious-organization exception).  *See also* EEOC Compliance Manual on Religious Discrimination § 12-I(C)(3) (Jan. 15, 2021), https://www.eeoc.gov/laws/guidance/sectio n-12-religious-discrimination.

No. 22-10145

challenges bears legal significance."[20]

Ultimately, though, plaintiffs have the better argument. To under-stand why, we must review the point of a declaratory judgment. In *Steffel v. Thompson*, 415 U.S. 452, 475 (1974), the Court allowed the petitioner, whom the state police had threatened with arrest if he did not stop distributing anti-Vietnam War handbills outside a mall, to seek declaratory relief. To raise a constitutional challenge, the petitioner did not need to break the law and thereby expose himself to liability. Instead, he merely needed to show a "genuine threat" of enforcement. *Id.* Indeed, "'[t]he purpose of the Declar-atory Judgment Act is to settle "actual controversies" before they ripen into violations of law or breach of some contractual duty.'"[21]

Plaintiffs' credible-threat analysis is quite simple. First, they admit they are breaking EEOC guidance, which the EEOC does not seriously con-test. They posit statutory and constitutional issues with the laws under which they are at risk of being prosecuted: Those issues, they allege, are already forcing plaintiffs to choose either to restrict their religious practices or to risk potential penalties. And the EEOC's actions in *Harris*, which the EEOC won under a less violative set of facts, indicate that plaintiffs, too, have a legitimate fear of prosecution, chilling their rights. "The loss of First Amendment free-doms, for even minimal periods of time, unquestionably constitutes irrepa-rable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Finally, the EEOC refuses to declare affirmatively that it will not enforce Title VII against the plaintiffs' policies on homosexual and transgender behavior.

---

[20] *Fenves*, 979 F.3d at 334–35 (alteration in original) (quoting *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019)).

[21] *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1154 (5th Cir. 1993) (quoting *Hardware Mut. Cas. Co. v. Schantz*, 178 F.2d 779, 780 (5th Cir. 1949)).

No. 22-10145

The EEOC responds that one action is not a history of enforcement.[22] But one case, especially one landmark case, such as *Bostock*, into which *Harris* was subsumed, can be considered a history of enforcement, even if the facts would not be precisely the same as in an action against Braidwood and Bear Creek. *Bostock* and *Harris* readily establish a credible threat to Braidwood's and Bear Creek's current practices. That is sufficient.[23]

Plaintiffs' policies mirror and, in many respects, go further than those of the employer in *Harris*. Thus, *Harris* shows that the EEOC may actively enforce Title VII in situations like plaintiffs'. Plaintiffs are justified in believing that *Harris* was a clear shot across the bow against their practices regarding homosexual and transgender employees.

---

[22] The EEOC further posits that *Harris* should not even be considered because the funeral home did not articulate its religious-liberty concerns immediately after the enforcement action was initiated. We can accept this as true and still acknowledge that *Harris* shows that the EEOC will litigate enforcement actions pertaining to Title VII and RFRA.

[23] A case in the Tenth Circuit was decided on similar grounds. *303 Creative LLC v. Elenis*, 6 F.4th 1160 (10th Cir. 2021), *cert. granted in part*, 142 S. Ct. 1106 (2022). The plaintiff (303 Creative) brought a pre-enforcement challenge against the Colorado Anti-Discrimination Act ("CADA") on free speech and free exercise grounds. *Id.* at 1168. 303 Creative alleged that it would refuse to make websites for same-sex marriages in violation of CADA. *Id.* at 1168–70. The Tenth Circuit found that the plaintiff showed a credible threat of enforcement based on this averred refusal. The first factor was that the refusal exposed 303 Creative to CADA liability. The second factor was Colorado's history of CADA enforcement, as displayed in *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018). *Id.* at 1172–74.

As a point of emphasis here, 303 Creative was able to establish standing and a credible threat of enforcement despite not even presently offering wedding websites: It only averred that it intended to do so in the future. *Id.* at 1172. In contrast, Bear Creek and Braidwood are longstanding employers currently subject to Title VII.

Although the case is currently before the Supreme Court, the standing analysis is not the question presented for review. *See 303 Creative LLC v. Elenis*, 142 S. Ct. 1106 (2022) (granting certiorari on "[w]hether applying a public-accommodation law to compel an artist to speak or stay silent violates the Free Speech Clause of the First Amendment.").

No. 22-10145

The EEOC claims that all *Harris* establishes is that "RFRA defenses to Title VII enforcement can present difficult, fact-intensive questions that cannot be categorically resolved ahead of time in the abstract. The only thing that can be said with certainty at this time is that RFRA may provide a defense to a Title VII enforcement action and that [the] EEOC should take RFRA's requirements seriously."

That claim is coy at best and tenuous, especially after the EEOC acknowledges how favorable *Harris* was to it.[24] Plaintiffs are reasonably worried about the implications of that case on their practices. They are entitled to receive clarification from this court before stifling their constitutional practices or otherwise exposing themselves to punishment or enforcement action. That is a core purpose of a declaratory judgment.

What is more, Congress did not explicitly give the EEOC substantive rulemaking authority.[25] That fact makes us even charier of granting the EEOC a blank check to issue guidance backed by the threat of an enforcement action without allowing employers to protect their own rights in response.

Nor is this court required to plug its ears and ignore *Bostock*'s siren call,[26] indicating the issues presented by this case require attention and have a chilling effect on employers whose religious exercises, until resolved, con-

---

[24] In its briefing, the EEOC states that "[t]he Sixth Circuit unanimously held that the employer's RFRA defense [in *Harris*] failed at three critical steps—substantial burden, compelling interest, and narrow tailoring."

[25] *See Griggs v. Duke Power Co.*, 401 U.S. 424, 433–34 (1971); *see also Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 140–41 (1976) *superseded by statute on other grounds*, Pregnancy Discrimination Act, Pub. L. No. 95–555, 92 Stat. 2076, 42 U.S.C. § 2000e(k) (1981) ("Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations pursuant to that Title.").

[26] *See, e.g.*, *Bostock*, 140 S. Ct. at 1754 ("[H]ow . . . doctrines protecting religious liberty interact with Title VII are questions for future cases . . . .").

No. 22-10145

flict with Title VII.  Without resolution, potential penalties hang over plaintiffs' heads like Damocles's sword.

The EEOC's attempts to distinguish plaintiffs' proffered cases are also not persuasive.  Most notably, the EEOC goes through the many points made by the Supreme Court in finding standing in *Susan B. Anthony*.  There, the state commission already had found against the Susan B. Anthony List in a probable-cause hearing, 573 U.S. at 162, and the organization brought a facial, pre-enforcement challenge only after the complaint against it had been withdrawn, *see id.* at 154–55; 164.  Moreover, the commission litigated 20 to 80 of those cases yearly.  *Id.* at 164.  All of those factors indicated that the threat of future enforcement was sufficient to justify the pre-enforcement challenge.  *Id.* at 164–65.  The EEOC posits that such a cavalcade is required to bring an action.

But that is not accurate.  In reality, *Susan B. Anthony* treated the threat of future enforcement as case- and fact-specific, understanding that evaluating threats against our most cherished rights cannot be neatly reduced to a rigid formula.  *See id.* at 161–66.  Different factors are weighed accordingly per the case-specific facts.  As the Eighth Circuit has noted, even a "public[] announce[ment]" to enforce a statute and one prior proceeding are sufficient for standing.  *See Lucero*, 936 F.3d at 749–50.  Through *Harris* and the credible threat of enforcement, plaintiffs have shown that that standard is met for the specific claims Braidwood and Bear Creek bring.

The EEOC also makes much of the distinction between an as-applied challenge (as brought here) and a facial challenge.  The agency accurately notes that most of plaintiffs' best cases about standing involve facial challenges, not the as-applied challenge that plaintiffs bring now.  Nevertheless, the EEOC makes too much of this distinction, which is largely without difference here.

No. 22-10145

The rule, as the EEOC notes, is that for an as-applied challenge, "[t]here must be some evidence that [a] rule would be applied to the plaintiff in order for that plaintiff to bring an as-applied challenge." *Fenves*, 979 F.3d at 335 (quoting *Schlissel*, 939 F.3d at 766) (alterations in original). But the EEOC has not explained how, in practice, that requirement is any more onerous than is the credible-threat analysis.

That is because our caselaw indicates that "adjudicating whether federal law would allow an enforcement action" might require courts to adjudicate "'hypothetical situations.'" *Hood*, 822 F.3d at 227 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382 (1992)). Whereas facial challenges can result in broad statements about the constitutionality of laws, as-applied challenges in a pre-enforcement posture, if applied inappositely, likely create a patchwork of exceptions and poorly reasoned legal standards covering a "fuzzily defined range of enforcement actions that do not appear imminent." *Id.*

The main problem with the EEOC's hanging its hat on that argument is that the agency refuses to provide a single additional fact that would be required to adjudicate the present action. For example, the EEOC points to *Hood* to support the contention that plaintiffs' case requires hypothetical and speculative facts to determine the legal claims before us. Yet *Hood* involved Google's asking for a declaratory judgment stating that Mississippi's attorney general could not enforce an administrative subpoena against it and prosecute it for publishing certain information that Mississippi considered dangerous and criminal. *Id.* at 216.

In *Hood*, our court held that allowing a preliminary injunction and declaratory relief was too speculative because, to rule on the matter properly, any decision would be overly reliant on information not before the court. *Id.* at 227. The court did not know what published information the attorney gen-

20

No. 22-10145

eral might one day try to prosecute under state law. *Id.* at 227–28. Moreover, the administrative subpoena was "a 'pre-litigation investigative tool' seeking information on a broad variety of subject matters—ranging from alleged facilitation of copyright infringement, illegal prescription drug sales, human trafficking, the sale of false identification documents, and credit card data theft." *Id.*

As a result, the court contrasted the hazy application of the law in *Hood* with the concrete application in *Steffel*, 415 U.S. at 455, in which police had told the plaintiff he would be prosecuted if he distributed handbills at a specific shopping center. In *Hood*, by contrast, the action was too hypothetical for adjudication.

The fact pattern here more clearly resembles *Steffel* than *Hood*. We know what the EEOC says violates its guidance and the law; we know what Braidwood's exact policies are; and we have admissions from the EEOC that Braidwood's current practices violate Title VII. Per *Harris*, we have evidence that the EEOC has brought an enforcement action against a similar violator. No party contests the facts or requests additional information to be presented to the court. There is remarkably little else needed to adjudicate the issue.[27]

The EEOC brings up two additional cases, attempting to demonstrate the inappropriateness of adjudicating the merits in a pre-enforcement con-

---

[27] Although standing doctrine is, in many ways, intended to avoid judicial resolution of cases in which prosecutorial discretion is an alternate solution, the credible-threat analysis here indicates that plaintiffs have overcome that barrier. Not every case in which a governmental authority has so far chosen not to prosecute can overcome the standing barrier. But here, there are sufficiently concrete facts, clear harms hanging over plaintiffs' heads, and a prior prosecution with an almost identical set of facts. There is harm in being "force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998).

No. 22-10145

text. It argues that we should, instead, require the plaintiffs to raise any RFRA or constitutional claim as a defense. The first, *Whole Women's Health v. Jackson*, 142 S. Ct. 522, 529–31 (2021), involved a novel Texas statute designed explicitly so that state officials had no part in enforcing the statute. Regardless of the merits of such jurisdictional legerdemain, the Court rejected various pre-enforcement challenges because there was no proper party for the Court to enjoin. Similarly so in the second case the EEOC relies on, *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336 (5th Cir. 2022) (per curiam), *preliminary injunction partially stayed sub nom. Austin v. U.S. Navy Seals 1-26*, 142 S. Ct. 1301 (2002) (mem.). That case dealt with complicated questions of military judgment and national security. 142 S. Ct. at 1302 (Kavanaugh, J., concurring).

None of those complications is present here. Instead, we can see the potential harms, adjudicate on the facts presented, and grant any appropriate concrete relief. Although, in the employment context, RFRA-based defenses have often been raised after the challenged governmental activity has occurred, that does not mean they must always be. Accordingly, for the above reasons, these plaintiffs have demonstrated Article III standing.

## B.

After standing comes ripeness. Unsurprisingly, there is a fair amount of overlap between Article III standing requirements and the ripeness analysis. *See Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007). Regardless, it is unnecessary to delve deeply into the prudential roots of the ripeness doctrine or into whether the analysis is required, if Article III standing exists separately, because plaintiffs' claims are ripe in any event.[28]

---

[28] It remains unclear whether we can reject a claim as unripe once plaintiffs have established Article III standing. The Court last addressed the issue in *Susan B. Anthony*, doing so only after reviewing the bread and butter of Article III standing. The Court

No. 22-10145

Per *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), a court must look at two factors to determine ripeness: (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." Additionally, the ripeness doctrine exists in some tension with the concept of a declaratory judgment.[29] So, when a plaintiff asks for declaratory relief, the court must assess whether an actual or immediate controversy exists between the parties or whether, instead, the controversy remains abstract and hypothetical.[30]

We address each required prong separately. First, a claim is "fit for judicial decision" if it presents a pure question of law that needs no further factual development. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586–87 (5th Cir. 1987). So, if a claim is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," the claim is not ripe. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985) (quotation omitted). We adjudicate the prong on a case-by-case basis. *Orix*, 212 F.3d at 896.

The EEOC avers that this matter is not fit for consideration: It posits that the court should wait to evaluate the issues at play because

> whether any particular application of Title VII will run afoul of RFRA or the Free Exercise Clause will depend on the precise employment practices applied to particular individual employ-

---

questioned the "continuing vitality of the prudential ripeness doctrine" but did not deliver any answers. 573 U.S. at 167.

[29] *See Orix Credit All., Inc., v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000) ("[D]eclaratory actions contemplate an ex ante determination of rights that exists in some tension with traditional notions of ripeness" (cleaned up)).

[30] *See Choice Inc. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012); *Orix*, 212 F.3d at 896; *Middle S. Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir. 1986).

> ees at issue in a given case. . . . [U]ntil [plaintiffs'] policies and preferences crystalize into particular employment decisions that violate Title VII, there is no way of assessing whether enforcing Title VII *as to that decision* will impose a substantial burden on Braidwood, or whether the government has a compelling interest in enforcing Title VII in that particular context.

Although Title VII discrimination claims require a fact-specific inquiry, the inquiry takes vastly differing forms in practice. Here, in the declaratory judgment posture, the court has sufficient facts to determine whether Braidwood's and Bear Creek's blanket policies entitle them to declaratory relief. After all, the EEOC has already admitted that the specific policies violate its guidance; it has brought a successful suit against another violator for the same policies.

The EEOC's near talismanic mantra that "further factual development" would "significantly advance" this court's ability to resolve plaintiffs' claims would be more compelling if the EEOC gave an example of factual development that would be helpful to the court. Yet nowhere in its briefs does the EEOC give specifics, and for good reason—no more factual detail is required to resolve the claims that Braidwood and Bear Creek present in this posture. Plaintiffs seek declaratory relief, and no further factual investigation is required to determine whether, for example, RFRA supersedes Title VII's requirements as applied to their specific employment policies.

The EEOC additionally alleges that any injury is abstract and hypothetical, as no individual nor the EEOC has brought an action against Braidwood or Bear Creek. For the reasons listed above, that is not dispositive—the EEOC's reading of a credible threat of enforcement is much too narrow.

Second, the hardship prong. No party disputes that under current EEOC guidance, neither Braidwood nor Bear Creek can fire any employee

No. 22-10145

for nonconformance with the employer's challenged religious beliefs.[31]  The EEOC avers that this does not matter because neither plaintiff has asserted that it has undertaken any violative action toward a specific individual.  Thus, there is no harm, as any violation remains speculative.

That reading of the prong is too restrictive, though, and the correct analysis principally tracks the Article III injury analysis above.  The *in terrorem* effects from the EEOC's guidance and a credible prosecution risk are sufficient.[32]  Denying prompt judicial review, again, forces plaintiffs to risk practicing their religious beliefs and maintaining the freedom to fire or choose not to hire those out of compliance with their beliefs—thereby putting themselves in danger of a costly enforcement action.

"One does not have to await the consummation of threatened injury to obtain preventive relief.  If the injury is certainly impending, that is enough." *Union Carbide*, 473 U.S. at 581 (quoting *Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 143 (1974)).  Litigants are entitled to relief where they "'remain under a constant threat' that government officials will use their power" to enforce the law against them.[33]  Therefore, plaintiffs' claims are ripe.

---

[31] Aside from the ministerial exception, which would not apply to Braidwood nor to non-ministerial employees for Bear Creek.  *See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060–61 (2020).

[32] We do not opine on whether *in terrorem* effects would be sufficient without a credible risk of prosecution, but merely that both are present and sufficient here.

[33] *See Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (per curiam) (quoting *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020)).  The Fifth Circuit has reviewed a similar ripeness issue.  *See E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015), *vacated and remanded sub nom. Zubik v. Burwell*, 578 U.S. 403 (2016), *and cert. granted, judgment vacated sub nom. Univ. of Dall. v. Burwell*, 578 U.S. 969 (2016).  In that case, we held that a claim by plaintiffs challenging a healthcare regulation that they asserted might allow healthcare providers to force them to pay for contraceptives was not ripe because there was no evidence that any third-party administrator had asked the plaintiffs to pay for contraceptives.  And if that did occur, plaintiffs could sue before paying anything, so there

No. 22-10145

## C.

Finally, the EEOC asserts that plaintiffs' claims addressing the scope of Title VII (claims 4 and 5), should fail because they have no cause of action. The EEOC is mistaken.

The EEOC correctly states Title VII "confers no right of action against the [EEOC]." *Gibson v. Mo. Pac. R.R.*, 579 F.2d 890, 891 (5th Cir. 1978) (per curiam). Nor does the Declaratory Judgment Act provide an independent cause of action. *See, e.g.*, *In re B-727 Aircraft Serial No. 21010*, 272 F.3d 264, 270 (5th Cir. 2001).

Still, plaintiffs can bring the underlying claims. The Declaratory Judgment Act is remedial. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). If plaintiffs have a "case or controversy" within the jurisdiction of the court, then the remedy the Act provides is available. 28 U.S.C. § 2201.

To be clear, the Act cannot create a cause of action where there is no risk of the future lawsuit from which the plaintiffs seek prospective relief, as there is no case or controversy. But so long as the defendant in a declaratory judgment suit can sue the plaintiff for an action the defendant is responsible

---

would be no harm. *Id.* at 463.

The main differences here are that (1) there has been prior enforcement, and plaintiffs have hired at least one religiously non-conforming employee in the past, whom they would now be prevented from acting against without running the risk of an enforcement action; and (2) plaintiffs do not have the option of "do[ing] nothing," *id.*, without violating their closely held religious beliefs. No retrospective damages are available after forcing plaintiffs to endorse non-conforming religious behavior for any period. *See Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *16 (5th Cir. Feb. 17, 2022) (Smith, J., dissenting) ("[C]onstitutional violations inflict irreparable harm . . . . '[D]ollars and cents' cannot capture the damage that the government inflicts when it deprives rights that it exists to defend." (second alteration in original) (citation omitted) (quoting *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021))).

No. 22-10145

for (within the scope of the proposed cause of action), the independent cause of action required for a declaratory judgment claim exists.[34]

It is without question that the EEOC is within its power to bring an enforcement action under Title VII against both Braidwood and Bear Creek for violations of the claims on which plaintiffs here seek prospective relief. Again, the Declaratory Judgment Act's purpose is to allow "parties, threatened with liability, but otherwise without a satisfactory remedy, an early adjudication of an actual controversy." *HAVEN*, 915 F.2d at 170 (citation omitted).

"Since it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action." *Id.* at 171. We ask "whether 'a coercive action' brought by 'the declaratory judgment defendant' . . . 'would necessarily present a federal question.'"[35] Those requirements are satisfied here: Plaintiffs have a proper cause of action for their scope-of-Title-VII claims.

## IV.

Next, class certification. Although the district court has wide discretion when defining and modifying classes, the class definitions it provided are too broad and ill-defined to reach the thresholds of class certification. Thus, we reverse the class certifications and proceed to the merits on only

---

[34] *See Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods, (HAVEN)*, 915 F.2d 167, 170–71 (5th Cir. 1990); see also *Lowe v. Ingalls Shipbuilding*, 723 F.2d 1173, 1179 (5th Cir. 1984).

[35] *Medtronic Inc. v. Mirowski Fam. Ventures*, LLC, 571 U.S. 191, 197 (2014) (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 19 (1983)).

No. 22-10145

Braidwood's individual claims.

A party seeking class certification must meet, for each defined class, the requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). Additionally, plaintiffs must show that their proposed classes "satisfy at least one of the three requirements listed in Rule 23(b)." *Id.* at 345. Plaintiffs sought certification under Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The Fifth Circuit has also articulated an "ascertainability" requirement for Rule 23 class actions.[36]

District courts have significant leeway and discretion over the man-

---

[36] *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23."). "[T]o maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam). Courts traditionally refuse to certify classes that are "amorphous" or "imprecise." *John*, 501 F.3d at 445 & n.3.

The district court questioned whether ascertainability is applicable in the Rule 23(b)(2) context. Although the court eventually held that it did not matter because the classes it defined were ascertainable, it seemed to imply that the Fifth Circuit had not taken a position.

That contention is questionable. Per our rule of orderliness, "one panel of our court may not overturn another panel's decision," absent intervening factors. *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008). In *DeBremaecker*, 433 F.2d at 734, our circuit required ascertainability in a Rule 23(b)(2) class action, holding that defining a class as members involved in a "peace movement" was too ill-defined to be an "adequately defined and clearly ascertainable" class. We are aware of no changes in our caselaw casting doubt on *DeBremaecker* nor any caselaw indicating that our circuit should no longer follow its holding for Rule 23(b)(2) class actions.

No. 22-10145

agement of class actions. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998). They may modify the classes to fit the requirements better and should not dismiss an action purely because the proposed class definition is too broad.[37]

Plaintiffs sought to certify two classes: (1) a class of "[e]very employer in the United States that opposes homosexual or transgender behavior for religious or nonreligious reasons" and (2) a class of "[e]very employer in the United States that opposes homosexual or transgender behavior for sincere religious reasons." The court accepted the first class without modification but changed the second to a "Religious Business-Type Employer Class."[38]

The district court attempted to address ascertainability by stating that "[t]he class is no less ascertainable because of the existence of employers who oppose homosexual or transgender behavior but, nevertheless, either (1) do not have occasion to take adverse employment action against a person who exhibits homosexual or transgender behavior or (2) choose to not take ad-

---

[37] *See In re Monumental Life Ins.*, 365 F.3d 408, 414 & n.7 (5th Cir. 2004) (citations omitted). Instead, the court should "look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Yates v. Collier*, 868 F.3d 354, 362 (5th Cir. 2017) (quoting *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012)).

[38] The religious business-type employer class consisted of "for-profit entities producing a secular product. While faith may be a motivating part of the businesses' missions, their incorporating documents generally do not include a religious purpose. For an employer like Braidwood, religion plays an important role, but is not the sole mission of the organization." That class definition does not mention any opposition to "homosexual or transgender behavior."

The limiting factors included in the class definition appear to be derived from the *LeBoon* factors. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007) (adopting a nine-factor test to determine whether an employer is a religious organization). The limited class definition also removed the claims of Bear Creek, which the court separated into a church-type employer subclass, which we discuss separately.

verse employment action against a person regardless of their [*sic*] homosexual or transgender behavior." The court then combined the commonality and typicality analysis.

The court stated the legal standard for commonality and addressed the merits of the certified classes in the typicality section.[39] The court noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)). Accordingly, the court's analysis of the suitability of class certification is scattered. Still, it generally depends on the concept that there is no need for an individualized assessment of the claims of members of each certified class. That is in part because "[t]he sincerity inquiry under RFRA is generally not an exacting one," and "fact-specific inquiries regarding the sincerity of belief do not prevent certification of the Religious Business-Type Employers class."

Moreover, the court opined that the ascertainability of the class members needs to be apparent only "at some stage of the proceeding," and class members need not be ascertainable at this stage.[40] For the all-opposing employer class, which was certified only for the sex-neutral-codes-of-conduct claims, the common question was whether "the proper reading of *Bostock* prohibits them from maintaining sex-neutral standards of conduct for their business."

As the EEOC notes, those overbroad classes present difficulties. First, the class definitions are based on the class members' state of mind.

_____

[39] The court stated, "The bottom-line question under commonality and typicality is whether the relief the named plaintiffs seek from the Court will resolve all class members' legal claims." *See Vita Nuova, Inc. v. Azar*, No. 4:19-cv-532, 2020 WL 8271942, at *8 (N.D. Tex. Dec 2, 2020).

[40] *See Seeligson v. Devon Energy Prod. Co.*, 761 F. App'x 329, 334 (5th Cir. 2019) (quoting *Frey v. First Nat'l Bank Sw.*, 602 F. App'x 164, 168 (5th Cir. 2015)).

No. 22-10145

"[C]ourts avoid certifying classes where the class definition depends on the class members' state of mind [because] this state is generally a subjective factor."[41] Furthermore, the classes are impermissibly vague in practice: The court cannot determine the specifics of the homosexual or transgender behavior that a general class member would object to or how they would enforce that objection.[42]

Plaintiffs have standing only because of the specific injuries they alleged and the credible fear they proved.[43] The district court has not adequately assessed those findings on a class-wide basis. For example, the court received a specific list of behaviors that Braidwood opposed and clarification as to the details of its opposition.[44] Regarding the specific sex-neutral codes of conduct, we cannot determine whether the employers' codes of conduct are similar enough in practice to Braidwood's that their lawfulness can be resolved "in one stroke." *Wal-Mart*, 564 U.S. at 350.

The religious-business-type employers class is also impermissibly vague and imprecise. First, the court asks us to make subjective distinctions to determine whether "religion plays an important role" in an organization. This determination can be made only on a case-by-case basis and not at this

---

[41] William B. Rubenstein, 1 Newberg and Rubenstein on Class Actions § 3:5 (5th ed. 2021).

[42] It is entirely plausible, for example, that an employer would object to homosexual conduct but have no policy of taking adverse action against the offending employee.

[43] *See, e.g.*, *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 271 (5th Cir. 2018) (upholding a class certification where the plaintiffs had established "a substantial risk of serious harm on a class-wide basis," but decertifying another where the plaintiffs had not established "class-wide constitutional harm.").

[44] One example was the certification that Braidwood opposes homosexual conduct, not the identity itself. For example, "Braidwood is 'unwilling to employ individuals whose *lifestyles* flout Christian Biblical teachings.'" (emphasis added).

No. 22-10145

level of abstraction at the class-certification stage.[45]   Second, the court ignores the requirement of having common questions of law and fact for the RFRA claims; instead, the court merely states that sincerity does not require an exacting review.  But the fact that a review of religious sincerity may not be demanding does not mean it is a non-existent requirement or non-essential for Rule 23 purposes.

Commonality is satisfied only if the class members' claims depend upon "a common contention" such that the "determination of its truth or falsity will resolve an issue . . . central to the validity of each one of the claims in one stroke."[46]  Without these guidelines, the doors to class action lawsuits would be thrown open too wide, especially in the Rule 23(b)(2) context. Accordingly, we police the definitions of class actions; otherwise, it would be impossible for future parties and courts to determine the scope and preclusive effect of any judgment.

Under the facts presented, we cannot determine a more appropriate, limited class definition for any of the classes presented here.  Accordingly, we reverse the certification of the classes.  As both Braidwood and Bear Creek have standing and bring individual claims, we proceed to the merits of their respective motions for summary judgment for their individual claims.[47]

---

[45] For example, the *LeBoon* test has nine factors, all of which can be weighted differently depending on a fact-specific inquiry.  *See infra* note 48.

[46] *Walmart*, 564 U.S. at 350.  The district court understood this requirement when it noted that "[u]sing such a broad definition could defeat commonality and render the class imprecise" when denying portions of plaintiffs' Motion to Amend/Correct Class-Certification.

[47] Because, *infra*, we affirm the district court's finding that Title VII does not burden Bear Creek, in practice only Braidwood's claims are affected.

No. 22-10145

## V.

The district court modified plaintiffs' proposed classes to move the claims of Bear Creek and all others similarly situated into a proposed "church-type employer" class. The court noted that such employers "tend to explicitly state a religious purpose in their organizational documents and carry out their mission through instruction, prayer, and worship."

The court refused certification to this proposed "church-type employer" class because it found its members qualify as religious organizations for purposes of the express statutory religious exemption to Title VII.[48]

---

[48] The religious exemption to Title VII, 42 U.S.C. § 2000e-1(a), states,

This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

The Fifth Circuit has not defined what entities the religious exemption applies to, but other courts, and the EEOC itself, rely on weighing the *LeBoon* factors:

(1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution, and (9) whether its membership is made up by coreligionists.

503 F.3d at 226 (collecting cases). No one factor is dispositive.

No party seriously contests that, under this test, Bear Creek is a religious employer and Braidwood is not. Plaintiffs did ask the district court to consider shifting to a different standard based on a plain-text reading of the religious exemption. That new standard may

No. 22-10145

As a result, they were not subject to Title VII and, therefore, could not be burdened by it. No party appeals this ruling on the merits,[49] so we pretermit discussion of it.

Still, plaintiffs request that we find that the district court erred in granting judgment against Bear Creek. Plaintiffs' arguments primarily revolve around semantics, and they cite no relevant cases indicating that the court abused its discretion in declining the original motion to amend the final judgment. Accordingly, we affirm the decisions here.

## VI.

On the merits, and as we explain, we decide that RFRA requires that Braidwood, on an individual level, be exempted from Title VII because compliance with Title VII post-*Bostock* would substantially burden its ability to operate per its religious beliefs about homosexual and transgender conduct. Moreover, the EEOC wholly fails to carry its burden to show that it has a compelling interest in refusing Braidwood an exemption, even post-*Bostock*.[50]

In *Bostock*, 140 S. Ct. at 1754, the Supreme Court noted that the free exercise of religion "lies at the heart of our pluralistic society." Nowhere was that commitment made more evident than with the passage of RFRA, which "was designed to provide very broad protection for religious liberty." *Hobby Lobby*, 573 U.S. at 706. RFRA states that the federal government

———————————

include Braidwood. Still, that issue is not advanced by any party on appeal, and we do not need to consider it or endorse the *LeBoon* test at the moment.

[49] The EEOC does not mention any disagreement with the district court's assertions about the scope of the religious exemption. In its response brief, the EEOC states that it believes the district court's reasoning is incorrect, but "because the district court relied on that analysis to grant summary judgment in the government's favor, the government does not challenge that erroneous analysis on appeal."

[50] The statutory exemption from Title VII applies only to policies pertaining to homosexual and transgender behavior.

No. 22-10145

"shall not substantially burden a person's exercise of religion" unless the burden furthers a "compelling governmental interest" and is "the least restrictive means of furthering" that interest. 42 U.S.C. § 2000bb-1(a)–(b). Additionally, the government "must accept the sincerely held . . . objections of religious entities." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020).[51]

Because sincerity is not at issue,[52] Braidwood must show that applying Title VII substantially burdens its ability to practice its religious faith. Braidwood maintains that it has sincere and deeply held religious beliefs that heterosexual marriage is the only form of marriage sanctioned by God, pre-marital sex is wrong, and "men and women are to dress and behave in accordance with distinct and God-ordained, biological sexual identity."[53]

To that end, the EEOC guidance almost assuredly burdens the exercise of Braidwood's religious practice. For example, "a law that operates so as to make the practice of . . . religious beliefs more expensive in the context of business activities imposes a burden on the exercise of religion." *Hobby Lobby*, 573 U.S. at 710 (cleaned up). As the district court succinctly put it, "[E]mployers are required to choose between two untenable alternatives:

---

[51] The religious are entitled to substantial deference when claiming obstruction of their religious exercise. Justice Alito went even further in his concurrence, indicating that the contraceptive exemptions granted by the Trump administration in *Little Sisters* were not only permitted, but required, under RFRA. *Id.* at 2387–96 (Alito, J., joined by Gorsuch, J., concurring).

[52] Sincerity *may* be an issue in some instances, but here the EEOC does not pursue the argument. *See United States v. Quaintance*, 608 F.3d 717, 718–19, 722 (10th Cir. 2010).

[53] Moreover, plaintiffs assert they are "called by God to obey the civil authorities." Unlike the pastor of Bear Creek, Hotze never makes this declaration for Braidwood explicitly. Regardless of whether Braidwood believes it has moral authority to follow the EEOC's orders, though, under EEOC guidance, Braidwood is still prevented from operating its business in a manner that accommodates its religious beliefs.

either (1) violate Title VII and obey their convictions or (2) obey Title VII and violate their convictions."[54]  We see no reason why that formulation is incorrect.  Being forced to employ someone to represent the company who behaves in a manner directly violative of the company's convictions is a substantial burden and inhibits the practice of Braidwood's beliefs.[55]

The EEOC's opposing arguments are uncompelling.  Most of them involve discussing the inapplicability of deciding RFRA claims class-wide. We agree with the broad contours of that proposition.  Still, the EEOC has presented no evidence indicating Braidwood's individual compliance with EEOC guidance is not a substantial burden on its religious practice.  Instead, the agency primarily cites *East Texas Baptist*, 793 F.3d at 459, for the notion that a party seeking to take advantage of the shield of RFRA must first identify "acts [it is] required to perform" that run contrary to its religious beliefs.  The EEOC's notion is not tenable.

As stated,[56] the plaintiffs in *East Texas Baptist* did not have a ripe case because they had not presented evidence that they were required to pay third-party administrators for contraceptive services, and they could easily sue for injunctive relief before paying.  *Id.* at 463.  The same is not true of Braidwood.

Per EEOC guidance, Braidwood, to comply, must violate its beliefs: No money needs to exchange hands; instead, Braidwood's employment

---

[54] *See also Holt v. Hobbs*, 574 U.S. 352, 360–62 (2015) (holding that a policy forcing a religious prisoner to shave his beard was a substantial burden because the prison's grooming policy put him to the choice of either shaving his beard in contravention of his religious beliefs or face disciplinary action.)

[55] Again, no party questions the sincerity of Braidwood's beliefs.  Braidwood has made it clear that even employing persons that engage in objectionable private conduct would "lend approval . . . [and] make [Braidwood] complicit in sin."

[56] *See supra* note 33.

No. 22-10145

policies must broadly change, and it must tacitly endorse homosexual and transgender behavior. The EEOC's euphemistic phrasing that "the only action that Braidwood is required to take under Title VII is to refrain from taking adverse employment actions" is tantamount to saying the only action Braidwood needs to take is to comply wholeheartedly with the guidance it sees as sinful.[57] That is precisely what RFRA is designed to prevent.

------

[57] The EEOC contends that the Sixth Circuit rejected the argument that employing individuals who engage in conduct prohibited by their employer's religion automatically substantially burdens the employer's religious practice. *See Harris*, 884 F.3d at 588. The EEOC's comparison is inapt. First, the Sixth Circuit addressed the RFRA defense in the specific context of a dress code that strongly implicated sex stereotypes. *Id.* at 567, 571. The EEOC's guidance post-*Bostock* implicates far more than dress codes, and Braidwood has properly established those burdens on its religious practices. *Harris* is also not binding on this court, nor did the Supreme Court address the RFRA-based defense.

The providence of the Sixth Circuit's decision is also questionable. It relied heavily on *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 65 (2006). *Harris*, 884 F.3d at 589. That reliance appears erroneous. The Sixth Circuit essentially applied a First Amendment associational analysis to a RFRA defense. The court decided that "as a matter of law, bare compliance with Title VII—without actually assisting or facilitating [the employee's] transition efforts—does not amount to an endorsement of [the employee's] views." *Harris*, 884 F.3d at 589. But that begs the question.

And the *Rumsfeld* issue of outside speakers' recruiting for the military at a college is nothing like a religious business's being forced to employ someone it views as engaging in sinful behavior. A law student can easily distinguish between the messages military recruiters bring and the beliefs of the law school itself. The recruiter is not a school employee, but a government representative. The same is not true of a customer at a Braidwood business, who can rationally believe that if a cross-dressing employee served her, Braidwood, despite professions of Christian belief, endorses that conduct.

Nor is the question in RFRA cases limited to third parties' subjective beliefs about what any business may endorse. Instead, "the question that RFRA presents . . . [is] whether the [government] mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with *their religious beliefs*." *Hobby Lobby*, 573 U.S. at 724. Braidwood claims that paying money to an employee—even one who conducts transgressive conduct off-premises and outside work hours—is itself impermissible because lending support of any kind, including monetary compensation to employees, is forbidden by its faith. Braidwood views employing those individuals as a tacit endorsement. To be protected from Title VII's mandates, Braidwood must show that such tacit endorse-

No. 22-10145

Now the compelling-interest prong. After Braidwood demonstrates a substantial burden on its religious liberty, the EEOC must establish that its interpretation of Title VII advances a "compelling government interest" and that its interpretation is the "least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). That is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The EEOC fails to meet that burden.

In the district court, the EEOC asserted that "it is beyond dispute that the government has a compelling interest in eradicating workplace discrimination," and RFRA does not "protect[] . . . discrimination in hiring . . . cloaked as religious practice." Using *Hobby Lobby*'s statement that the government "has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race," 573 U.S. at 733, the EEOC then states that sex should be treated the same in all cases, citing the plurality opinion in *Price Waterhouse v. Hopkins*. *See* 490 U.S. 228, 243 n.9 (1989) (plurality opinion).

Although the Supreme Court may some day determine that preventing commercial businesses from discriminating on factors specific to sexual orientation or gender identity is such a compelling government interest that it overrides religious liberty in all cases, it has never so far held that. And despite *Bostock*'s relying on *Hopkins* for a significant part of the ruling,[58] the Court expressly did not extend the holding that far; instead, it noted that RFRA "might supersede Title VII's commands in appropriate cases." 140 S. Ct. at 1754. That qualification would be a nullity if the government's

---

ment substantially burdens its ability to practice its religious faith. But just because that belief does not comply with Title VII as a matter of law does not mean that a RFRA defense must fail.

[58] *See Bostock*, 140 S. Ct. at 1741 (citing *Hopkins*, 490 U.S. at 239).

compelling interest in purportedly eradicating sex discrimination were a trump card against every RFRA claim.

Instead, in RFRA cases, the courts must "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1881 (2021) (alteration in original) (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)). Under RFRA, the government cannot rely on generalized interests but, instead, must demonstrate a compelling interest in applying its challenged rule to "the particular claimant whose sincere exercise of religion is being substantially burdened." *O Centro Espirita*, 546 U.S. at 430–31. Even if there is a compelling interest as a categorical matter, there may not be a compelling interest in prohibiting all instances of discrimination.

But we need not go so far, because the EEOC fails to carry its burden. It does not show a compelling interest in denying Braidwood, individually, an exemption. The agency does not even attempt to argue the point outside of gesturing to a generalized interest in prohibiting all forms of sex discrimination in every potential case. Moreover, even if we accepted the EEOC's formulation of its compelling interest, refusing to exempt Braidwood, and forcing it to hire and endorse the views of employees with opposing religious and moral views is not the least restrictive means of promoting that interest.[59] We affirm the summary judgment here.[60]

---

[59] An example of a less restrictive means of furthering the government's interest in preventing employment discrimination on the basis of sex under Title VII could involve the EEOC's propagating guidance that provides a framework for employers, like Braidwood, that oppose homosexual or transgender behavior on religious grounds, to obtain an exemption. The lack of any guidance or method of gaining an exemption gives rise to the inference that the EEOC "has no intention in granting an exception" regardless of an employer's religious exercise claim. *Fulton*, 141 S. Ct. at 1878.

[60] Because Braidwood succeeds in its RFRA claim, this court is not required to address the constitutional issues presented by its First Amendment claims. As the EEOC

No. 22-10145

## VII.

Finally, Braidwood asks this court to decide, post-*Bostock*, what policies are prohibited by Title VII. Specifically, Braidwood requests a declaratory judgment that Title VII, as interpreted in *Bostock*, permits employers to discriminate against bisexuals and to establish sex-neutral codes of conduct that may exclude practicing homosexuals and transgender persons.[61]

On these issues, class-wide, the district court concluded that Title VII does not permit the classes to discriminate against bisexuals, nor did the court allow the classes to prohibit employees from taking hormone therapy or undergoing sex-reassignment surgery. On the other hand, the court held that the classes may "enforce a sexual ethic that applies evenly to heterosexual and homosexual sexual activity" and that Title VII, post-*Bostock*, does not prohibit employers from enforcing sex-specific dress code policies or sex-segregated bathroom policies.

Although plaintiffs have a valid cause of action, we decline to answer these open questions for Braidwood's policies because the class certifications have been reversed. Braidwood already has obtained statutory relief and does not represent a class requiring relief. On that ground, we vacate the judgments for all of the scope-of-Title-VII claims post-*Bostock*.

\* \* \* \* \*

---

and the district court noted, the canon of constitutional avoidance indicates that if relief on statutory grounds is possible, courts should avoid granting relief on constitutional grounds. *See Slack v. McDaniel*, 529 U.S. 473, 485 (2000) ("[The] 'Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.'" (quoting *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring))).

[61] Namely, employer policies addressing hormone treatment and genital/sex-reassignment surgery, sex-neutral codes of conduct over sexual activities, dress codes, and sex-segregated bathroom policies.

No. 22-10145

For the reasons stated, the district court's conclusion that plaintiffs' claims are justiciable is AFFIRMED. The class certifications are REVERSED. The judgment against Bear Creek is AFFIRMED. The ruling that Braidwood is statutorily entitled to a Title VII exemption is AFFIRMED. The judgment that Braidwood is constitutionally entitled to a Title VII exemption is VACATED. The judgment regarding the scope-of-Title-VII claims as a matter of law is VACATED.

This matter is REMANDED. We place no limitation on the matters that the district court may address on remand, and we give no indication of what decisions it should reach.